IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

LEROY DORSEY,

                          Plaintiff,          Civil Action No.
                                              9:09-CV-1011 (GLS/DEP)

          v.

DALE ARTUS, Superintendent,
Clinton Correctional Facility;
*et al.,*

                          Defendants.

_____

<u>APPEARANCES</u>:                          <u>OF COUNSEL</u>:

<u>FOR PLAINTIFF</u>:

LEROY DORSEY, *Pro Se*
97-A-3442
Elmira Correctional Facility
P.O. Box 500
Elmira, NY 14902

<u>FOR DEFENDANTS</u>:

HON. ERIC T. SCHNIEDERMAN          ADELE TAYLOR-SCOTT, ESQ.
New York State Attorney General    Assistant Attorney General
The Capitol
Albany, NY 12224-0341


DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT, RECOMMENDATION, AND ORDER

*Pro se* plaintiff Leroy Dorsey, a New York State prison inmate, has commenced this action pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights. Following an extensive procedural history, including dismissal of the action and a subsequent reversal by the United States Court of Appeals for the Second Circuit, the causes of action now before the court arise from two instances of alleged deliberate indifference to plaintiff's serious medical needs, in violation of the Eighth Amendment, asserted against six defendants who have yet to be identified and joined in the action.

Currently pending before the court in connection with the action are several motions. Plaintiff has moved for preliminary injunctive relief and the entry of summary judgment. Defendant Dale Artus, the Superintendent at Clinton Correctional Facility – who has been substituted in this action solely for the purpose of aiding plaintiff in identifying the Doe defendants – has cross-moved for summary judgment dismissing plaintiff's complaint based upon his failure to exhaust available administrative remedies before commencing suit. For the reasons set forth below, I recommend that (1) plaintiff's two pending requests for a

preliminary injunction be rejected, one as moot and the other as seeking

relief already denied by the court; (2) plaintiff's summary judgment motion

be denied as premature in light of the fact that the unidentified defendants

implicated in the remaining causes of action have not yet been identified

and served, nor had an opportunity to respond to plaintiff's motion; (3)

defendant's motion for summary judgment be granted based upon

plaintiff's failure to exhaust administrative remedies before commencing

suit; and (4) plaintiff's complaint be dismissed in its entirety.

I.      BACKGROUND

        Plaintiff is a prison inmate currently held in custody of the New York

State Department of Corrections and Community Supervision ("DOCCS")

at the Elmira Correctional Facility ("Elmira"), located in Elmira, New York.

Docket Entry Dated January 20, 2011.  At the time of the relevant events,

plaintiff was confined in the Clinton Correctional Facility ("Clinton"),

located in Dannemora, New York.  *See generally* First Amended

Complaint (Dkt. No. 17).[1]

---

        [1]      As will be explained more fully below in part II of this report, the
complaint dismissed by this court but partially restored by virtue of the Second Circuit's
decision was an amended complaint filed by the plaintiff on January 22, 2010 ("first
amended complaint").  Dkt. No. 17.  That complaint remains the operative pleading in
the case despite plaintiff's two subsequent attempts to file further amended
complaints.

Liberally construed, plaintiff's first amended complaint alleges that unidentified defendants "4 Young Officers" denied plaintiff access to breathing machine filters and accessories and interfered with his access to daily medications. First Amended Complaint (Dkt. No. 17) at 8. It is also alleged that, on July 13, 2009, after eating breakfast, his face and mouth swelled. *Id.* at 10. Plaintiff maintains that unidentified defendants "Medication Nurse" and "Escort [Corrections Officer]" refused him immediate medical attention for that condition. *Id.*

II.    PROCEDURAL HISTORY

Plaintiff commenced this action on September 8, 2009. Dkt. No. 1. Since its inception, the case has had a lengthy procedural history. Plaintiff has filed several motions seeking preliminary injunctive relief, all of which were denied principally upon the ground that they raise matters and seek relief unrelated to the causes of action asserted in his first amended complaint. *See*, *e.g.*, Dkt Nos. 5, 10, 15, 42, 43, 53, 57, 60, 61, 63, 78, 84. In addition, plaintiff has filed three separate amended complaints in the case, only one of which has been accepted for filing to date. Dkt. Nos. 17, 70, 81. More specifically, on August 1, 2012, without leave of court or defendants' written consent, plaintiff filed a second

4

amended complaint in the action. Dkt. No. 70. Plaintiff then filed a third

amended complaint on September 26, 2012, also without the consent of

the defendants or leave of the court. Dkt. No. 91. Those pleadings were

filed in violation of Rule 15 of the Federal Rules of Civil Procedure, which

requires that a party seeking to file an amended pleading either obtain

consent from the opposing party or leave from the court prior to filing.

Fed. R. Civ. P. 15(a)(2). Moreover, plaintiff's submissions violated Rule

7.1 of the local rules of practice for this court, which requires that a motion

for leave to file an amended pleading "must set forth specifically the

proposed amendments and identify the amendments in the proposed

pleading, either through the submission of a red-lined version of the

original pleading or other equivalent means." N.D.N.Y. L.R. 7.1(a)(4). For

these reasons, plaintiff's second and third amended complaints are not

accepted for filing, and are stricken from the record.[2] Accordingly, the

operative pleading at this juncture of the proceedings is plaintiff's first

amended complaint, Dkt. No. 17.

_____

[2] Although plaintiff was granted leave to file a second amended complaint
by Chief District Judge Gary L. Sharpe's decision order dated September 12, 2011,
Dkt. No. 43 at 3-4, plaintiff failed to timely file his second amended complaint.
Specifically, Judge Sharpe ordered that any second amended complaint must be filed
within thirty days of the date of that order. Because plaintiff did not file that pleading
until nearly a year later, it is untimely and will not be considered by the court.

On May 19, 2010, Judge Sharpe issued a decision and order dismissing the action; judgment was entered on that same day. Dkt. Nos. 25, 26. The Second Circuit Court of Appeals vacated that judgment on November 12, 2010, and the matter was remanded solely with respect to plaintiff's claims that

> (1) 'Medication Nurse' and 'Escort C.O.' were deliberately indifferent to [plaintiff's] serious medical needs, in violation of the Eighth Amendment; and (2) '4 Young Officers' were deliberately indifferent to [plaintiff's] serious medical needs and/or deliberately interfered with his medically prescribed treatment solely for the purpose of causing him unnecessary pain in violation of the Eighth Amendment[.]

Mandate (Dkt. No. 31) at 1-2.

Following the Second Circuit's Mandate, Judge Sharpe issued a decision and order, dated September 12, 2011, reiterating that the claims in the action are now limited to the deliberate medical indifference claims identified in the Second Circuit's decision, and emphasizing to plaintiff that he must identify the "Doe" defendants referenced in his complaint. Dkt. No. 43 at 3-4. A subsequent decision and order, dated January 23, 2012, directed that Clinton Superintendent Dale Artus be added as a defendant, not because any of plaintiff's claims were properly asserted against him, but instead solely to facilitate service and discovery in order to aid plaintiff

in identifying the Doe defendants.  Dkt. No. 49.

Currently pending before the court are four motions.  On September 20, 2012, the plaintiff submitted a document entitled "Affirmation of Services."  Dkt. No. 78.  That letter addresses both plaintiff's continuing efforts to ascertain the identities of the Doe defendants against whom his claims are asserted, and raises incidents alleged to have occurred at Clinton, including food poisoning, denial of treatment and medications, and a search of his cell, that are all unrelated to his surviving causes of action.  *Id.*  In that letter, plaintiff requested that he be returned to Elmira. *Id*.  Because of its nature and the relief requested, that letter has been construed by the court as a request for a preliminary injunction.

Plaintiff subsequently filed a preliminary injunction motion on October 4, 2012, requesting that the court direct officials at Elmira, where he is now confined, to afford him access to law books and legal materials. Dkt. No. 84.  On October 11, 2012, defendant Artus responded to plaintiff's motions for preliminary injunction and cross-moved for summary judgment dismissing plaintiff's first amended complaint.  Dkt. Nos. 86, 87. In his motion, defendant argues that plaintiff is not entitled to a preliminary injunction, and that this action is subject to dismissal based upon his

failure to exhaust the available administrative remedies before commencing suit.  *See generally* Def.'s Memo. of Law (Dkt. No. 86-3).

On October 25, 2012, plaintiff filed a document entitled "plaintiff's request for summary judgment."  Dkt. No. 93.  In that document, plaintiff asserts that defendants have "wasted this court[']s time" for three years and he is therefore entitled to the entry of summary judgment.  *Id*. at 3.

The pending motions, which are now fully briefed and ripe for determination, have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. §636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).  *See also* Fed.R.Civ.P. 72(b).

III.    DISCUSSION

A.    Plaintiff's Preliminary Injunction Motions

Plaintiff's two pending motions for a preliminary injunction are the latest in a series of such motions brought by the plaintiff in this action.  *See*, *e.g.*, Dkt. Nos. 5, 10, 42, 53, 60, and 61.  All of those motions have been denied.  Dkt. Nos. 15, 43, 57, and 63.  In the court's orders denying those earlier requests for injunctive relief, plaintiff was advised that such requests concerning matters unrelated to the allegations contained in his complaint cannot be granted in this action.  *See*, *e.g.*, Decision and Order

(Dkt. No. 43) at 7; Decision and Order (Dkt. No. 57) at 5.

In the first of the two motions for preliminary injunction now pending before the court, plaintiff requests a transfer from Clinton to Elmira. Dkt. No. 78. Because the court's records reveal that the plaintiff is currently confined in Elmira, I recommend that this motion be denied as moot. *See Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974) ("The rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed."); *Mason v. Coughlin*, No. 84-CV-7861, 1985 WL 298, at *1 (S.D.N.Y. Feb. 20, 1985) ("[T]he defendants assert that they have acceded to the plaintiff's reqeuest [sic], and have transferred him to another facility. In view of this it appears to the Court that plaintiff's motion for a preliminary injunction is now moot.").[3]

Plaintiff's second preliminary injunction application relates to access to the courts. Dkt. No. 84. That request for injunctive relief, like several others previously filed, concerns matters unrelated to the medical indifference claims that remain in dispute in this action. Accordingly, I recommend that plaintiff's second request for preliminary injunction also

---

[3]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

be denied.[4] *See McAllister v. Goord*, No. 06-CV-0442, 2009 WL 5216953, at *2 (N.D.N.Y. Dec. 30, 2009) (McAvoy, J.) ("In other words, the relief that a plaintiff seeks by way of injunction must relate to the allegations contained in the underlying complaint." (emphasis omitted) (citing *Allen v. Brown*, No. 96-CV-1599, 1998 WL 214418, at *2 (N.D.N.Y. Apr. 28, 1998) (Pooler, J., *adopting report and recommendation by* DiBianco, M.J.))).

B.    Legal Standard Governing Motions for Summary Judgment

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this

_____

[4]      Plaintiff also raised the issue of denial of access to the courts by letter dated February 23, 2011.  Dkt. No. 33.  Because that claim is unrelated to the claims asserted in this action, the court advised plaintiff to pursue his court-access concerns initially through the grievance process at Elmira, and, if necessary, through a separate legal action.  Text Order Dated Feb. 24, 2011.  Similarly, plaintiff complained of the conditions of confinement at Elmira in a letter dated June 14, 2011, Dkt. No. 40, and the court struck that letter because the matters raised were unrelated to the claims asserted in this action, Text Order Dated June 15, 2011.

inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v.*

*McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

      C.    <u>Plaintiff's Motion for Summary Judgment</u>

Plaintiff's summary judgment motion does not address the merits of his claims, but instead hinges upon the perceived failure of the Doe defendants to come forward and identify themselves to him through the course of pretrial discovery. Dkt. No. 93 at 2-3. The court has previously advised plaintiff that an alleged failure to provide discovery does not form a basis for the entry of summary judgment. Text Minute Entry Dated Aug. 1, 2012. In any event, the court has, on several prior occasions, addressed plaintiff's claims regarding discovery, and finds no basis to conclude that defendants have not fully complied with all court-issued discovery orders.

I note, moreover, that plaintiff's summary judgment motion is procedurally and legally deficient, as well as premature. On August 20, 2012, Dorsey submitted a motion for summary judgment. Dkt. No. 72. The court denied the motion without prejudice to plaintiff's right to renewal upon a proper showing, and in full compliance with the requirements of

Rule 7.1 of the local rules of practice for this court, which governs such motions.  Text Order Dated Aug. 31, 2012.  More specifically, Rule 7.1(a) requires that motions for summary judgment include a (1) memorandum of law, (2) at least one supporting affidavit, (3) proof of service, and (4) a statement of undisputed material facts.  N.D.N.Y. L.R. 7.1(a)(1) - (3). Because plaintiff's most recent attempt to move for summary judgment once again fails to comply with those requirements, his motion is subject to denial on this procedural basis.

The motion is also legally deficient, in that it fails to satisfy plaintiff's obligation to demonstrate the lack of any genuine dispute of material fact surrounding his claims.  *See Sec. Ins. Co. of Hartford*, 391 F.3d at 83 ("The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment.").  Additionally, plaintiff's motion is premature because the only defendant who has been named and appeared in the action is the superintendent at Clinton, and the court has made it clear to plaintiff that there is no evidence of defendant Artus' involvement, and therefore he bears no responsibility for the acts alleged in plaintiff's first amended complaint.  Decision and Order (Dkt. No. 49) at 6.  Instead, he was named as a defendant only as a matter of

convenience to permit Dorsey to engage in discovery to assist him in ascertaining the identity of the six defendants intended to be named.  *Id.* Because those defendants have not been identified, substituted as parties, and given the opportunity to respond to plaintiff's first amended complaint and summary judgment motion, plaintiff's motion is premature.

For all of the foregoing reasons, I recommend that plaintiff's motion for summary judgment be denied.

D.      Defendant's Motion for Summary Judgment

In his motion, defendant contends that the action must be dismissed based upon plaintiff's failure to satisfy his obligation to exhaust the available administrative remedies before commencing suit.  Def.'s Memo. of Law (Dkt. No. 86-3) at 3-5.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. §

1997e(a); *see also Woodford v. Ngo,* 548 U.S. 81, 84 (2006) ("Exhaustion is . . . mandatory.  Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley,* No. 04-CV-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983.").  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The requirement that inmates exhaust administrative remedies before filing a lawsuit, however, is not a jurisdictional requirement. *Richardson v. Goord*, 347 F.3d 431, 434 (2d Cir. 2003).  Instead, failure to exhaust is an affirmative defense under the PLRA, and "inmates are not required to specifically plead or demonstrate exhaustion in their complaints."  *Jones v. Bock*, 549 U.S. 199, 216 (2007).

In accordance with the PLRA, the DOCCS has made a grievance procedure, called the Inmate Grievance Program ("IGP"), available to inmates.  It is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions.  7 N.Y.C.R.R. § 701.5;

15

*Mingues v. Nelson*, No. 96-CV-5396, 2004 WL 234898, at *4 (S.D.N.Y.

Feb. 20, 2004). Embodied in 7 N.Y.C.R.R. § 701, the IGP requires that an

inmate first file a complaint with the facility's IGP clerk within twenty-one

days of the alleged occurrence. 7 N.Y.C.R.R. § 701.5(a)(1). If a

grievance complaint form is not readily available, a complaint may be

submitted on plain paper. *Id.* A representative of the facility's inmate

grievance resolution committee ("IGRC") has up to sixteen days after the

grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If

there is no such informal resolution, then the full IGRC conducts a hearing

within sixteen days after receipt of the grievance. *Id.* at § 701.5(b)(2).

A grievant may then appeal the IGRC's decision to the facility's

superintendent within seven days after receipt of the IGRC's written

decision. *Id.* at § 701.5(c). The superintendent must issue a written

decision within a certain number of days of receipt of the grievant's

appeal.[5] *Id.* at § 701.5(c)(i), (ii).

The third and final step of the IGP involves an appeal to the CORC,

which must be taken within seven days after receipt of the

_____

[5]      Depending on the type of matter complained of by the grievant, the
superintendent has either seven or twenty days after receipt of the grievant's appeal to
issue a decision. *Id.* at § 701.5(c)(i), (ii).

16

superintendent's written decision.  *Id.* at § 701.5(d)(1)(i).  The CORC is required to render a written decision within thirty days of receipt of the appeal. *Id.* at § 701.5(d)(2)(i).

Accordingly, at each step of the IGP process, a decision must be entered within a specified time period.  Significantly, "[a]ny failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can – and must – be appealed to the next level, including CORC, to complete the grievance process." *Murray v. Palmer*, No. 03-CV-1010, 2010 WL 1235591, at *2 (N.D.N.Y. Mar. 31, 2010) (Hurd, J., *adopting report and recommendation by* Lowe, M.J.) (citing, *inter alia*, 7 N.Y.C.R.R. § 701.6(g)(2)).

Generally, if a plaintiff fails to follow each of the required three steps of the above-described procedure prior to commencing litigation, he has failed to exhaust his administrative remedies.  *See Ruggerio v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

In support of his motion, defendant Artus has submitted evidence

17

suggesting that plaintiff did not file a grievance concerning the two incidents remaining at issue in this case. Certified records submitted by Deborah L. Jarvis, the DOCCS Inmate Records Coordinator, reflect that, although plaintiff has filed many grievances while incarcerated, including nine in 2009, none relate to the incidents at issue in this case. *See* Taylor-Scott Decl. Exh. A (Dkt. No. 86-1). Also submitted in support of the motion is a declaration from Jeffrey Hale, Assistant Director of the IGP, listing 148 grievances that have been appealed by plaintiff to the CORC while in custody of the DOCCS. Hale Decl. Exh. A (Dkt. No. 86-2) at 4-8. According to Hale, there is no record of plaintiff appealing to the CORC a grievance regarding a lack of adequate medical care at Clinton in 2009. Hale Decl. (Dkt. No. 86-2) at ¶¶ 2-4.

Countering this evidence are plaintiff's statements that he filed grievances at Clinton regarding the incidents alleging deliberate medical indifference by the Doe defendants, and that he pursued those grievances to completion through the CORC. Plf.'s Resp. 7.1(a)(3) Statement (Dkt. No. 92) at ¶¶ 11, 12. Plaintiff offers no explanation, however, for why, if he did file grievances and appeal their denials to the CORC, prison officials have no record of those grievances despite many others filed by

him and pursued to completion, nor does he provide copies of those grievances or specify the grievance numbers assigned to them. *Id.* Moreover, plaintiff's contentions regarding exhaustion are made in his response to defendant's rule 7.1(a)(3) statement, but he fails to support them with accurate record citations. *See* N.D.N.Y. L.R. 7.1(a)(3) ("Each denial shall set forth a specific citation to the record where the factual issue arises."). Although plaintiff cites to the certified copies of grievances by Jarvis, and Hale's declaration (both of which were submitted by defendant in support of his motion), a careful review of that evidence reveals that he, in fact, did not appeal his grievances related to this action to the CORC. Based on the lack of any evidentiary support in the record to show that plaintiff filed grievances addressing the allegations regarding the defendant Doe's conduct regarding medical treatment, I conclude that plaintiff failed to rebut defendant's contention that he failed to exhaust available administrative remedies, which is supported by evidence in the record. Although the court is mindful that, on a motion for summary judgment, it is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff, *Terry*, 336 F.3d at 137, it is also true that conclusory, self-serving affidavits that are unsupported by any

19

factual detail are insufficient to give rise to a dispute of material fact.  *See*

*Zappia Middle East Const. Co. Ltd. v. Emirate of Abu* Dhabi, 215 F.3d

247, 253 (2d Cir. 2000) ("The conclusory allegations in Mr. Zappia's

affidavit are not sufficient to create a material issue of fact."); *Belcher v.*

*Serriano*, No. 95-CV-1340, 1998 WL 173169, at *1 (N.D.N.Y. Apr. 9,

1998) (Pooler, J.) (holding that the plaintiff's complaint and an affidavit

submitted in opposition to the defendants' motion for summary judgment

were "[in]sufficient to overcome summary judgment," particularly where

"his affidavit contains no factual support"); *see also Robert v.  Dep't of*

*Justice*, No. 05-CV-2543, 2005 WL 3371480, at *8 (E.D.N.Y. Dec. 12,

2005) (finding, on a motion for summary judgment, that the "[p]laintiff's

conclusory statement" that he "timely appealed all three decisions . . . fails

to rebut [the d]efendants' competent evidence showing an absence of

genuine issue of fact that [he] has not administratively exhausted the . . .

requests").

Plaintiff's failure to exhaust, however, does not warrant dismissal of

plaintiff's complaint without further inquiry.  In a series of decisions

rendered since enactment of the PLRA, the Second Circuit has prescribed

a three-part test for determining whether dismissal of an inmate plaintiff's

20

complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *See*, *e.g.*, *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir. 2004); *see also Macias,* 495 F.3d at 41. Those decisions instruct that, before dismissing an action as a result of a plaintiff's failure to exhaust, a court must first determine whether the administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. In the event of a finding that a remedy existed and was available, the court must next examine whether the defendant has forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through his own actions preventing the exhaustion of plaintiff's remedies, he should be estopped from asserting failure to exhaust as a defense. *Id*. In the event the exhaustion defense survives these first two levels of scrutiny, the court must examine whether the plaintiff has plausibly alleged special circumstances to justify his failure to comply with the applicable administrative procedure requirements. *Id*.

In this instance, there is no record evidence to suggest that the IGP was not fully available to the plaintiff in this matter. Indeed, the certified copies of plaintiff's grievances and the records attached to Hale's

declaration demonstrate that, during his custody by the DOCCS, the IGP was available to plaintiff, and he availed himself of the grievance process extensively. Taylor Scott Decl. Exh. A (Dkt. No. 86-1); Hale Decl. Exh. A (Dkt. No. 86-2). Turning to the second inquiry, there is no record evidence that suggests defendants forfeited the exhaustion defense, and plaintiff has not alleged as much. Finally, nothing in the record suggests that special circumstances exist that may justify plaintiff's failure to exhaust the available administrative remedies. Accordingly, because I find no reason to conclude that plaintiff should be excused from the exhaustion requirement, I recommend that his complaint be dismissed on this procedural ground.

IV.   <u>SUMMARY AND RECOMMENDATION</u>

Pending before the court are several motions filed by both parties. Plaintiff's applications for injunctive relief are subject to denial, one on the basis that it is now moot, and the second because, like several of his prior requests, it addresses matters unrelated to the claims asserted in his complaint in this action. Plaintiff's motion for summary judgment is similarly subject to denial both as premature, and as failing to comply with the court's local rules governing such motions. Turning to defendant's

motion, I conclude that, based upon the record now before the court, no genuine dispute of material fact exists as to whether plaintiff failed to comply with his obligation to exhaust available administrative remedies before commencing this action, and that his complaint is therefore subject to dismissal on this procedural basis. Accordingly, it is hereby respectfully

RECOMMENDED that plaintiff's motions for a preliminary injunction (Dkt. Nos. 78, 84) be DENIED; and its further

RECOMMENDED that plaintiff's motion for summary judgment (Dkt. No. 93) be DENIED; and it is further

RECOMMENDED that defendant's motion for summary judgment (Dkt. No. 86) be GRANTED and plaintiff's complaint in this action be DISMISSED; and it is further

ORDERED that plaintiff's second and third amended complaints (Dkt. Nos. 70, 81) be stricken from the record due to plaintiff's failure to comply with the applicable rules governing motions for leave to file amended complaints.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.

FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d),

72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this

report and recommendation upon the parties in accordance with this

court's local rules.

Dated:      September 3, 2013
            Syracuse, New York

David E. Peebles
U.S. Magistrate Judge



Not Reported in F.Supp., 1985 WL 298 (S.D.N.Y.)

(Cite as: 1985 WL 298 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Terrence E. MASON, Plaintiff,
v.
THOMAS A. COUGHLIN, et al., Defendants.
No. 84 CIV. 7861 SWK.

Feb. 20, 1985.
MEMORANDUM OPINION AND ORDER

SHIRLEY WOHL KRAM, United States District Judge.
*1 The plaintiff has moved, pursuant to Rule 65 of the Federal Rules of Civil Procedure, for a preliminary injunction. The Court reads plaintiff's moving papers as requesting an order directing the defendants to transfer him to a different facililty than the one he is currently incarcerated in. Plaintiff seeks this relief to avoid what he alleges to be a pattern of assault and harrassment against him by certain of the defendants who work at the facility where plaintiff is currently incarcerated.

In their reply papers, the defendants assert that they have acceded to the plaintiff's reqeuest, and have transferred him to another facility. In view of this it appears to the Court that plaintiff's motion for a preliminary injunction is now moot.

Even if the motion is not moot, the effect of defendants' assent to plaintiff's transfer reqeuest is to destroy any claim of irreparable harm which plaintiff may have had. Thus, because plaintiff can no longer demonstrate that he will suffer irreparable harm, him motion for a preliminary injunction is DENIED. *Jack Kahn Music Co. v. Baldwin Pinano & Organ Co.,* 604 F.2d 755, 758 (2d Cir.1979).

Should the plaintiff be transferred back to the Clinton Correctional Facility at some future date, or should he encounter at the facility where he is currently incarcerated (Attica Correctional Facility) difficulties similar to those which he alleged to have occurred at clinton, he may once again move for appropriate relief from this Court. It is further,

ORDERED, that the clerk of this Court shall serve, by certified mail, a copy of this Memorandum Opinion and Order upon the plaintiff, Terrence E. Mason.

SO ORDERED.

S.D.N.Y.,1985.

Mason v. Coughlin
Not Reported in F.Supp., 1985 WL 298 (S.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5216953 (N.D.N.Y.)

(Cite as: 2009 WL 5216953 (N.D.N.Y.))



Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
Charles McALLISTER, Plaintiff,
v.
Glenn S. GOORD; et al., Defendants.
No. 9:06-CV-0442 (TJM)(RFT).

Dec. 30, 2009.
Charles McAllister, Cape Vincent, NY, pro se.

Hon. Andrew M. Cuomo, New York State Attorney General, C. Harris Dague, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

**DECISION AND ORDER**

THOMAS J. McAVOY, Senior District Judge.
   *1 Currently before the Court is Plaintiff Charles McAllister's motion for a temporary restraining order and preliminary injunction.[FN1] Dkt. No. 87. Defendants oppose the motion. Dkt. No. 89. Plaintiff has filed a reply to defendants' opposition. Dkt. No. 91.

   FN1. Plaintiff has other motions pending, which will be addressed by a separate Court order.

   Plaintiff seeks a Court Order enjoining Defendants from "[e]nforcing a new policy under [Department of Correctional Services (DOCS) ] directive 4913 only allowing Plaintiff to pack and have transfer[red] (1) bag of active legal materials." Dkt. No. 87 at 1. Plaintiff also seeks a court order enjoining defendants from (1) restricting his access to his legal materials and (2) depriving him of his criminal records, files, documents, etc., "by limiting Plaintiff to 4 draft bags of property consisting of personal items, religious items, legal materials and state issue items when transferred from

SHU." *Id.* In support of his motion, Plaintiff states, among other things, that there is a "substantial likelihood that [he] will be forced to dispose of his legal property with threats of further DOCS rule violations for disobeying direct order." *Id.* at 2.

   In opposition to the motion, defendants assert that Plaintiff has failed to demonstrate that he will suffer irreparable harm should the injunctive relief that he requests not issue. Dkt. No. 89. Defendants also argue that Plaintiff lacks standing to seek the relief that he requests because (1) "he does not establish a nexus between the 'new policy under [D]irective 4913' and any of the defendants;" (2) plaintiff does not allege in his motion that his transfer to another facility is imminent, and although plaintiff notified the court shortly after the motion was filed that he was transferred, nowhere in the change of address letter did plaintiff "allege that he suffered irreparable harm" as a result of the transfer because of Directive 4913. *Id.* at 3-4. Defendants also argue that Plaintiff has failed to show how the enforcement of revised Directive 4913 would cause Plaintiff actual injury. *Id.*

   A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." *Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986). In most cases, to warrant the issuance of a preliminary injunction, a movant must show (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits, and a balance of hardships tipping decidedly in favor of the moving party. *D.D. ex rel. V.D. v. New York City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (quotation omitted). "The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the ... merits.' " *Candelaria v. Baker,* No. 00-CV-0912E, 2006 WL 618576, at *3 (W.D.N.Y. Mar. 10, 2006) (quoting *Devose v. Herrington,* 42 F.3d 470, 471 (8th Cir.1994) (per curiam)). When, however, the moving party seeks a "mandatory injunction that alters the status quo by commanding a positive act," the standard is higher. *Id.*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5216953 (N.D.N.Y.)

(Cite as: 2009 WL 5216953 (N.D.N.Y.))

"[I]n addition to demonstrating irreparable harm, " '[t]he moving party must make a clear or substantial showing of a likelihood of success on the merits,' *Jolly v. Coughlin,* 76 F.3d 468, 473 (2d Cir.1996) (internal quotations omitted), a standard especially appropriate when a preliminary injunction is sought against government. *Mastrovincenzo v. City of New York,* 435 F.3d 78, 89 (2d Cir.2006)." *D.D. ex rel. V.D.,* 465 F.3d at 510. The same standards govern consideration of an application for a temporary restraining order. *Perri v. Bloomberg,* No. 06-CV-403, 2008 WL 2944642, at * 2 (E.D.N.Y. Jul. 31, 2008) (citing *Therrien v. Martin,* No. 3:07-cv-1285 (JCH), 2007 WL 3102181, at *5 (D.Conn. Oct. 19, 2007)).

**\*2** "To prevail on a motion for preliminary injunctive relief, the moving party must establish a relationship between the injury claimed in the motion and the conduct giving rise to the complaint." *McKinnon v. Tresman,* 2004 WL 78091, at *1 (2004 D. Conn.) (citing *Devose,* at 471 (denying the inmate plaintiff's motion for preliminary injunction when the inmate's complaint alleged denial of adequate medical treatment and his motion for preliminary injunction sought relief for alleged retaliation based on filing the instant lawsuit)); *see also Omega World Travel, Inc. v. Trans World Airlines,* 111 F.3d 14, 16 (4th Cir.1997) ("[A] preliminary injunction may never issue to prevent an injury or harm which not even the moving party contends was caused by the wrong claimed in the underlying action.").

*Candelaria,* 2006 WL 618576, at *3. In other words, the relief that a plaintiff seeks by way of injunction **must relate to the allegations contained in the underlying complaint.** *See Allen v. Brown,* No. 96-CV-1599, 1998 WL 214418, at *4 (N.D.N.Y. Apr. 28, 1998) (adopting a magistrate judge's recommendation that the court deny a request for injunctive relief because the allegations in the application were unrelated to claims asserted in the complaint and, thus, the plaintiff had "failed to establish either a likelihood of succeeding on the merits of his *underlying claim,* or sufficiently serious questions going to the merits of *such claim* and a balance of hardships tipping decidedly toward" the plaintiff (citations omitted)).

In his Second Amended Complaint (Dkt. No. 11),

Plaintiff claims, among other things,[FN2] that while incarcerated at Ogdensburg Correctional Facility and Marcy Correctional Facility, he was denied medical and dental care in deliberate indifference to his serious medical and dental needs; denied the right to freely practice his religion; subjected to retaliation and discrimination because he filed grievances and served on the Inmate Liason Committee; and threatened with physical harm. Dkt. No. 11. Plaintiff also alleges that his grievances were not properly handled; he was issued retaliatory false misbehavior reports; and he was denied due process in the course of his disciplinary proceedings. *Id.*

> FN2. The other allegations in the Second Amended Complaint are also unrelated to the claims in this motion.

In his motion for injunctive relief, Plaintiff for the first time claims that DOCS Directive # 4913, as revised October 23, 2008, will cause him irreparable harm in that he will be forced to relinquish some of his personal property, including legal documents and religious articles, when he is transferred to a new facility. Dkt. No. 87. Clearly the allegations that form the basis for Plaintiff's current motion-namely the impact that DOCS Directive # 4913, as amended in 2008, will have upon Plaintiff-are not related to the allegations contained in Plaintiff's Second Amended Complaint concerning allegations of wrongdoing that occurred at Ogdensburg and Marcy Correctional Facilities in 2003 through 2006-years before the October 2008 amendment of DOCS Directive # 4913. Thus, Plaintiff's request for injunctive relief could be denied on this basis alone.[FN3]

> FN3. Additionally, apart from former DOCS Commissioner Goord and perhaps Lester Wright, the Associate Commissioner of Health Services, it appears that none of the other defendants would be personally involved in the promulgation of DOCS directives.

**\*3** Even if the Court were to find that his present motion is sufficiently related to the claims set forth in the underlying action in that Plaintiff claims that enforcing the directive will result in "restricting and limiting plaintiff's

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5216953 (N.D.N.Y.)

(Cite as: 2009 WL 5216953 (N.D.N.Y.))

ability to properly present his case," the Court would still deny Plaintiff's motion. Since Plaintiff seems to allege that he might be denied access to the courts if the provisions of directive 4913 are enforced against him upon his transfer to a new facility, the Court will assume for the purposes of this motion that Plaintiff has alleged irreparable harm. However, a party is not entitled to injunctive relief unless there is also proof of a likelihood of succeeding on the merits of a claim, or evidence that establishes sufficiently serious questions going to the merits of such a claim and a balance of hardships tipping decidedly toward the party seeking such relief. *See Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). Plaintiff has failed to submit **proof or evidence** which meets this standard. In order to establish that he is being denied access to the courts, an inmate must demonstrate that he has suffered an actual injury. While it is true that under the Constitution a correctional facility must provide an inmate with meaningful access to the courts, *Bounds v. Smith,* 430 U.S. 817, 828 (1977), **the mere limitation of access to legal materials,** without more, does not state a constitutional claim, as " 'the Constitution requires no more than reasonable access to the courts.' " *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995) (quoting *Pickett v. Schaefer,* 503 F.Supp. 27, 28 (S.D.N.Y.1980)). To state a constitutional claim, a plaintiff must make a showing that he has suffered, or will imminently suffer, actual harm; that is, that he was "hindered [in] his efforts to pursue a legal claim." *Lewis v. Casey,* 518 U.S. 343, 351 (1996); *accord Morello v. James,* 810 F.2d 344, 347 (2d Cir.1987). Plaintiff does not allege any actual injury **as a result of the amended DOCS Directive.**[FN4] Plaintiff's conclusory allegations that his future legal work will be hampered by his possible loss of property does not meet the standard required for issuance of injunctive relief. *See Ivy Mar Co. v. C.R. Seasons Ltd.,* 907 F.Supp. 547, 561 (E.D.N.Y.1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction."); *Hancock v. Essential Resources, Inc.,* 792 F.Supp. 924, 928 (S.D.N.Y.1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals."). Additionally, to the extent that Plaintiff claims that he will not be able to effectively prosecute this action, the record for this action belies this claim. Since he filed this motion, plaintiff has filed several additional motions in this case, demonstrating his ability to effectively prosecute this action despite the amendment to DOCS Directive # 4913.

FN4. Plaintiff alleges that he suffered actual injury in his attempt to access the courts when defendants lost plaintiff's legal property and "prevented plaintiff's appeal to the Court of Appeals for the Second Circuit, in December 2003." Dkt. No. 91 at 4. This alleged loss of property *in 2003* is not related even remotely to newly revised DOCS directive # 4913.

Based on the foregoing, Plaintiff's request for a temporary restraining order and a preliminary injunction (Dkt. No. 87) is **denied.**

**\*4** WHEREFORE it is hereby

**ORDERED** that Plaintiff's motion for a temporary restraining order and a preliminary injunction (Dkt. No. 87) IS **DENIED,** and it is further

**ORDERED** that the Clerk serve a copy of this Decision and Order on the parties in accordance with the Local Rules.

N.D.N.Y.,2009.

McAllister v. Goord
Not Reported in F.Supp.2d, 2009 WL 5216953 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 214418 (N.D.N.Y.)

(Cite as: 1998 WL 214418 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Victor Jerome ALLEN, Plaintiff,
v.
Beverly L. BROWN, Purchasing Agent, New York
State Department of Correctional Services; Frank
LaCosta,[FN1] Police Officer, Menands Police Department;
Menands Police Department, Defendants.

FN1. This individual is alternatively referred to
as "LaCosta", *see* docket no, 1, and "LaCosse",
*see* docket no. 13. For sake of clarity, the Court
will refer to this defendant as LaCosta.

No. 96–CV–1599 (RSP/GJD).

April 28, 1998.

Victor Jerome Allen, Dannemora, New York, plaintiff pro
se.

Cheryl Parsons Reul, Albany, New York, for defendant
Brown.

Office of Michael M. Emminger, Albany, New York, for
defendants LaCosta and Menands Police Department,
Joseph W. Buttridge, of counsel.

Beverly Brown, Menands, NY, defendant pro se.

**MEMORANDUM–DECISION AND ORDER**

POOLER, J.

**\*1** This case comes to me following an order and
report-recommendation by Magistrate Judge Gustave J.
DiBianco, duly filed on the 17th day of February, 1998.
Ten days after service thereof, the Clerk of the Court has
sent me the entire file, including any and all objections to
the report-recommendation filed by the parties.

In this civil rights case pursuant to 42 U.S.C. § 1983,
plaintiff moved (1) to compel discovery, dkt. nos. 31 and
35; (2) for injunctive relief, dkt. no. 37; and (3) for

appointment of counsel, dkt. no. 42. The magistrate judge
granted plaintiff's motion to compel as to defendant
Brown, dkt. no. 35, denied the motion to compel as to
defendant LaCosta, and recommended I deny plaintiff's
motions for injunctive relief and appointment of counsel.
Report–Rec ., Dkt. No. 47. The parties did not appeal
from the magistrate judge's order as to the discovery order
or file objections to the report-recommendation. After
careful review of the entire file, I conclude that the
magistrate judge's findings and recommendations were not
clearly erroneous. It is therefore

ORDERED that the report-recommendation is
approved, and it is further

ORDERED that plaintiff's motions for injunctive
relief [Dkt. No. 37] and for appointment of counsel [Dkt.
No. 42] are DENIED, and it is further

ORDERED that the Clerk of the Court serve a copy
of this order on the parties by regular mail.

IT IS SO ORDERED.

**ORDER and REPORT–RECOMMENDATION**

DIBIANCO, Magistrate J.

Presently before the Court are motions by the plaintiff
Victor Jerome Allen ("plaintiff" or "Allen") (a) to compel
discovery (docket nos. 31 and 35), (b) for injunctive relief
(docket no. 37) and (c) for appointment of counsel (docket
no. 42). The Court will address each of these motions in
turn.
(A) Motions to compel.

Plaintiff has filed two motions to compel. The first of
these motions is directed to defendants Frank LaCosta
("LaCosta") and the Menands Police Department
("Menands police"). Docket no. 31. Defendants LaCosta
and Menands police have filed papers in opposition to
plaintiff's motion to compel. See docket no. 32. In their
opposing papers, defendants argue that they have fully
complied with plaintiff's discovery demands. Plaintiff

Not Reported in F.Supp., 1998 WL 214418 (N.D.N.Y.)

(Cite as: 1998 WL 214418 (N.D.N.Y.))

argues that such responses were not complete. Docket no. 36.

(1) Plaintiff's motion to compel responses from LaCosta and Menands police.

Initially, the undersigned notes that plaintiff has not submitted any documentation which indicates that he made any good faith efforts, in respect to these defendants, to resolve the instant discovery dispute prior to filing his motion to compel as is required Local Rule 7.1(e). In light of the above, plaintiff's motion to compel (docket no. 31) could be denied on this basis alone. *See* docket no. 40 at p. 2.

The Court finds, however, that plaintiff's motion must also be denied on the merits. Plaintiff apparently served upon defendants LaCosta and Menands police a demand for discovery of documents dated May 31, 1997 ("May request"). FN2 A response to this request was filed on June 26, 1997. Docket no. 17. On July 28, 1997, plaintiff filed interrogatories seeking responses from LaCosta and Menands police ("July request"). Docket no. 23. These defendants filed a response to the July request on August 28, 1997. *See* docket no. 30.

FN2. The May request has not been filed with the Court.

**\*2** Plaintiff's motion to compel is confusing at best, if not misleading. Plaintiff requests that the Court order the defendants:

... to produce documents and/or Transcript/affidavits to question # 12, 31, 35 and 36 etc. of the interrogatory and to answer Interrogatories # 4–5; 7, 9–10; # 12; # 18; # 21; # 26–27. Which was propounded to defendants attorney on August 6, 1997.

Docket no. 31 at 1. However, plaintiff's discovery requests of August 1997 contain only five items. ("August request") (Docket no. 29). Accordingly, the Court presumes that plaintiff's motion is directed to the July request. FN3

FN3. The July request contains 36 numbered requests and therefore more clearly comports with plaintiff's motion to compel.

(i) Plaintiff's request for documents as set forth in his interrogatories.

Plaintiff appears to implicitly assume that the defendants were required to produce those documents which were utilized by defendants in answering plaintiff's interrogatories concerning Allen's July request. For example, his motion to compel seeks production of "... documents and or Transcripts/affidavits to question # 12, 31, 35 and 36 etc...." Docket no. 31 at unnumbered p. 1. However, plaintiff's interrogatories never directed the defendants to produce such documents. *See* docket no. 23. Since plaintiff never formally requested the defendants to produce the documents at issue in his motion to compel as is required by Rule 34 of the Federal Rules of Civil Procedure ("FRCP"), plaintiff's motion to compel the production of documents, as it relates to any of the interrogatories served on the defendants, must be denied.

(ii) Plaintiff's request for additional information.

Allen also claims that the defendants' responses to paragraphs 4, 5, 7, 9, 10 and 21 of plaintiff's July request is incomplete. In those interrogatories, plaintiff requested information concerning the policies and procedures followed by the Menands police when they become involved in a domestic relations dispute. Defendants object "... upon the grounds that the alleged incident involving the plaintiff was not a domestic relation situation as plaintiff and Beverly Brown were not married nor were they otherwise related." Docket no. 30 at ¶¶ 4, 5, 7, 9, 10, and 21; *see also* docket no. 32 at ¶ 4. The Court agrees with the defendants that the policies and procedures followed by the defendants when responding to domestic relations disputes is not germane to an action which contends, *inter alia,* that the Menands Department and LaCosta unlawfully detained and arrested plaintiff, and thereafter improperly caused Allen's car to be towed. Accordingly, the Court sustains defendants' objections to paragraphs 4, 5, 7, 9, 10 and 21 of Allen's discovery requests, and denies plaintiff's motion to compel as it relates to same.

(iii) Paragraphs 12 and 18 of plaintiff's July request.

Pursuant to paragraph 12, plaintiff requests information regarding "... the policies of the MeNands [*sic*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 214418 (N.D.N.Y.)

(Cite as: 1998 WL 214418 (N.D.N.Y.))

] Police Department in bringing a Defendant to MeNands Village Court in leg irons in front of a jury...." The defendants object to the interrogatory as irrelevant because "[t]he Menands Police Department never brought plaintiff in front of a jury in a leg irons." Docket no. 30 at ¶ 12. Paragraph 18 requests information concerning the "stalking" charges levied against plaintiff. Defendants' answer to this request indicates that "[p]laintiff was not charged with stalking." *Id.* at 18.

**\*3** Since plaintiff has not provided the Court with any evidence that indicates that these responses are incomplete or erroneous, the Court denies plaintiff's motion to compel as it relates to these interrogatories.

(iv) Paragraphs 26 and 27 of plaintiff's July request.

Paragraphs 26 and 27 of the July request seek: "The Officer(s) involved?" and "The date(s) of such alleged prior incident". The Court sustains the objection of the defendants that the requests are vague and confusing and accordingly denies plaintiff's motion to compel as it relates to these paragraphs.

(2) Plaintiff's motion to compel responses from Brown.

Allen claims that plaintiff served upon defendant Brown a demand for discovery and inspection and interrogatories (*see* docket no. 28), and that, despite plaintiff's communication with Brown regarding responses to same (*see* docket no. 34), defendant Brown has neither timely responded to said discovery requests nor filed a response to the instant motion to compel.[FN4]

> **FN4.** Defendant Brown's response deadline as to plaintiff's motion to compel was October 15, 1997. *See* docket no. 35.

Based on the above, the Court orders defendant Brown to file and serve on plaintiff responses to Allen's outstanding discovery on or before March 27, 1998.

In light of such ruling, plaintiff's second motion to compel (docket no. 35) is denied without prejudice to renew. Should Allen, after receiving the responses as ordered above, still contend that defendant Brown's responses are incomplete, he shall attempt to resolve any issues involving discovery prior to filing any new motion to compel.

(B) Motion for temporary restraining order.

Turning to plaintiff's request for injunctive relief, plaintiff requests an order "... enjoining defendant Beverly L. BROWN and the N.Y.S. Dept of Correctional Services Inspector's General and The Bare Hill C.F. or any of them, from hindering the prosecuting this pending Civil action." Docket no. 37 at 1.

As to plaintiff's request for injunctive relief against DOCS and Bare Hill C.F., the undersigned notes that these entities are not named as defendants in this action. Except in limited circumstances not relevant herein, a Court may not order injunctive relief as to non-parties to the action. *See* Rule 65(d) of the Federal Rules of Civil Procedure ("[e]very order granting an injunction ... is binding only upon the parties to the action ..."); *United States v. Regan, 858 F.2d 115, 120 (2d Cir.1988), see also Aregano v. Costello, 1997 WL 567962 at *2, (N.D.N.Y. Sept.10, 1997)* (Pooler, J.). Thus, plaintiff's motion for injunctive relief as it relates to DOCS and Bare Hill C.F.—who are not named by Allen as defendants herein,[FN5] must be denied.

> **FN5.** Although plaintiff's motion to amend his complaint was granted on September 26, 1997 (docket no. 33), no amended complaint was ever filed. Therefore, plaintiff's original complaint is the only one before the Court.

As to plaintiff's request concerning defendant Brown, the standard a court must utilize in considering whether to grant a request for injunctive relief is well-settled in this Circuit. As the Second Circuit noted in *Covino v. Petrissi, 967 F.2d 73 (2d Cir.1992)*, the movant must show: (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief. *Id.* at 77 (affirming district court's denial of inmate's request for preliminary injunction); *see also Rouccio v. LeFevre, 850 F.Supp. 143, 144 (N.D.N.Y.1994)* (McAvoy, C.J.) (adopting Report–Recommendation of Magistrate Judge that denied inmate's request for injunctive relief).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 214418 (N.D.N.Y.)

(Cite as: 1998 WL 214418 (N.D.N.Y.))

(a) Irreparable harm.

**\*4** As to this first factor, the Court notes that where an alleged deprivation of a constitutional right is involved, courts generally do not require a further showing of irreparable harm by the party seeking injunctive relief. *Mitchell v. Cuomo,* 748 F.2d 804, 806 (2d Cir.1984); *see, e.g., Paulsen v. County of Nassau,* 925 F.2d 65, 68 (2d Cir.1991) (irreparable harm exists where deprivation of rights under First Amendment alleged). Since plaintiff seems to contend that defendant Brown, as an employee of DOCS, is interfering with his right of access to the courts, the undersigned finds that, for purposes of the application currently before it, plaintiff has established that he may suffer irreparable harm should the Court deny the present request for injunctive relief.
(b) Likelihood of success on the merits or sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the plaintiff.

Despite the fact that one has established irreparable harm, a party is not entitled to injunctive relief unless there is also proof of a likelihood of succeeding on the merits of a claim, or evidence that establishes sufficiently serious questions going to the merits of such a claim and a balance of hardships tipping decidedly toward the party seeking such relief. *See Covino, id.* at 77.

The allegations contained in the request for injunctive relief—interference with plaintiff's right of access to the courts—do not relate to plaintiff's underlying claim. In his underlying action, plaintiff alleges, *inter alia,* that he was unlawfully detained and arrested by the defendants, and that his car was improperly towed and impounded. No portion of plaintiff's *pro se* complaint contains allegations that Brown impeded Allen's access to the Courts. Since plaintiff has failed to establish either a likelihood of succeeding on the merits of his *underlying claim,* or sufficiently serious questions going to the merits of *such claim* and a balance of hardships tipping decidedly toward Allen, plaintiff's motion for injunctive relief must be denied. *See, e.g., Sweeney v. Bane,* 996 F.2d 1384, 1388 (2d Cir.1993); *Foxworth v. United States Park Police,* 1989 U.S.Dist. LEXIS 9648 (D.D.C. Aug. 14, 1989) (denying motion for restraining order where allegations contained in such application were unrelated to claims asserted in complaint).

(C) Motion for appointment of counsel.

Finally, the Court will consider plaintiff's application for appointment of counsel. In support of such application, Allen has provided this Court with a copy of a letter that he has received from Prisoners' Legal Services of New York as an attempt to substantiate plaintiff's claimed inability to secure counsel on his own. Docket no. 42. Thus, this Court may properly consider plaintiff's request for appointment of counsel.

Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin,* 114 F.3d 390, 392–93 (2d Cir.1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion. As a threshold matter, the court should ascertain whether the indigent's claims seem likely to be of substance. If so, the court should then consider:

**\*5** The indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 (2d Cir.1986)). This is not to say that all, or indeed any, of these factors are controlling in a particular case. Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Hodge,* 802 F.2d at 61).

A review of the file in this matter reveals that the issues in dispute herein—whether the defendants violated plaintiff's constitutional rights as discussed above—are not overly complex. Further, it appears to the Court as though, to date, the plaintiff has been able to effectively litigate this action. While it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of the trial of this matter, as is the case in many actions brought under 42 U.S.C. §

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 214418 (N.D.N.Y.)

(Cite as: 1998 WL 214418 (N.D.N.Y.))

1983 by *pro se* litigants, "this factor alone is not determinative of a motion for appointment of counsel." *Velasquez,* 899 F.Supp. at 974. Finally, this Court is unaware of any special reason why appointment of counsel at this time would be more likely to lead to a just determination of this litigation. The Court therefore finds that, based upon the existing record in this case, appointment of counsel is unwarranted. Plaintiff may file another motion for appointment of counsel in the event he can demonstrate that, in light of changed circumstances, consideration of the above factors warrants the granting of such an application.

(D) Failure to file an amended complaint.

Finally, as noted above, even though the undersigned previously granted Allen's motion to amend his complaint (*see* docket no. 33), no such amended complaint was ever filed by plaintiff. Therefore, the parties hereto are advised that the only pleading before the Court is Allen's original complaint (docket no. 1).

WHEREFORE, it is hereby

ORDERED, that plaintiff's motion to compel as it relates to defendants LaCosta and Menands police (docket no. 31) is DENIED, and it is further

ORDERED, that defendant Brown is directed to respond to the plaintiff's discovery requests (docket no. 28) on or before **March 27, 1998,** and it is further

ORDERED, that plaintiff's second motion to compel (docket no. 35) is DENIED, without prejudice to renew, and it is further

RECOMMENDED, that plaintiff's motion for injunctive relief (docket no. 37) be DENIED, and it is further

ORDERED, that plaintiff's motion for appointment of counsel (docket no. 42) is DENIED without prejudice to renew as noted above, and it is further

**\*6** ORDERED, that the Clerk serve a copy of this Order on the parties hereto by regular mail.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report-recommendation. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e) and 72.

IT IS SO ORDERED.

N.D.N.Y.,1998.

Allen v. Brown
Not Reported in F.Supp., 1998 WL 214418 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

C  Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County Correctional
Facility, et al; Nassau County University Medical Staff
and Nassau County Correctional Facility, Defendants.
**Civil Action No. CV-04-4587 (DGT).**

Jan. 31, 2007.

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma,
NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

**\*1** Inmate Wayne Hargrove ("Hargrove" or "plaintiff")
brings this *pro se* action pursuant to 42 U.S.C. § 1983
against the Nassau County Sheriff, Nassau County
Correctional Facility ("NCCF") and NCCF's medical staff,
(collectively, "defendants"), seeking damages for injuries
allegedly caused by defendants while he was incarcerated
at NCCF. Defendants now move for summary judgment
pursuant to Fed.R.Civ.P. 56 arguing, *inter alia,* that
Hargrove's claims should be dismissed because he failed
to exhaust administrative remedies, as required by the
Prison Litigation Reform Act of 1995 ("PLRA"), 42
U.S.C. § 1997e. For the following reasons, defendants'
motions for summary judgment are granted.

**Background**

On August 27, 2004,[FN1] Hargrove filed a complaint,
alleging that defendants violated his civil rights when they
forcibly administered purified protein derivative skin tests
("PPD test") to test for latent tuberculosis ("TB") in April
2002, 2003 and 2004 while he was incarcerated at NCCF.
Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A. Hargrove
named Nassau County Sheriff Edward Reilly ("Reilly"),
NCCF and Nassau County University Medical Staff [FN2] as
defendants.[FN3] On November 22, 2004, after discovery,
County Defendants and NHCC Defendants filed separate
motions for summary judgment pursuant to Fed.R.Civ.P.
56. Both defendants properly filed a Local Rule 56.1
Statement and served Hargrove a Notice to *Pro Se* Litigant
Opposing Motion for Summary Judgment, pursuant to
Local Civil Rule 56.2.

> **FN1.** Hargrove signed the complaint August 27,
> 2004. The *pro se* clerk's office received and filed
> the complaint on September 20, 2004. Under the
> prison mail-box rule, a *pro se* prisoner's
> complaint is deemed filed when it is delivered to
> prison authorities. *See, e.g., Walker v.
> Jastremski, 430 F.3d 560, 562 (2d
> Cir.2005)*(deeming *pro* se prisoner's § 1983
> action filed on date complaint was handed to
> prison officials). There is no evidence in the
> record as to when Hargrove handed the
> complaint to prison officials. However, it is clear
> the operative date is between August 27, 2004
> and September 20, 2004. As discussed, *infra,*
> both of these dates occur before Hargrove
> properly exhausted the administrative remedies
> available to him at NCCF.

> **FN2.** The Nassau County University Medical
> Staff are employed by the Nassau Health Care
> Corporation ("NHCC"). Pursuant to the
> Correctional Center Health Services Agreement
> between the County of Nassau and NHCC, dated
> September 24, 1999, NHCC provides medical
> services for inmates at NCCF. County Defs.'s

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Not. of Motion, Decl., at 1.

FN3. Reilly and NCCF are represented separately from NHCC. Accordingly, when a distinction is necessary, Reilly and NCCF will be referred to as "County Defendants" and Nassau County University Medical Staff and NHCC will be referred to as "NHCC Defendants."

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go through medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶ 3. This standard process usually takes seventy-two hours. Edwards Aff. ¶ 4. During medical intake, NCCF tests inmates for TB. Aff. of Getachew Feleke ("Feleke Aff.") ¶ 3. NCCF generally uses a PPD test to detect latent TB. Feleke Aff. ¶ 3. However, if an inmate has previously tested positive for TB, it is NCCF's policy to test for TB using an x-ray instead.FN4 Feleke Aff. ¶ 3. As part of its Infectious Disease Program, NCCF re-tests inmates for TB each year, beginning after they have been housed in that facility for one year. Edwards Aff. ¶ 5.

FN4. According to WebMD, "[a] tuberculin skin test should not be done for people who have a(1) Known TB infection [or a] (2) Positive tuberculin skin test in the past. A second test may cause a more severe reaction to the TB antigens." Jan Nissl, RN, BS, *Tuberculin Skin Tests,* W E B M D , h t t p : / / www.webmd.com/hw/lab_tests/hw203560.asp (last visited Jan. 31, 2007).

**(2)**

**Hargrove's Tuberculosis Testing at NCCF**

On March 15, 2002, Hargrove was incarcerated at NCCF.

NHCC Defs.' 56.1 Statement ¶ 1. Before entering the general population, Hargrove was processed through medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The NCCF Medical Intake Chart for Hargrove, dated March 15, 2002 ("3/15/02 Chart"), shows that Hargrove informed medical staff that he had previously been exposed to tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at 1; NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also shows that Hargrove reported testing positive to a prior PPD test and that he had been treated for TB in 2000. NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges that he was exposed to and treated for TB in 1997. Hargrove's Aff. in Opp. to Mot. for Summary Judgment, ("Aff. in Opp."), Ex. A at 1-2. Defendants contend that Hargrove was given an x-ray during the medical intake process because of his reported positive PPD test, and that the x-ray was negative, showing no active TB infection. NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3. Without specifying a date, Hargrove generally states that his "request to be x-rayed was denied." Aff. in Opp. at 3.

**\*2** Pursuant to NCCF's Infectious Disease Program, after being incarcerated in NCCF for a year, Hargrove was scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. This test was negative. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to Hargrove, he requested an x-ray instead of a PPD test because of his previous exposure to TB, but was forced to submit to the PPD test. He also alleges that defendants threatened to put him in "keep lock" or "lock up" unless he submitted to the PPD test.FN5 Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A.

FN5. Hargrove has made contradictory statements about being placed in "keep lock" or "lock up". It is unclear whether he is alleging that defendants threatened to place him in "lock up" unless he submitted to the PPD test or whether he was actually placed in "lock up" until such time that he agreed to submit to the PPD tests. For example, in his complaint, Hargrove states that when he "refused to submit to another [PPD] test, the Correctional Authorities were brought in and placed [him] in lock up." Complaint ¶ 4. In a hearing before Magistrate Judge Bloom on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B to his complaint, Hargrove alleges both that he was given an unwarranted TB shot and that when he refused the same shot he was placed in "keep lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann ("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he was never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra,* Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his Section 1983 claim.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp., Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD

test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, high blood pressure, chronic back pain, lung infection, dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp. at 3-4.

### (3)

### NCCF's Inmate Grievance Procedure

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

**\*3** The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. FN6 The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

> FN6. Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

not dispute that he received a handbook outlining the IGP.

The first step requires an inmate to submit his grievance form [FN7] to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance." [FN8] *Id.* at 2-3. NCCF indexes all grievance forms filed by inmates in a log book and in a computer system. *Id.* at 1, 3. Once a grievance form is received by the Inmate Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form. [FN9] *Id.* at 3. The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form. *See, e.g.,* 11/19/2004 Grievance form. If the inmate is not satisfied with the decision of the Inmate Grievance Coordinator, the inmate may appeal the determination to the Chief Administrative Officer. Williams Aff. at 3. Finally, if the inmate is not satisfied with the Chief Administrative Officer's determination, the inmate may appeal to the New York State Commission of Correction Citizen's Policy and Complaint Review Council ("Council"). *Id.* at 3. The Council will then render a final determination. *Id.* at 3.

FN7. The grievance forms contain four sections to be utilized throughout all three steps of the IGP. Section I provides space for the inmate to explain his complaint and the actions he requests as relief. Section II is for the decision of the Inmate Grievance Coordinator. Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two mutually exclusive options in which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision." Section IV provides space for the decision of the Chief Administrative Officer.

FN8. Hargrove has not argued that he was unaware of this five-day deadline.

FN9. There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

(4)

**Authenticity of the Grievance Forms and Other Documents Submitted by Hargrove**

In support of his allegations that he continuously informed defendants that he had been exposed to TB and, therefore, should not have been given PPD tests, Hargrove submitted three letters with his complaint, two of which were addressed to the Inmate Grievance Committee and one of which was addressed to "To whom this may concern." Complaint, Exs. A-C. He also submitted five complaint letters written to Sheriff Reilly, seventeen sick call requests and nine grievance forms during discovery and with his Affidavit in Opposition to Defendants' Motion for Summary Judgment, explaining that some of the medical records and notarized letters were "missing." Aff. in Opp, Ex. A at 2. Defendants call the authenticity of most of these documents into question, contending that Hargrove never submitted any grievance form or complaint letter before he filed his complaint. County Defs.' Mem. of Law at 16-21; County Defs.' 56.1 Statement at ¶¶ B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate Grievance Unit, testified that he reviewed all of the grievance forms, complaint letters and sick call requests annexed to Hargrove's Complaint and to Hargrove's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Williams Aff. at 2. Williams testified that he examined the grievance records at NCCF and searched "for any grievances by plaintiff/inmate Hargrove" and found "only two." [FN10] Williams Aff. at 1. The first grievance, dated November 19, 2004, complained that the medical staff continued "forcing [Hargrove] to take a T.B. shot while [he] keep[s] telling them that [he] has been exposed to T.B." 11/19/2004 Grievance; Williams Aff. at 1. In response to this grievance, Hargrove's "positive" TB status was noted in his medical records and an order was placed in Hargrove's medical chart, stating that Hargrove not be subjected to future PPD tests. 11/19/2004 Grievance, Section II;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Williams Aff. at 1; NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7. In Section III of the 11/19/2004 Grievance, Hargrove acknowledged that he had read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated matter. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes); Williams Aff. at 1. Thus, Williams concluded that, beside the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

> FN10. It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones not specifically addressed to the Grievance Unit. Williams Aff. at 3.

**\*4** A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. *See* April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. *See* March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. *See generally* Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated

documents and photocopied onto the bottom of the complaint letters. *See* County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial. McDevitt Aff. at 1-2. Hargrove signed the Notary Log Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

**\*5** Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

**Discussion**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**(1)**

**Summary Judgment Standard**

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005). Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest argument, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g., Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia,* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

**(2)**

**Prison Litigation Reform Act**

**a. Purpose of the Prison Litigation Reform Act**

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,*

--- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of prisons by federal courts, and thus " 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. at 2387 (quoting *Porter,* 534 U.S. at 525).*See also Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See Ruggiero v. County of Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

**b. The Exhaustion Requirement**

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524).Section 1997e(a) provides that:

**\*6** [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford,* 126 S.Ct. at 2383;*Ruggiero,* 467 F.3d at 174;*Williams,* 418 F.Supp.2d at 100-01. The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004); *see also Woodford,* 126 S.Ct. at 2382-83 ("[A] prisoner must now exhaust

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth, 532 U.S. at 734).*

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford, 126 S.Ct. at 2387.* "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero, 467 F.3d at 176* (citing *Woodford, 126 S.Ct. at 2385* (emphasis in original)). Although the level of detail necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Bock, 127 S.Ct. 910, 2007 WL 135890, at *12 (Jan. 22, 2007),* "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero, 467 F.3d at 176* (quoting *Woodford, 126 S.Ct. at 2386).* Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero, 467 F.3d at 176* (citing *Woodford, 126 S.Ct. at 2382).*

**(3)**

**Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit**

*Section 1997e(a)* of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see Berry v. Kerik, 366 F.3d 85, 87 (2d Cir.2004),* and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see Williams, 418 F.Supp.2d at 101. See also Sloane v. W. Mazzuca, No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006)* (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Accordingly, the merits of Hargrove's *Section 1983* claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under *Section 1997e(a)* of the PLRA before filing his complaint in federal court.

**\*7** Hargrove has submitted both forged [FN11] and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero, 467 F.3d at 176* (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford, 126 S.Ct. at 2382).*

> FN11. Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance.[FN12]

> FN12. Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal step of NCCF's three-step administrative grievance process; Hargrove never appealed to the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams, 418 F.Supp.2d at 101, 102* (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e .g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at *4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams, 418 F.Supp.2d at 101* (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at *8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by 42 U.S.C. § 1997e(a) unless Hargrove can establish excuse for his failure to exhaust.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(4)**

**No Grounds to Excuse Plaintiff's Failure to Exhaust**

**\*8** Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones,* 2007 WL 135890, at *8-11;*Sloane,* 2006 WL 3096031, at *4;*Williams,* 418 F.Supp.2d at 101. Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. *See Ruggiero,* 467 F.3d at 175;*Collins v. Goord,* 438 F.Supp.2d 399, 411 (S.D.N.Y.2006) ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.' ")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by Section 1997e(a) of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).[FN13]

> FN13. Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero,* 467 F.3d at 175-76 (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second Circuit. *See, e.g., Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at *9, n. 4 (S.D.N.Y. Dec. 6,

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2006) (applying the current law of the Second Circuit to exhaustion claims); *Sloane,* 2006 WL 3096031, at *5 ("Until such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); *Collins v. Goord,* 438 F.Supp.2d at 411 n. 13 (acknowledging that *Woodford* and *Hemphill* may be in tension, but deciding exhaustion claims under *Hemphill* inquiry); *Hernandez v. Coffey,* No. 99-CV11615, 2006 WL 2109465, at *3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under *Hemphill;* therefore, there is no occasion to address the potential effect *Woodford* may have had in his case.

**a. Whether administrative remedies were "available" to Hargrove**

The first step in the *Hemphill* inquiry requires a court to determine whether administrative remedies were available to the prisoner. *Hemphill,* 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Id.* at 688 (internal quotation marks omitted). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, *Ruggiero,* 467 F.3d at 179, or where defendants' behavior prevents plaintiff from seeking administrative remedies,[FN14]*Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004).

FN14. Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances [FN15] or that they threatened him or took any other action which effectively rendered the administrative process unavailable.

FN15. Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be arguing that NCCF's IGP was not available to him because the Grievance Coordinator failed to respond to his grievances. In the single grievance regarding PPD tests that defendants concede is authentic, Hargrove writes, "[n]ow for the third time your office refused to answer my grievances so please look into this matter because the T.B. shot is [sic] effecting my health." 11/19/04 Grievance. This language implies that Hargrove filed grievances in the past and received no response from the Inmate Grievance Coordinator. Furthermore, Hargrove wrote on one of the submitted copies of the November 19, 2004 grievance that "[t]his is the only accepte[sic] that Plaintiff got back from all grievances and letters that the Plaintiff sent to Sheriff Riley and his medical staffs about his staff making [sic] take T.B. test for 3 year[s]." County Defs'. Not. of Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the initial grievances was untimely. However, even assuming *arguendo* that the original grievances had been timely filed, district courts in the Second Circuit have held that the "lack of a response from the [Inmate Grievance Review Committee] does not excuse an inmate's obligation to exhaust his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

remedies through available appeals." *Hernandez v. Coffey,* 2006 WL 2109465, at *3-5. *See also Hemphill,* 380 F.3d at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins,* No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord,* No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner [does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or offer evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

**\*9** Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g., Sims v. Blot,* No. 00-CV-2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense. Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at 1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g., Sloane,* 2006 WL 3096031, at *8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf. Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); *Feliciano v. Goord,* No. 97-CV-263, 1998 WL 436358, at *2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation). Hargrove has not argued otherwise. *See Ruggiero,* 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); *Sloane,* 2006 WL 3096031, at *8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); *Hernandez,* 2006 WL 2109465,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

at *4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

### c. Special circumstances

**\*10** Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " *Hemphill,* 380 F.3d at 688 (quoting *Giano,* 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from prison official's interpretation has been held to constitute a "special circumstance." *Giano,* 380 F.3d at 676-77. No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. *See Sloane,* 2006 WL 3096031, at *8; *Freeman v. Goord,* No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at * 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

### (5)

### Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct

its own mistakes with respect to the programs it administers." *Woodford,* 126 S.Ct. at 2385. *See also Ruggiero,* 467 F.3d at 178 (citing *Porter,* 534 U.S. at 525). Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. *Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004). Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." *Berry,* 366 F.3d at 88. Here, Hargrove's administrative remedies were available to him during his entire period of confinement at NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests were given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. *Berry,* 366 F.3d at 88 (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

**\*11** Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. *Shangold v. The Walt Disney Co.,* No. 03-CV-9522, 2006 WL 71672, at *4 (S.D.N.Y. January 12, 2006) (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of adjudication." *Gleason v. Jandrucko,* 860 F.2d 556, 559 (2d Cir.1988); *McMunn v. Mem'l Sloan-Kettering Cancer Center,* 191 F.Supp.2d 440, 445 (S.D.N.Y.2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

the presentation of the opposing party's claim or defense." *McMunn,* 191 F.Supp.2d at 455 (quoting *Aoude v. Mobil Oil Corp.,* 892 F.2d 1115, 1119 (1st Cir.1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. *See, e.g., Shangold,* 2006 WL 71672, at *1, *3 (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); *McMunn,* 191 F.Supp.2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove. *See* Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer,* 221 F.Supp.2d 425, 444 (S.D.N.Y.2002) (citing *McMunn,* 191 F.Supp.2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn

affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold,* 2006 WL 71672, at *5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic,* 221 F.Supp.2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); *McMunn,* 191 F.Supp.2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

**Conclusion**

**\*12** Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

E.D.N.Y.,2007.
Hargrove v. Riley
Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
William MINGUES, Plaintiff,
v.
C.O NELSON and C.O. Berlingame, Defendants.
**No. 96 CV 5396(GBD).**

Feb. 20, 2004.

**Background:** Inmate brought a § 1983 action asserting, inter alia, claims of excessive force during his wife's visit with him at the correctional facility.

**Holding:** On a defense motion to dismiss, the District Court, Daniels, J., held that the record established that the action was filed after the effective date of the Prison Litigation Reform Act (PLRA).
Motion granted.

West Headnotes

Civil Rights 78 ☞ 1395(7)

78 Civil Rights
    78III Federal Remedies in General
        78k1392 Pleading
            78k1395 Particular Causes of Action
                78k1395(7) k. Prisons and Jails; Probation and Parole. Most Cited Cases
Record established that inmate's § 1983 action was filed after the effective date of the Prison Litigation Reform Act of 1996 (PLRA), such that the inmate's failure to exhaust his administrative remedies precluded relief; examination of the initial complaint itself, on its face, unequivocally demonstrated that the inmate's subsequent allegation in his amended complaint that he filed the complaint in April of

1996 was patently false; there was no explanation offered that could reasonably support and account for the existence of May dates on the complaint. 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act, § 7(a), 42 U.S.C.A. § 1997e(a).

*MEMORANDUM DECISION AND ORDER*

DANIELS, J.

**\*1** This § 1983 action was originally commenced by the plaintiff,[FN1] a prisoner in New York State custody, and his wife claiming their civil rights were violated during the wife's visit with plaintiff at the correctional facility. Discovery in this matter has concluded. Previously, all claims asserted by plaintiff's wife were dismissed for failure to prosecute. Additionally, defendants' summary judgment motion was denied with respect to plaintiff's claims of excessive force,[FN2] and summary judgment was granted dismissing all of plaintiff's other claims. Defendants now seek to dismiss the remaining excessive force claims on the grounds they are barred by the Prisoner Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e(a), as plaintiff failed to exhaust his administrative remedies.

FN1. Plaintiff and his wife were proceeding *pro se* when they filed the complaint and amended complaint. Thereafter, plaintiff obtained legal representation.

FN2. In the amended complaint, plaintiff alleges he was beaten, kicked and punched. (Am.Compl. § 6). In his original complaint, he had also claimed that he was whipped." (Compl. at 7, 8). Plaintiff testified at his deposition that he was slapped once in the face, punched about four or five times in the lower back, and a correctional officer then laid on top of him. (Mingues Dep. at 78-81). The incident, which took approximately thirty to forty seconds, caused plaintiff to suffer from back pain for an unspecified period of time. (*Id.* at 81, 86).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

Subdivision (a) of § 1997e provides, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This provision became effective on April 26, 1996. *Blisset v. Casey,* 147 F.3d 218, 219 (2d Cir.1998). The PLRA's exhaustion requirement does not apply retroactively to actions pending when the Act was signed into law. *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

There is no dispute that plaintiff did not avail himself of the existing and available prison grievance procedure. Plaintiff, however, argues he was not required to exhaust his administrative remedies because, as alleged in his amended complaint, "petitioners (sic) had already filed in April 10-12 of 1996," prior to the PLRA's April 26, 1996 enactment date.[FN3] (Am.Compl. § 2). In order to determine the date that the instant action was commenced, the date of the filing of the amended complaint relates back to the filing date of the original complaint. Fed.R.Civ.P. 15(c). The original complaint was signed and dated by plaintiff's wife on May 8, 1996; it was stamped received by the Pro Se Office on May 10, 1996; and plaintiff's signature is dated May 13, 1996.[FN4]

> FN3. The amended complaint reads as follows:
>
> That the original complaint filed under and pursuant to Title 42 section 1983 and 1985 was made and submitted before this court in April of 1996, before the application of the Prisoner Litigation Reform Act of 1996 was signed into law. The Act was signed into law April 26, 1996 and petitioners had already filed in April 10-12 of 1996. (Am.Compl. § 2).

> FN4. Plaintiff's wife application for *in forma pauperis* relief was signed and dated May 8, 1996, and it is stamped as received by the Pro Se Office on May 10, 1996. Plaintiff's signature, on his initial application for appointment of counsel, is dated May 13, 1996, and it is stamped as

received by the Pro Se Office on May 10, 1996. Attached to plaintiff's application, is his signed Affirmation of Service, also dated May 13, 1996, wherein plaintiff declared under penalty of perjury that he served his application upon the Pro Se Office. Plaintiff alleges that "between April 17, 1996 until October 7, 1996," all visitation was suspended between him and his wife and that their "only form of communications was correspondence ." (Am.Compl. § 7).

The matter was referred to Magistrate Judge Pitman for a Report and Recommendation ("Report"). Although the magistrate judge found that the three earliest possible dates that the evidence demonstrates the complaint could have been filed, *i.e.,* May 8th, 10th, and 13th of 1996, were all beyond the PLRA enactment date, he nevertheless recommended that the motion to dismiss be denied based on plaintiff's allegation in the amended complaint that he filed the original complaint April 10-12 of 1996, prior to the April 26, 1996 enactment date. The magistrate judge found that, "[i]n light of the express allegation in the Amended Complaint that plaintiff commenced the action before April 26, 1996 and the absence of a clear record to the contrary, the requirement that disputed factual issues be resolved in plaintiff's favor for purposes of this motion requires that the motion be denied." (Report at 12-13).

*2 Defendants object to the Report's conclusion that there is a material issue of fact regarding the date the action was filed. Plaintiff's attorney did not file any objections.[FN5] The Court must make a *de novo* determination as to those portions of the Report to which there are objections. Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1)(C). It is not required that the Court conduct a *de novo* hearing on the matter. *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). Rather, it is sufficient that the Court "arrive at its own, independent conclusion" regarding those portions to which the objections were made. *Nelson v. Smith,* 618 F.Supp. 1186, 1189-90 (S.D.N.Y.1985) (quoting *Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir.1983)). Accordingly, the Court, in the exercise of sound judicial discretion, must determine the extent, if any, it should rely upon the magistrate judge's proposed findings and recommendations. *Raddatz,* 447 U.S. at 676. The Court may accept, reject or modify, in whole or in part, the findings and recommendations set forth within the Report. Fed.R.Civ.P. 72(b); 28 U.S.C. §

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

636(b)(1)(C). Where there are no objections, the Court may accept the Report provided there is no clear error on the face of the record. *Nelson v. Smith,* 618 F.Supp. at 1189; *see also Heisler v. Kralik,* 981 F.Supp. 830, 840 (S.D.N.Y.1997), *aff'd sub nom. Heisler v. Rockland County,* 164 F.3d 618 (2d Cir.1998).

> FN5. Plaintiff himself filed objections which was not adopted by his counsel. Plaintiff objects to the magistrate judge's finding that an issue exists as to when plaintiff filed the complaint because plaintiff asserts he gave it to prison officials to be mailed in April. Additionally, plaintiff objects to the magistrate judge's suggestion that the defendants convert their motion to one for summary judgment asserting the same theory as set forth in the present motion. Since this Court finds that the instant motion is meritorious, the propriety of plaintiff personally submitting his own objections need not be address as those objections are moot.

Upon a *de novo* review, the Report's recommendation that the motion be denied is rejected by the Court. Section 1997e (a) requires that inmates exhaust all available administrative remedies prior to the commencement of a § 1983 action concerning prison conditions, and failure to do so warrants dismissal of the action. *Porter v. Nussel,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Scott,* 344 F.3d at 290. The exhaustion of one's administrative remedies, however, is not a jurisdictional requirement under the PLRA. *Richardson v. Goord,* 347 F.3d 431 (2d Cir.2003). A defendant may assert a non-exhaustion claim as an affirmative defense. *Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999). Since it is an affirmative defense, defendants bear the burden of proof in this regard. *See, McCoy v. Goord,* 255 F.Supp.2d 233, 248 (S.D.N.Y.2003); *Arnold v. Goetz,* 245 F.Supp.2d 527, 534-35 (S.D.N.Y.2003); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002). A motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), is an appropriate vehicle to be used by a defendant where the failure to exhaust is clear from the face of the complaint as well as any written instrument attached as an exhibit and any statements or documents incorporated by reference into the complaint. *See, Scott v. Gardner,* 287 F.Supp.2d 477, 485 (S.D.N.Y.2003) (citation omitted); *McCoy,* 255 F.Supp.2d at 249.

In the amended complaint, plaintiff alleges, in a conclusory manner, that he filed the original complaint before the effective date of the PLRA, sometime between April 10th and April 12th of 1996.[FN6] On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inference in plaintiff's favor. *Resnick v. Swartz,* 303 F.3d 147, 150-51 (2d Cir.2002) (citation omitted); *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). Dismissal is only warranted where it appears without doubt that plaintiff can prove no set of facts supporting his claims that would entitle him to relief. *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). The court's consideration is not limiting solely to the factual allegations set forth in the amended complaint. Rather, the court may also consider documents attached to the complaint as exhibits or incorporated in it by reference, matters of which judicial notice may be taken, or to documents either in plaintiff's possession or of which he has knowledge of and relied on in bringing the action. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (citation omitted). The court is not bound to accept as true a conclusory allegation where the pleadings are devoid of any specific facts or circumstances supporting such an assertion. *DeJesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996). Nor must the court "ignore any facts alleged in the complaint that undermine the plaintiff's claim." *Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1416 (7th Cir.1992) (citation omitted).

> FN6. In response to then Chief Judge Thomas P. Griesa's 1996 order dismissing this action, plaintiff filed an Application for Reconsideration, dated October 28, 1996, wherein he claims that "on April 12, 1996 this petitioner filed a 1983 civil suit ..." (Pl.'s Mot. for Recons. at 1).

*3 Plaintiff fails to allege any factual basis in support of his claim that he filed the initial complaint between April 10-12, 1996. The Court is not required to accept this statement as a well-pleaded factual allegation in light of the existing record which clearly demonstrates that such an allegation is not only factually unsupported by the clear evidence, but is factually impossible. Generally, an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

amended complaint supersedes the original complaint, and renders it of no legal effect. *In re. Crysen/Montenay Energy Co.,* 226 F.3d 160, 162 (2d Cir.2000). In plaintiff's amended complaint, he states that he is submitting the amended complaint in support of his original complaint. Hence, the original complaint is incorporated by reference in the amended complaint, and may be considered by the Court. Even if the initial complaint was not so incorporated, given the circumstances of this case, the Court would nevertheless consider it as it relates to the original date of filing. An examination of the initial complaint itself, on its face, unequivocally demonstrates that plaintiff's subsequent allegation in his amended complaint that he filed the complaint between April 10th and 12th of 1996 is patently false.

The original complaint refers to plaintiff's prison disciplinary hearing arising out of the same incident forming the basis of the present lawsuit. Generally, the disciplinary charges against plaintiff were in connection with an alleged conspiracy by him and his wife to commit grand larceny against inmate Robert Cornell. That hearing began on April 16, 1996, and concluded on April 19, 1996. (Defs.' Notice of Mot. for Summ. J. Ex. N, Transcript of Disciplinary Hr'g, conducted on April 16, 18-19, 1996). Specifically, in the original complaint, plaintiff refers to the testimony given by this fellow inmate.[FN7] (Compl. at 8). That inmate testified on April 19th. (Hr'g. Tr. at 53-54, 57). Thus, plaintiff's claim that he filed the complaint between April 10-12, 1996, is absolutely impossible as the initial complaint refers to events occurring after that time period. Merely because plaintiff boldly alleges in his amended complaint that he filed the original complaint between April 10th and 12th does not require this Court to turn a blind eye to plaintiff's prior pleadings demonstrating the absurdity of his claim.[FN8] *See, Silva Run Worlwide Ltd. v. Gaming Lottery Corp.,* 2001 WL 396521, *1 (S.D.N.Y. April 19, 2001) (citations omitted) (A court should not "accept allegations that are contradicted or undermined by other more specific allegations in the complaint or by written materials properly before the court.").

FN7. In the complaint, plaintiff alleges "that at his S.H.U. hearing petitioner called as a witness Robert Cornell who stated that this petitioner Mingues nor his wife (co-petitioner) Narvaez ever took any money from him. (Compl. at 8).

FN8. At his deposition, plaintiff testified that he filed the initial complaint "[a]pproximately around June of 1996." (Mingues Dep. at 37-38).

Lawsuits by inmates represented by counsel are commenced when the complaint is filed with the court. *See,* Fed.R.Civ.P. 3, 5(e). For *pro se* litigants, who are not imprisoned and have been granted *in forum pauperis* relief, their complaints are deemed filed when received by the Pro Se Office. *See,* *Toliver v. County of Sullivan,* 841 F.2d 41 (2d Cir.1998). The complaint of a *pro se* prisoner, however, is deemed filed when he or she gives the complaint to prisoner officials to be mailed. *Houston v. Lack,* 487 U.S. 266, 270, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988); *Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993), *modified on other grounds,* 25 F.3d 81 (2d Cir.1994). The "prison mailbox" rule is designed to combat inmate litigants' dependence on the prison facility's mail system and their lack of counsel so as to assure the timely filing of their legal papers with the court. *Noble v. Kelly,* 246 F.3d 93, 97 (2d Cir.2001) (citations omitted). Given the difficulty in determining when a prisoner relinquishes control of the complaint to prison personnel, the date the plaintiff signed the original complaint is presumed to be the date plaintiff gave the complaint to prison officials to be mailed. *See e.g., Forster v. Bigger,* 2003 WL 22299326, *2 (S.D.N.Y. Oct.7, 2003); *Hosendove v. Myers,* 2003 WL 22216809, *2 (D.Conn. Sept.19, 2003); *Hayes v. N .Y.S. D.O.C. Officers,* 1998 WL 901730, *3 (S.D.N.Y. Dec.28, 1998); *Torres v. Irvin,* 33 F.Supp.2d 257, 270 (S.D.N.Y.1998) (cases cited therein).

**\*4** In response to the Report and Recommendation, plaintiff asserts that, in April, the original complaint "was placed in the facility mail box." (Pl.'s Objection to Report at 1). However, it is uncontested that plaintiff's wife signed the complaint on May 8th; it was received by the Pro Se Office on May 10th; and plaintiff's signature is dated May 13th. There is no explanation offered that could reasonably support and account for the existence of these May dates on a complaint which plaintiff falsely claims to have deposited to be mailed during the period of April 10th and April 12th. Had plaintiff mailed the complaint directly to the court prior to April 26th, it would have been impossible for the plaintiff's wife to have signed the document two

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

days prior to the date that the Pro Se Office stamped it received on May 10th.[FN9] Moreover, absent evidence to the contrary, applying the mailbox rule would presume that plaintiff gave his complaint to prison officials on May 13, 1996, the date he signed it. *See, Johnson v. Coombe,* 156 F.Supp.2d 273, 277 (S.D.N.Y.2001) (quoting *Torres,* 33 F.Supp.2d at 270). Even if the Court gave plaintiff the benefit of the date plaintiff's wife signed the complaint, *i.e.,* the earliest date reflected on the filed complaint, it was still after the effective date of the PLRA. Hence, plaintiff is legally obligated to have pursued his prison grievance procedures prior to filing the instant action. The plaintiff has offered no explanation for the initial complaint's reference to events that occurred after the date he claims he filed it, the two May dates on which he and his former co-plaintiff wife signed the complaint, or the May date stamped received by the Pro Se Office. As the magistrate Judge observed:

FN9. The benefit of the mailbox rule does not apply where the plaintiff delivers the complaint to someone outside the prison system to forward to the court. *Knickerbocker v. Artuz,* 271 F.3d 35, 37 (2d Cir.2001).

Apart from the allegation that certain events giving rise to the claims occurred on April 9, 1996, the Original Complaint contains no mention of dates in April, 1996. Mingues no where explains the contradiction between the signature dates on the Original Complaint and the allegations contained in Amended Complaint. (Report at 12).

New York state law provides a three tier grievance procedure applicable to plaintiff's claims of excessive force. *See,* N.Y. Correct. Law § 139 (McKinnney's 2003); N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7 (2003); *Mendoz v. Goord,* 2002 WL 31654855 (S.D.N.Y. Nov.21, 2002); *Rodriguez v. Hahn,* 209 F.Supp.2d 344 (S.D.N.Y.2002). Plaintiff has not denied knowledge of the grievance procedure at his institution, nor claimed that anything or anyone caused him not to file a grievance and completely pursue it through the administrative process.[FN10] The magistrate judge's determination that the defendants' Rule 12(b) motion should be denied because of an "absence of a clear record" contrary to plaintiff's express allegation in the amended complaint that he

commenced the action before April 26, 1996 is erroneous. The Court could have *sua sponte* dismiss this action as the record is unmistakably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA. *See, Mojias v. Johnson,* 351 F.3d 606 (2003); *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999). In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear.

FN10. In the original complaint, plaintiff stated he did not file a grievance, pursuant to the state's prisoner grievance procedure, "because this matter can not be dealt with by interdepartmental grievances." (Compl. at 2-3). In plaintiff's attorney's memorandum in opposition to the motion to dismiss, counsel contends that plaintiff is not required to file a grievance because the state's prison system provides extremely limited administrative remedies and money damages, which plaintiff seeks, are not available.

*5 Accordingly, it is hereby

ORDERED that the Report and Recommendation is not adopted; and it is further

ORDERED that the defendants' motion to dismiss the complaint is granted.

S.D.N.Y.,2004.
Mingues v. Nelson
Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)

END OF DOCUMENT



Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
James MURRAY, Plaintiff,
v.
R. PALMER, Corrections Officer, Great Meadow
Correctional Facility; S. Griffin, Corrections Officer,
Great Meadow Correctional Facility; M. Terry,
Corrections Officer, Great Meadow Correctional
Facility; F. Englese, Corrections Officer, Great Meadow
Correctional Facility; Sergeant Edwards, Great Meadow
Correctional Facility; K. Bump, Sergeant, Great
Meadow Correctional Facility; K.H. Smith, Sergeant,
Great Meadow Correctional Facility; A. Paolano,
Facility Health Director: and Ted Nesmith, Physicians
Assistant, Defendants.
No. 9:03-CV-1010 (DNH/GLS).

June 20, 2008.
James Murray, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, James Seaman, Esq., Asst. Attorney General,
of Counsel, Albany, NY, for Defendants.

### *ORDER*

DAVID N. HURD, District Judge.

**\*1** Plaintiff, James Murray, brought this civil rights
action pursuant to 42 U.S.C. § 1983. In a 51 page Report
Recommendation dated February 11, 2008, the Honorable
George H. Lowe, United States Magistrate Judge,
recommended that defendants' motion for summary
judgment be granted in part (i.e., to the extent that it
requests the dismissal with prejudice of plaintiff's claims
against defendant Paolano and Nesmith); and denied in
part (i.e., to the extent that it requests dismissal of
plaintiff's claims against the remaining defendants on the
grounds of plaintiff's failure to exhaust available
administrative remedies) for the reasons stated in the

Report Recommendation. Lengthy objections to the
Report Recommendation have been filed by the plaintiff.

Based upon a de novo review of the portions of the
Report-Recommendation to which the plaintiff has
objected, the Report-Recommendation is accepted and
adopted. See 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion for summary judgment is
GRANTED in part and DENIED in part;

2. Plaintiff's complaint against defendants Paolano
and Nesmith is DISMISSED with prejudice;

3. Defendants' motion for summary judgment is
DENIED, to the extent that their request for dismissal of
plaintiff's assault claims under the Eighth Amendment
against the remaining defendants on the grounds of
plaintiff's failure to exhaust available administrative
remedies as stated in the Report-Recommendation.

IT IS SO ORDERED.

JAMES MURRAY, Plaintiff,

-v.-

R. PALMER, Corrections Officer, Great Meadow
C.F.; S. GRIFFIN, Corrections Officer, Great Meadow
C.F.; M. TERRY, Corrections Officer, Great Meadow
C.F.; F. ENGLESE, Corrections Officer, Great Meadow
C.F.; P. EDWARDS, Sergeant, Great Meadow C.F.; K.
BUMP, Sergeant, Great Meadow C.F.; K.H. SMITH,
Sergeant, Great Meadow C.F.; A. PAOLANO, Health
Director, Great Meadows C.F.; TED NESMITH,
Physicians Assistant, Great Meadows C.F., Defendants.

R. PALMER, Corrections Officer, Great Meadow
C.F.; S. GRIFFIN, Corrections Officer, Great Meadow
C.F.; M. TERRY, Corrections Officer, Great Meadow

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

C.F.; Counter Claimants,

-v.-

JAMES MURRAY, Counter Defendant.

### ORDER and REPORT-RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Currently pending before the Court is Defendants' motion for summary judgment. (Dkt. No. 78.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

## I. BACKGROUND

### A. Plaintiff's Second Amended Complaint

In his Second Amended Complaint, James Murray ("Plaintiff") alleges that nine correctional officials and health care providers employed by the New York State Department of Correctional Services ("DOCS") at Great Meadow Correctional Facility ("Great Meadow C.F .") violated his rights under the Eighth Amendment on August 17, 2000, when (1) Defendants Palmers, Griffin, Terry, and Englese assaulted him without provocation while he was incapacitated by mechanical restraints, (2) Defendants Edwards, Bump, and Smith witnessed, but did not stop, the assault, and (3) Defendants Paolano and Nesmith failed to examine and treat him following the assault despite his complaints of having a broken wrist. (Dkt. No. 10, ¶¶ 6-7 [Plf.'s Second Am. Compl.].)

### B. Defendants' Counterclaim

*2 In their Answer to Plaintiff's Second Amended Complaint, three of the nine Defendants (Palmer, Griffin and Terry) assert a counterclaim against Defendant for personal injuries they sustained as a result of Plaintiff's assault and battery upon them during the physical struggle that ensued between them and Plaintiff due to his threatening and violent behavior on August 17, 2000, at Great Meadow C.F. (Dkt. No. 35, Part 1, ¶¶ 23-30 [Defs.'

Answer & Counterclaim].)

I note that the docket in this action inaccurately indicates that this Counterclaim is asserted also on behalf of Defendants Englese, Edwards, Bump, Smith, Paolano, and "Nejwith" (later identified as "Nesmith"). (*See* Caption of Docket Sheet.) As a result, at the end of this Report-Recommendation, *I direct the Clerk's Office to correct the docket sheet to remove the names of those individuals as "counter claimants" on the docket.*

I note also that, while such counterclaims are unusual in prisoner civil rights cases (due to the fact that prisoners are often "judgment proof" since they are without funds), Plaintiff paid the $150 filing fee in this action (Dkt. No. 1), and, in his Second Amended Complaint, he alleges that he received a settlement payment in another prisoner civil rights actions in 2002. (Dkt. No. 10, ¶ 10 [Plf.'s Second Am. Compl.].) Further investigation reveals that the settlement resulted in a payment of $20,000 to Plaintiff. *See Murray v. Westchester County Jail,* 98-CV-0959 (S .D.N.Y.) (settled for $20,000 in 2002).

## II. DEFENDANTS' MOTION AND PLAINTIFF'S RESPONSE

### A. Defendants' Motion

In their motion for summary judgment, Defendants argue that Plaintiff's Second Amended Complaint should be dismissed for four reasons: (1) Plaintiff has failed to adduce any evidence establishing that Defendant Paolano, a supervisor, was personally involved in any of the constitutional violations alleged; (2) Plaintiff has failed to adduce any evidence establishing that Defendant Nesmith was deliberately indifferent to any of Plaintiff's serious medical needs; (3) at the very least, Defendant Nesmith is protected from liability by the doctrine of qualified immunity, as a matter of law; and (4) Plaintiff has failed to adduce any evidence establishing that he exhausted his available administrative remedies with respect to his assault claim, before filing that claim in federal court. (Dkt. No. 78, Part 13, at 2, 4-13 [Defs.' Mem. of Law].)

In addition, Defendants argue that, during his deposition in this action, Plaintiff asserted, for the first time, a claim that the medical staff at Great Meadow C.F. violated his rights under the Eighth Amendment by failing

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

to honor non-life-sustaining medical prescriptions written at a former facility. (*Id.* at 3.) As a threshold matter, Defendants argue, this claim should be dismissed since Plaintiff never included the claim in his Second Amended Complaint, nor did Plaintiff ever file a motion for leave to file a Third Amended Complaint. (*Id.*) In any event, Defendants argue, even if the Court were to reach the merits of this claim, the Court should dismiss the claim because Plaintiff has failed to allege facts plausibly suggesting, or adduce evidence establishing, that Defendants were personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided such allegations or evidence indicating the policy is even unconstitutional. (*Id.*)

**\*3** Defendants' motion is accompanied by a Statement of Material Facts, submitted in accordance with Local Rule 7.1(a)(3) ("Rule 7.1 Statement"). (Dkt. No. 78, Part 12.) Each of the 40 paragraphs contained in Defendants' Rule 7.1 Statement is supported by an accurate citation to the record evidence. (*Id.*) It is worth mentioning that the record evidence consists of (1) the affirmations of Defendants Nesmith and Paolano, and exhibits thereto, (2) the affirmation of the Inmate Grievance Program Director for DOCS, and exhibits thereto, (3) affirmation of the Legal Liaison between Great Meadow C.F. and the New York State Attorney General's Office during the time in question, and exhibits thereto, and (4) a 155-page excerpt from Plaintiff's deposition transcript. (Dkt. No. 78.)

**B. Plaintiff's Response**

After being specifically notified of the consequences of failing to properly respond to Defendants' motion (*see* Dkt. No. 78, Part 1), and after being granted *three* extensions of the deadline by which to do so (*see* Dkt. Nos. 79, 80, 83), Plaintiff submitted a barrage of documents: (1) 49 pages of exhibits, which are attached to neither an affidavit nor a memorandum of law (Dkt. No. 84); (2) 113 pages of exhibits, attached to a 25-page affidavit (Dkt. No. 85); (3) 21 pages of exhibits, attached to a 12-page supplemental affidavit (Dkt. No. 86); and (4) a 29-page memorandum of law (Dkt. No. 86); and a 13-page supplemental memorandum of law (Dkt. No. 88).

Generally in his Memorandum of Law and Supplemental Memorandum of Law, Plaintiff responds to

the legal arguments advanced by Defendants. (*See* Dkt. No. 86, Plf.'s Memo. of Law [responding to Defs.' exhaustion argument]; Dkt. No. 88, at 7-13 [Plf.'s Supp. Memo. of Law, responding to Defs.' arguments regarding the personal involvement of Defendant Paolano, the lack of evidence supporting a deliberate indifference claim against Defendant Nesmith, the applicability of the qualified immunity defense with regard to Plaintiff's claim against Defendant Nesmith, and the sufficiency and timing of Plaintiff's prescription-review claim against Defendant Paolano].) Those responses are described below in Part IV of this Report-Recommendation.

However, unfortunately, not among the numerous documents that Plaintiff has provided is a *proper* response to Defendants' Rule 7.1 Statement. (*See* Dkt. No. 85, Part 2, at 45-52 [Ex. N to Plf.'s Affid.].) Specifically, Plaintiff's Rule 7.1 Response (which is buried in a pile of exhibits) fails, with very few exceptions, to "set forth ... specific citation[s] to the record," as required by Local Rule 7.1(a)(3). (*Id.*) I note that the notary's "sworn to" stamp at the end of the Rule 7.1. Statement does not transform Plaintiff's Rule 7.1 Response into record evidence so as to render that Response compliant with Local Rule 7.1. First, Local Rule 7.1 expressly states, "The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits." N.D.N.Y. L.R. 7.1(a)(3). In this way, the District's Local Rule, like similar local rules of other districts, contemplates citations to a record that is independent of a Rule 7.1 Response. *See, e.g., Vaden v. GAP, Inc.,* 06-CV-0142, 2007 U.S. Dist. LEXIS 22736, at *3-5, 2007 WL 954256 (M.D.Tenn. March 26, 2007) (finding non-movant's verified response to movant's statement of material facts to be deficient because it did cite to affidavit or declaration, nor did it establish that non-movant had actual knowledge of matters to which he attested); *Waterhouse v. District of Columbia,* 124 F.Supp.2d 1, 4-5 (D.D.C.2000) (criticizing party's "Verified Statement of Material Facts," as being deficient in citations to independent record evidence, lacking "firsthand knowledge," and being purely "self-serving" in nature). Moreover, many of Plaintiff's statements in his Rule 7.1 Response are either argumentative in nature or lacking in specificity and personal knowledge, so as to disqualify those statements from having the effect of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

sworn testimony for purposes of a summary judgment motion. *See, infra,* notes 10-12 of this Report-Recommendation.

### III. GOVERNING LEGAL STANDARD

**\*4** Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material fact exists,[FN1] the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.[FN2]

> FN1. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> FN2. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." [FN3] The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [FN4] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [FN5]

> FN3. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary

judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

> FN4. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."); *Matsushita,* 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> FN5. *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at \*8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added].

What this burden-shifting standard means when a plaintiff has failed to *properly* respond to a defendant's Rule 7.1 Statement of Material Facts is that the facts as set forth in that Rule 7.1 Statement will be accepted as true [FN6] to the extent that (1) those facts are supported by the evidence in the record,[FN7] and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment.[FN8]

> FN6. *See* N.D.N.Y. L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."*) [emphasis in original].

> FN7. *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) ("[I]n determining whether the moving party has met [its] burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [internal quotation marks and citations omitted].

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

FN8. *See* *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996); *cf.* N.D.N.Y. L.R. 56.2 (imposing on movant duty to provide such notice to *pro se* opponent).

Implied in the above-stated standard is the fact that a district court has no duty to perform an *independent* review of the record to find proof of a factual dispute, even if the non-movant is proceeding *pro se.*[FN9] In the event the district court chooses to conduct such an independent review of the record, any affidavit submitted by the non-movant, in order to be sufficient to create a factual issue for purposes of a summary judgment motion, must, among other things, not be conclusory.[FN10] (An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general.)[FN11] Finally, even where an affidavit is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint."[FN12]

FN9. *See* *Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432, 2004 WL 2309715 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4, 2006 WL 395269 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct.29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

FN10. *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate v. Top Assoc.,* 425 F.2d 92, 97 (2d Cir.1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN11. *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

FN12. *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-55 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb.15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 F. App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit Local Rule § 0.23).

## IV. ANALYSIS

### A. Whether Plaintiff Has Adduced Evidence Establishing that Defendant Paolano Was Personally Involved in the Constitutional Violations Alleged

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 [2d Cir.1991] ).[FN13] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant.[FN14] If the defendant is a supervisory official, such as a correctional facility superintendent or a facility health services director, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN15] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN16] Rather, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[FN17]

FN13. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

FN14. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

FN15. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

FN16. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

FN17. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

781 F.2d 319, 323-324 (2d Cir.1986) (setting forth four prongs).

**\*5** Defendants argue that Plaintiff has not adduced evidence establishing that Defendant Paolano, the Great Meadow C.F. Health Services Director during the time in question, was personally involved in the constitutional violations alleged. (Dkt. No. 78, Part 13, at 2 [Defs.' Memo. of Law].) In support of this argument, Defendants point to the record evidence establishing that, during the time in which Plaintiff was incarcerated at Great Meadow C.F. (i . e., from early August of 2000 to late November of 2000), Defendant Paolano never treated Plaintiff for any medical condition, much less a broken wrist on August 17, 2000. (*Id.; see also* Dkt. No. 78, Part 4, ¶¶ 7-8 [Paolano Affid.]; Dkt. No. 78, Part 5 [Ex. A to Paolano Affid.]; Dkt. No. 78, Part 11, at 32-33 [Plf.'s Depo.].)

Plaintiff responds that (1) Defendant Paolano was personally involved since he "treated" Plaintiff on August 17, 2000, by virtue of his supervisory position as the Great Meadow C.F.'s Health Services Director, and (2) Defendant Paolano has the "final say" regarding what medications inmates shall be permitted to retain when they transfer into Great Meadow C.F. (Dkt. No. 88, at 7-8 [Plf.'s Supp. Memo. of Law].) In support of this argument, Plaintiff cites a paragraph of his Supplemental Affidavit, and an administrative decision, for the proposition that Defendant Paolano, as the Great Meadow C.F. Health Services Director, had the "sole responsibility for providing treatment to the inmates under [the Facility's] care." (*Id.; see also* Dkt. No. 86, Suppl. Affid., ¶ 5 & Ex. 14.)

**1. Whether Defendant Paolano Was Personally Involved in Plaintiff's Treatment on August 17, 2000**

With respect to Plaintiff's first point (regarding Defendant Paolano's asserted "treatment" of Plaintiff on August 17, 2000), the problem with Plaintiff's argument is that the uncontroverted record evidence establishes that, as Defendants' assert, Defendant Paolano did not, in fact, treat Plaintiff on August 17, 2000 (or at any time when Plaintiff was incarcerated at Great Meadow C.F.). This was the fact asserted by Defendants in Paragraphs 38 of their Rule 7.1 Statement. (*See* Dkt. No. 78, Part 12, ¶ 38 [Defs.' Rule 7.1 Statement].) Defendants supported this

factual assertion with record evidence. (*Id.* [providing accurate record citations]; *see also* Dkt. No. 78, Part 12, ¶¶ 37-38 [Defs.' Rule 7.1 Statement, indicating that it was Defendant Nesmith, not Defendant Paolano, who treated Plaintiff on 8/17/00].) Plaintiff has failed to specifically controvert this factual assertion, despite having been given an adequate opportunity to conduct discovery, and having been specifically notified of the consequences of failing to properly respond to Defendants' motion (*see* Dkt. No. 78, Part 1), and having been granted *three* extensions of the deadline by which to do so (*see* Dkt. Nos. 79, 80, 83). Specifically, Plaintiff fails to cite any record evidence in support of his denial of Defendants' referenced factual assertion. (*See* Dkt. No. 85, Part 2, at 50 [Ex. N to Plf.'s Affid.].) As a result, under the Local Rules of Practice for this Court, Plaintiff has effectively "admitted" Defendants' referenced factual assertions. N.D.N.Y. L.R. 7.1(a)(3).

**\*6** The Court has no duty to perform an independent review of the record to find proof disputing this established fact. *See, supra,* Part III and note 9 of this Report-Recommendation. Moreover, I decline to exercise my discretion, and I recommend that the Court decline to exercise its discretion, to perform an independent review of the record to find such proof for several reasons, any one of which is sufficient reason to make such a decision: (1) as an exercise of discretion, in order to preserve judicial resources in light of the Court's heavy caseload; (2) the fact that Plaintiff has already been afforded considerable leniency in this action, including numerous deadline extensions and liberal constructions; and (3) the fact that Plaintiff is fully knowledgeable about the requirements of a non-movant on a summary judgment motion, due to Defendants' notification of those requirements, and due to Plaintiff's extraordinary litigation experience.

With regard to this last reason, I note that federal courts normally treat the papers filed by *pro se* civil rights litigants with special solicitude. This is because, generally, *pro se* litigants are unfamiliar with legal terminology and the litigation process, and because the civil rights claims they assert are of a very serious nature. However, "[t]here are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded [the] special solicitude" that is normally afforded *pro se* litigants.[FN18] Generally, the

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

rationale for diminishing special solicitude (at least in the Second Circuit) is that the *pro se* litigant's extreme litigiousness demonstrates his *experience,* the lack of which is the reason for extending special solicitude to a *pro se* litigant in the first place.[FN19] The Second Circuit has diminished this special solicitude, and/or indicated the acceptability of such a diminishment, on several occasions.[FN20] Similarly, I decide to do so, here, and I recommend the Court do the same.

FN18. *Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *3 & n. 17 (N.D.N.Y. Sept.26, 2007) (Kahn, J., adopting Report-Recommendation) [citations omitted].

FN19. *Koehl,* 2007 WL 2846905, at *3 & n. 18 [citations omitted].

FN20. *See, e.g., Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001) (unpublished opinion), *aff'g,* 97-CV-0938, Decision and Order (N.D.N.Y. filed May 28, 1999) (Kahn, J.), *adopting,* Report-Recommendation, at 1, n. 1 (N.D.N.Y. filed Apr. 28, 1999) (Smith, M.J.); *Johnson v. C. Gummerson,* 201 F.3d 431, at *2 (2d Cir.1999) (unpublished opinion), *aff'g,* 97-CV-1727, Decision and Order (N.D.N.Y. filed June 11, 1999) (McAvoy, J.), *adopting,* Report-Recommendation (N.D.N.Y. filed April 28, 1999) (Smith, M.J.); *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994); *see also Raitport v. Chem. Bank,* 74 F.R.D. 128, 133 (S.D.N.Y.1977)[citing *Ackert v. Bryan,* No. 27240 (2d Cir. June 21, 1963) (Kaufman, J., concurring).

Plaintiff is no stranger to the court system. A review of the Federal Judiciary's Public Access to Court Electronic Records ("PACER") System reveals that Plaintiff has filed at least 15 other federal district court actions,[FN21] and at least three federal court appeals.[FN22] Furthermore, a review of the New York State Unified Court System's website reveals that he has filed at least 20 state court actions,[FN23] and at least two state court appeals.[FN24] Among these many actions he has had at least one victory, resulting in the payment of $20,000 to him in settlement proceeds.[FN25]

FN21. *See Murray v. New York,* 96-CV-3413 (S.D.N.Y.); *Murray v. Westchester County Jail,* 98-CV-0959 (S.D.N.Y.); *Murray v. McGinnis,* 99-CV-1908 (W.D.N.Y.); *Murray v. McGinnis,* 99-CV-2945 (S.D.N.Y.); *Murray v. McGinnis,* 00-CV-3510 (S.D.N.Y.); *Murray v. Jacobs,* 04-CV-6231 (W.D.N.Y.); *Murray v. Bushey,* 04-CV-0805 (W.D.N.Y.); *Murray v. Goord,* 05-CV-1113 (N.D.N.Y.); *Murray v. Wissman,* 05-CV-1186 (N.D.N.Y.); *Murray v. Goord,* 05-CV-1579 (N.D.N.Y.); *Murray v. Doe,* 06-CV-0205 (S.D.N.Y.); *Murray v. O'Herron,* 06-CV-0793 (W.D.N.Y.); *Murray v. Goord,* 06-CV-1445 (N.D.N.Y.); *Murray v. Fisher,* 07-CV-0306 (W.D.N.Y.); *Murray v. Escrow,* 07-CV-0353 (W.D.N.Y.).

FN22. *See Murray v. McGinnis,* No. 01-2533 (2d Cir.); *Murray v. McGinnis,* No. 01-2536 (2d Cir.); *Murray v. McGinnis,* No. 01-2632 (2d Cir.).

FN23. *See Murray v. Goord,* Index No. 011568/1996 (N.Y. Sup.Ct., Westchester County); *Murray v. Goord,* Index No. 002383/1997 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002131/1998 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002307/1998 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002879/1998 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002683/2004 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002044/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. McGinnis,* Index No. 002099/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Sullivan,* Index No. 002217/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002421/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002495/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002496/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002888/2006 (N.Y. Sup.Ct., Chemung

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

County); *Murray v. LeClaire,* Index No. 002008/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. LeClaire,* Index No. 002009/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. LeClaire,* Index No. 002010/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. LeClaire,* Index No. 002011/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. Fisher,* Index No. 002762/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. New York,* Claim No. 108304, Motion No. 67679 (N.Y.Ct.Cl.); *Murray v. New York,* Motion No. M-67997 (N.Y.Ct.Cl.).

FN24. *See Murray v. Goord,* No. 84875, 709 N.Y. S.2d 662 (N.Y.S.App.Div., 3d Dept.2000); *Murray v. Goord,* No. 83252, 694 N.Y.S .2d 797 (N.Y.S.App.Div., 3d Dept.1999).

FN25. *See Murray v. Westchester County Jail,* 98-CV-0959 (S.D.N.Y .) (settled for $20,000 in 2002).

I will add only that, even if I were inclined to conduct such an independent review of the record, the record evidence that Plaintiff cites regarding this issue in his Supplemental Memorandum of Law does not create such a question of fact. (*See* Dkt. No. 88, at 7-8 [Plf.'s Supp. Memo. of Law, citing Dkt. No. 86, Suppl. Affid., ¶ 5 & Ex. 14].) It appears entirely likely that Defendant Paolano had the ultimate responsibility for providing medical treatment to the inmates at Great Meadow C.F.[FN26] However, this duty arose solely because of his supervisory position, i.e., as the Facility Health Services Director. It is precisely this sort of supervisory duty that does *not* result in liability under 42 U.S.C. § 1983, as explained above.

FN26. To the extent that Plaintiff relies on this evidence to support the proposition that Defendant Paolano had the "sole" responsibility for such health care, that reliance is misplaced. Setting aside the loose nature of the administrative decision's use of the word "sole," and the different context in which that word was used (regarding the review of Plaintiff's grievance about having had his prescription

discontinued), the administrative decision's rationale for its decision holds no preclusive effect in this Court. I note that this argument by Plaintiff, which is creative and which implicitly relies on principles of estoppel, demonstrates his facility with the law due to his extraordinary litigation experience.

**\*7** As for the other ways through which a supervisory official may be deemed "personally involved" in a constitutional violation under 42 U.S.C. § 1983, Plaintiff does not even argue (or allege facts plausibly suggesting)[FN27] that Defendant Paolano *failed to remedy* the alleged deliberate indifference to Plaintiff's serious medical needs on August 17, 2000, after learning of that deliberate indifference through a report or appeal. Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano created, or allowed to continue, *a policy or custom* under which the alleged deliberate indifference on August 17, 2000, occurred. Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano had been *grossly negligent* in managing subordinates (such as Defendant Nesmith) who caused the alleged deliberate indifference. Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano exhibited *deliberate indifference* to the rights of Plaintiff by failing to act on information indicating that Defendant Nesmith was violating Plaintiff's constitutional rights.

FN27. *See Bell Atl. Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007) (holding that, for a plaintiff's complaint to state a claim upon which relief might be granted under Fed.R.Civ.P. 8 and 12, his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," or, in other words, there must be "plausible grounds to infer [actionable conduct]"), *accord, Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) ("[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible."* ) [emphasis in

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

original].

In the alternative, I reach the same conclusion (that Plaintiff's claim against Defendant Paolano arising from the events of August 17, 2000, lacks merit) on the ground that there was no constitutional violation committed by Defendant Nesmith on August 17, 2000, in which Defendant Paolano could have been personally involved, for the reasons discussed below in Part IV.B. of this Report-Recommendation.

**2. Whether Defendant Paolano Was Personally Involved in the Review of Plaintiff's Prescriptions in Early August of 2000**

With respect to Plaintiff's second point (regarding Defendant Paolano's asserted "final say" regarding what medications inmates shall be permitted to retain when they transfer into Great Meadow C.F.), there are three problems with this argument.

First, the argument regards a claim that is not properly before this Court for the reasons explained below in Part IV.E. of this Report-Recommendation.

Second, as Defendants argue, even if the Court were to reach the merits of this claim, it should rule that Plaintiff has failed to adduce evidence establishing that Defendant Paolano was personally involved in the creation or implementation of DOCS' prescription-review policy. It is an uncontroverted fact, for purposes of Defendants' motion, that (1) the decision to temporarily deprive Plaintiff of his previously prescribed pain medication (i.e., pending the review of that medication by a physician at Great Meadow C.F.) upon his arrival at Great Meadow C.F. was made by an "intake nurse," not by Defendant Paolano, (2) the nurse's decision was made pursuant to a policy instituted by DOCS, not by Defendant Paolano, and (3) Defendant Paolano did not have the authority to alter that policy. These were the facts asserted by Defendants in Paragraphs 6 through 9 of their Rule 7.1 Statement. (*See* Dkt. No. 78, Part 12, ¶¶ 6-9 [Defs.' Rule 7.1 Statement].) Defendants supported these factual assertions with record evidence. (*Id.* [providing accurate record citations].) Plaintiff expressly admits two of these factual assertions, and fails to support his denial of the remaining factual assertions with citations to record evidence that actually controverts the facts asserted. (Dkt. No. 85, Part 2, at

46-47 [Ex. N to Plf.'s Affid.].)

**\*8** For example, in support of his denial of Defendants' factual assertion that "[t]his policy is not unique to Great Meadow, but applies to DOCS facilities generally," Plaintiff says that, at an unidentified point in time, "Downstate CF honored doctors proscribed [sic] treatment and filled by prescriptions from Southport Correctional Facility .... Also I've been transferred to other prisons such as Auburn [C.F.] in which they honored doctors prescribe[d] orders." (*Id.*) I will set aside the fact that Defendants' factual assertion is not that the policy applies to every single DOCS facility but that it applies to them as a general matter. I will also set aside the fact that Plaintiff's assertion is not supported by a citation to independent record evidence. The main problem with this assertion is that it is not specific as to what year or years he had these experiences, nor does it even say that his prescriptions were immediately honored without a review by a physician at the new facility.

The other piece of "evidence" Plaintiff cites in support of this denial is "Superintendent George B. Duncan's 9/22/00 decision of Appeal to him regarding [Plaintiff's Grievance No.] GM-30651-00." (*Id.*) The problem is that the referenced determination states merely that Defendant Paolano, as the Great Meadow C.F. Health Services Director, had the "sole responsibility for providing treatment to the inmates under [the Facility's] care, and has the final say regarding all medical prescriptions." (Dkt. No. 86, at 14 [Ex. 14 to Plf.'s Suppl. Affid.].) For the sake of much-needed brevity, I will set aside the issue of whether an IGP Program Director's broadly stated *rationale* for an appellate determination with respect to a prisoner's grievance can ever constitute evidence sufficient to create proof of a genuine issue of fact for purposes of a summary judgment motion. The main problem with this "evidence" is that there is absolutely nothing inconsistent between (1) a DOCS policy to temporarily deprive prisoners of non-life-sustaining prescription medications upon their arrival at a correctional facility, pending the review of those medical prescriptions by a physician at the facility, and (2) a DOCS policy to give Facility Health Service Directors the "final say" regarding the review of those medical prescriptions.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

Because Plaintiff has failed to support his denial of these factual assertions with citations to record evidence that actually controverts the facts asserted, I will consider the facts asserted by Defendants as true. N.D.N.Y. L.R. 7.1(a)(3). Under the circumstances, I decline, and I recommend the Court decline, to perform an independent review of the record to find proof disputing this established fact for the several reasons described above in Part IV.A.1. of this Report-Recommendation.

Third, Plaintiff has failed to adduce evidence establishing that the policy in question is even unconstitutional. I note that, in his Supplemental Memorandum of Law, Plaintiff argues that "deliberate indifference to serious medical needs is ... shown by the fact that prisoners are denied access to a doctor and physical examination upon arrival at [Great Meadow] C.F. to determine the need for pain medications which aren't life sustaining ...." (Dkt. No. 88, at 10 [Plf.'s Supp. Memo. of Law].) As a threshold matter, Plaintiff's argument is misplaced to the extent he is arguing about the medical care other prisoners may not have received upon their arrival at Great Meadow C.F. since this is not a class-action. More importantly, to the extent he is arguing about any medical care that he (allegedly) did not receive upon his arrival at Great Meadow C.F., he cites no record evidence in support of such an assertion. (*Id.*) Indeed, he does not even cite any record evidence establishing that, upon his arrival at Great Meadow C.F. in early 2000, either (1) he asked a Defendant in this action for such medical care, or (2) he was suffering from a serious medical need for purposes of the Eighth Amendment. (*Id.*)

**\*9** If Plaintiff is complaining that Defendant Paolano is liable for recklessly causing a physician at Great Meadow C.F. to excessively delay a review Plaintiff's pain medication upon his arrival at Great Meadow C.F., then Plaintiff should have asserted that allegation (and some basic facts supporting it) in a pleading in this action so that Defendants could have taken adequate discovery on it, and so that the Court could squarely review the merits of it. (Dkt. No. 78, Part 11, at 53 [Plf.'s Depo.].)

For all of these reasons, I recommend that Plaintiff's claims against Defendant Paolano be dismissed with prejudice.

**B. Whether Plaintiff Has Adduced Evidence Establishing that Defendant Nesmith Was Deliberately Indifferent to Plaintiff's Serious Medical Needs**

Generally, to state a claim for inadequate medical care, a plaintiff must allege facts plausibly suggesting two things: (1) that he had a sufficiently serious medical need; and (2) that the defendants were deliberately indifferent to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

Defendants argue that, even assuming that Plaintiff's broken wrist constituted a sufficiently serious medical condition for purposes of the Eighth Amendment, Plaintiff has not adduced evidence establishing that, on August 17, 2000, Defendant Nesmith acted with deliberate indifference to that medical condition. (Dkt. No. 78, Part 13, at 4-9 [Defs.' Memo. of Law].) In support of this argument, Defendants point to the record evidence establishing that Defendant Nesmith sutured lacerations in Plaintiff's forehead, ordered an x-ray examination of Plaintiff's wrist, and placed that wrist in a splint (with an intention to replace that splint with a cast once the swelling in Plaintiff's wrist subsided) within 24 hours of the onset of Plaintiff's injuries. (*Id.* at 7-9 [providing accurate record citations].) Moreover, argue Defendants, Plaintiff's medical records indicate that he did not first complain of an injury to his wrist until hours after he experienced that injury. (*Id.* at 8 [providing accurate record citation].)

Plaintiff responds that "[he] informed P.A. Nesmith that his wrist felt broken and P.A. Nesmith ignored plaintiff, which isn't reasonable. P.A. Nesmith didn't even care to do a physical examination to begin with[,] which would've revealed [the broken wrist] and is fundamental medical care after physical trauma." (Dkt. No. 88, at 11 [Plf.'s Supp. Memo. of Law].) In support of this argument, Plaintiff cites *no* record evidence. (*Id.* at 11-12.)

The main problem with Plaintiff's argument is that the uncontroverted record evidence establishes that, as Defendants have argued, Defendant Nesmith (1) sutured lacerations in Plaintiff's forehead within hours if not minutes of Plaintiff's injury and (2) ordered an x-ray

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

examination of Plaintiff's wrist, and placed that wrist in a splint (with an intention to replace that splint with a cast once the swelling in Plaintiff's wrist subsided) within 24 hours of the onset of Plaintiff's injuries. These facts were asserted by Defendants in Paragraphs 27 through 32 of their Rule 7.1 Statement. (*See* Dkt. No. 78, Part 12, ¶¶ 27-32 [Defs.' Rule 7.1 Statement].) Defendants supported these factual assertions with record evidence. (*Id.* [providing accurate record citations].) Plaintiff expressly admits most of these factual assertions, and fails to support his denial of the remaining factual assertions with citations to record evidence that actually controverts the facts asserted. (Dkt. No. 85, Part 2, at 48-50 [Ex. N to Plf.'s Affid.].)

**\*10** The only denial he supports with a record citation is with regard to when, within the referenced 24-hour period, Defendant Nesmith ordered his wrist x-ray. This issue is not material, since I have assumed, for purposes of Defendants' motion, merely that Defendant Nesmith ordered Plaintiff's wrist x-ray within 24 hours of the onset of Plaintiff's injury.[FN28] (Indeed, whether the wrist x-ray was ordered in the late evening of August 17, 2000, or the early morning of August 18, 2000, would appear to be immaterial for the additional reason that it would appear unlikely that any x-rays could be conducted in the middle of the night in Great Meadow C.F.)

FN28. Furthermore, I note that the record evidence he references (in support of his argument that the x-ray was on the morning of August 18, 2000, not the evening of August 17, 2000) is "Defendants exhibit 20," which he says "contains [an] 11/20/00 Great Meadow Correctional Facility Investigation Sheet by P. Bundrick, RN, NA, and Interdepartmental Communication from defendant Ted Nesmith P.A. that state [that the] X ray was ordered on 8/18/00 in the morning." (*Id.*) I cannot find, in the record, any "exhibit 20" having been submitted by Defendants, who designated their exhibits by letter, not number. (*See generally* Dkt. No. 78.) However, at Exhibit G of Defendant Nesmith's affidavit, there is the "Investigation Sheet" to which Plaintiff refers. (Dkt. No. 78, Part 3, at 28 [Ex. G to Nesmith

Affid.].) The problem is that document does not say what Plaintiff says. Rather, it says, "Later that evening [on August 17, 2000] ... [a]n x-ray was ordered for the following morning ...." (*Id.*) In short, the document says that the x-ray was not ordered *on* the morning of August 18, 2007, but *for* that morning. Granted, the second document to which Plaintiff refers, the "Interdepartmental Communication" from Defendant Nesmith, does say that "I saw him the next morning and ordered an xray ...." (*Id.* at 29.) I believe that this is a misstatement, given the overwhelming record evidence to the contrary.

Moreover, in confirming the accuracy of Defendants' record citations contained in their Rule 7.1 Statement, I discovered several facts further supporting a finding that Defendant Nesmith's medical care to Plaintiff was both prompt and responsive. In particular, the record evidence cited by Defendants reveals the following specific facts:

(1) at approximately 10:17 a.m. on August 17, 2000, Plaintiff was first seen by someone in the medical unit at Great Meadow C.F. (Nurse Hillary Cooper);

(2) at approximately 10:40 a.m. on August 17, 2000, Defendant Nesmith examined Plaintiff; during that examination, the main focus of Defendant Nesmith's attention was Plaintiff's complaint of the lack of feeling in his lower extremities; Defendant Nesmith responded to this complaint by confirming that Plaintiff could still move his lower extremities, causing Plaintiff to receive an x-ray examination of his spine (which films did not indicate any pathology), and admitting Plaintiff to the prison infirmary for observation;

(3) at approximately 11:00 a.m. on August 17, 2000, Defendant Nesmith placed four sutures in each of two 1/4" lacerations on Plaintiff's left and right forehead;

(4) by 11:20 a.m. Plaintiff was given, or at least prescribed, Tylenol by a medical care provider;

(5) Plaintiff's medical records reflect no complaint by Plaintiff of any injury to his wrist at any point in time other than between 4:00 p.m. and midnight on August 17,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

2000;

(6) at some point after 9:00 p.m. on August 17, 2000, and 9:00 a.m. on the morning of August 18, 2000, Defendant Nesmith ordered that Plaintiff's wrist be examined by x-ray, in response to Plaintiff's complaint of an injured wrist; that x-ray examination occurred at Great Meadow C.F. at some point between 9:00 a.m. on August 17, 2000, and 11:00 a.m. on August 18, 2000, when Defendant Nesmith personally performed a "wet read" of the x-rays before sending them to Albany Medical Center for a formal reading by a radiologist;

(7) at approximately 11:00 a.m. on August 18, 2000, Defendant Nesmith placed a splint on Plaintiff's wrist and forearm with the intent of replacing it with a cast in a couple of days; the reason that Defendant Nesmith did not use a cast at that time was that Plaintiff's wrist and forearm were swollen, and Defendant Nesmith believed, based on 30 years experience treating hundreds of fractures, that it was generally not good medical practice to put a cast on a fresh fracture, because the cast will not fit tightly once the swelling subsides;

*11 (8) on August 22, 2000, Defendant Nesmith replaced the splint with a cast;

(9) on August 23, 2000, Plaintiff was discharged from the infirmary at Great Meadow C.F.; and

(10) on August 30, 2000, Defendant Nesmith removed the sutures from Plaintiff's forehead. (*See generally* Dkt. No. 78, Part 2, ¶¶ 3-15 [Aff. of Nesmith]; Dkt. No. 78, Part 3, Exs. A-E [Exs. to Affid. of Nesmith].)

"[D]eliberate indifference describes a state of mind more blameworthy than negligence," [FN29] one that is "equivalent to criminal recklessness." [FN30] There is no evidence of such criminal recklessness on the part of Defendant Nesmith, based on the uncontroverted facts before the Court, which show a rather prompt and responsive level of medical care given by Defendant Nesmith to Plaintiff, during the hours and days following the onset of his injuries.

FN29. *Farmer v. Brennan,* 511 U.S. 825, 835,

114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence."); *Estelle,* 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Murphy v. Grabo,* 94-CV-1684, 1998 WL 166840, at *4 (N.D.N.Y. Apr.9, 1998) (Pooler, J.) ("Deliberate indifference, whether evidenced by [prison] medical staff or by [prison] officials who allegedly disregard the instructions of [prison] medical staff, requires more than negligence.... Disagreement with prescribed treatment does not rise to the level of a constitutional claim.... Additionally, negligence by physicians, even amounting to malpractice, does not become a constitutional violation merely because the plaintiff is an inmate.... Thus, claims of malpractice or disagreement with treatment are not actionable under section 1983.") [citations omitted].").

FN30. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ("The required state of mind [for a deliberate indifference claim under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.") [internal quotation marks and citations omitted]; *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("The subjective element requires a state of mind that is the equivalent of criminal recklessness ....") [citation omitted]; *cf. Farmer,* 511 U.S. at 827 ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

interpreted in our cases, and we adopt it as the test for 'deliberate indifference' under the Eighth Amendment.").

In his argument that his treatment in question constituted deliberate indifference to a serious medical need, Plaintiff focuses on the approximate 24-hour period that appears to have elapsed between the onset of his injury and his receipt of an x-ray examination of his wrist. He argues that this 24-hour period of time constituted a delay that was unreasonable and reckless. In support of his argument, he cites two cases. *See Brown v. Hughes,* 894 F.2d 1533, 1538-39 (11th Cir.), *cert. denied,* 496 U.S. 928, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990); *Loe v. Armistead,* 582 F.2d 1291, 1296 (4th Cir.1978), *cert. denied,* 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980). However, the facts of both cases are clearly distinguishable from the facts of the case at hand.

In *Brown v. Hughes,* the Eleventh Circuit found a genuine issue of material fact was created as to whether a correctional officer knew of a prisoner's foot injury during the four hours in which no medical care was provided to the prisoner, so as to preclude summary judgment for that officer. *Brown,* 894 F.2d at 1538-39. However, the Eleventh Circuit expressly stated that the question of fact was created because the prisoner had "submitted affidavits stating that [the officer] was called to his cell because there had been a fight, that while [the officer] was present [the prisoner] began to limp and then hop on one leg, that his foot began to swell severely, that he told [the officer] his foot felt as though it were broken, and that [the officer] promised to send someone to look at it but never did." *Id.* Those are *not* the facts of this case.

In *Loe v. Armistead,* the Fourth Circuit found merely that, in light of the extraordinary leniency with which *pro se* complaints are construed, the court was unable to conclude that a prisoner had failed to state a claim upon which relief might be granted for purposes of a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) because the prisoner had alleged that the defendants-*despite being (at some point) "notified"* of the prisoner's injured arm-had inexplicably delayed for 22 hours in giving him medical treatment for the injury. *Loe,* 582 F.2d at 1296. More specifically, the court expressly construed the prisoner's

complaint as alleging that, following the onset of the plaintiff's injury at 10:00 a.m. on the day in question, the plaintiff was immediately taken to the prison's infirmary where a nurse, while examining the prisoner's arm, heard him complain to her about pain. *Id.* at 1292. Furthermore, the court construed the prisoner's complaint as alleging that, "[t]hroughout the day, until approximately 6:00 p.m., [the prisoner] repeatedly requested that he be taken to the hospital. He was repeatedly told that only the marshals could take him to a hospital and that they had been notified of his injury." *Id.* at 1292-93. Again, those are *not* the facts of this case.

**\*12** Specifically, there is no evidence in the record of which I am aware that at any time before 4:00 p.m. on August 17, 2000, Defendant Nesmith either (1) heard Plaintiff utter a complaint about a wrist injury sufficient to warrant an x-ray examination or (2) observed physical symptoms in Plaintiff's wrist (such as an obvious deformity) that would place him on notice of such an injury. As previously stated, I decline, and I urge the Court to decline, to tediously sift through the 262 pages of documents that Plaintiff has submitted in the hope of finding a shred of evidence sufficient to create a triable issue of fact as to whether Plaintiff made, and Defendant Nesmith heard, such a complaint before 4:00 p.m. on August 17, 2000.

I note that, in reviewing Plaintiff's legal arguments, I have read his testimony on this issue. That testimony is contained at Paragraphs 8 through 12, and Paragraph 18, of his Supplemental Affidavit. (*See* Dkt. No. 86, at ¶¶ 8-10, 18 [Plf.'s Supp. Affid., containing two sets of Paragraphs numbed "5" through "11"].) In those Paragraphs, Plaintiff swears, in pertinent part, that "[w]hile I was on the x-ray table I told defendant Ted Nesmith, P.A. and/or Bill Redmond RN ... that my wrist felt broken, and was ignored." (*Id.* at ¶ 9.) Plaintiff also swears that "I was [then] put into a room in the facility clinic[,] and I asked defendant Ted Nesmith, PA[,] shortly thereafter for [an] x-ray of [my] wrist[,] pain medication and [an] ice pack but wasn't given it [sic]." (*Id.* at ¶ 10.) Finally, Plaintiff swears as follows: "At one point on 8/17/00 defendant Nesmith told me that he didn't give a damn when I kept complaining that my wrist felt broken and how I'm going to sue him cause I'm not stupid

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

[enough] to not know he's supposed to do [a] physical examination [of me], [and not] to ignore my complaints about [my] wrist feeling broke and feeling extreem [sic] pain. He told me [to] stop complaining [and that] he's done with me for the day." (*Id.* at ¶ 18.)

This last factual assertion is important since a response of "message received" from the defendant appears to have been critical in the two cases cited by Plaintiff. It should be emphasized that, according to the undisputed facts, when Plaintiff made his asserted wrist complaint to Defendant Nesmith during the morning of August 17, 2000, Defendant Nesmith was either suturing up Plaintiff's forehead or focusing on Plaintiff's complaint of a lack of feeling in his lower extremities. (This complaint of lack of feeling, by the way, was found to be inconsistent with Defendant Nesmith's physical examination of Plaintiff.)

In any event, Defendant Nesmith can hardly be said to have, in fact, "ignored" Plaintiff since he placed him under *observation* in the prison's infirmary (and apparently was responsible for the prescription of Tylenol for Plaintiff).[FN31] Indeed, it was in the infirmary that Plaintiff was observed by a medical staff member to be complaining about his wrist, which resulted in an x-ray examination of Plaintiff's wrist.

> FN31. In support of my conclusion that this fact alone is a sufficient reason to dismiss Plaintiff's claims against Defendant Nesmith, I rely on a case cited by Plaintiff himself. *See Brown,* 894 F.2d at 1539 ("Although no nurses were present [in the hospital] at the jail that day, the procedure of sending [the plaintiff] to the hospital, once employed, was sufficient to ensure that [the plaintiff's broken] foot was treated promptly. Thus, [the plaintiff] has failed to raise an issue of deliberate indifference on the part of these defendants, and the order of summary judgment in their favor must be affirmed.").

**\*13** Even if it were true that Plaintiff made a wrist complaint directly to Defendant Nesmith (during Defendant Nesmith's examination and treatment of Plaintiff between 10:40 a.m. and 11:00 a.m. on August 17,

2000), and Defendant Nesmith heard that complaint, and that complaint were specific and credible enough to warrant an immediate x-ray examination, there would be, at most, only some *negligence* by Defendant Nesmith in not ordering an x-ray examination until 9:00 p.m. that night.

As the Supreme Court has observed, "[T]he question of whether an X-ray-or additional diagnostic techniques or forms of treatment-is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice....." *Estelle,* 429 U.S. at 107.[FN32] For this reason, this Court has actually held that a *17-day* delay between the onset of the prisoner's apparent wrist fracture and the provision of an x-ray examination and cast did not constitute deliberate indifference, as a matter of law. *Miles v. County of Broome,* 04-CV-1147, 2006 U.S. Dist. LEXIS 15482, at *27-28, 2006 WL 561247 (N.D.N.Y. Mar. 6, 2006)* (McAvoy, J.) (granting defendants' motion for summary judgment with regard to prisoner's deliberate indifference claim).

> FN32. *See also Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001) (prisoner's "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention [with regard to the treatment of his broken finger], are not adequate grounds for a section 1983 claim. These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment.") [citation omitted]; *cf. O'Bryan v. Federal Bureau of Prisons,* 07-CV-0076, 2007 U.S. Dist. LEXIS 65287, at *24-28 (E.D.Ky. Sept. 4, 2007) (holding no deliberate indifference where prisoner wore wrist brace/bandage on his broken wrist for two months even though he had asked for a cast; finding that "the type of wrap would only go the difference of opinion between a patient and doctor about what should be done, and the Supreme Court has stated that a difference of opinion regarding the plaintiff's

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

diagnosis and treatment does not state a constitutional claim.").

As I read Plaintiff's complaints about the medical care provided to him by Defendant Nesmith in this action, I am reminded of what the Second Circuit once observed:

It must be remembered that the State is not constitutionally obligated, much as it may be desired by inmates, to construct a perfect plan for [medical] care that exceeds what the average reasonable person would expect or avail herself of in life outside the prison walls. [A] correctional facility is not a health spa, but a prison in which convicted felons are incarcerated. Common experience indicates that the great majority of prisoners would not in freedom or on parole enjoy the excellence in [medical] care which plaintiff[ ] understandably seeks .... We are governed by the principle that the objective is not to impose upon a state prison a model system of [medical] care beyond average needs but to provide the minimum level of [medical] care required by the Constitution.... The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves ....

*Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) [internal quotations and citations omitted].

For all of these reasons, I recommend that Plaintiff's claims against Defendant Nesmith be dismissed with prejudice.

**C. Whether Defendant Nesmith Is Protected from Liability by the Doctrine of Qualified Immunity, As a Matter of Law**

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " [FN33] In determining whether a particular right was *clearly established,* courts in this Circuit consider three factors:

> FN33. *Williams,* 781 F.2d at 322 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ).

*14 (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful. [FN34]

> FN34. *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted).

Regarding the issue of whether *a reasonable person would have known* he was violating a clearly established right, this "objective reasonableness" [FN35] test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." [FN36] As the Supreme Court explained,

> FN35. *See Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") (quoting *Harlow,* 457 U.S. at 819); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

> FN36. *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *see also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) (citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law .... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

should be recognized.[FN37]

> FN37. *Malley,* 475 U.S. at 341.

Furthermore, courts in the Second Circuit recognize that "the use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law."[FN38]

> FN38. *Malsh,* 901 F.Supp. at 764 (citing *Cartier v. Lussier,* 955 F.2d 841, 844 [2d Cir.1992] [citing Supreme Court cases].)

Here, I agree with Defendants that, based on the current record, it was not clearly established that, between August 17, 2000, and August 22, 2000, Plaintiff possessed an Eighth Amendment right to receive an x-ray examination and casting of his wrist any sooner than he did. (Dkt. No. 78, Part 13, at 9-11 [Defs.' Memo. of Law].) I note that neither of the two decisions cited by Plaintiff (discussed earlier in this Report-Recommendation) were controlling in the Second Circuit. *See Brown v. Hughes,* 894 F.2d 1533, 1538-39 (11th Cir.), *cert. denied,* 496 U.S. 928, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990); *Loe v. Armistead,* 582 F.2d 1291, 1296 (4th Cir.1978), *cert. denied,* 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980). I also note that what was controlling was the Supreme Court's decision in *Estelle v. Gamble,* holding that "the question of whether an X-ray-or additional diagnostic techniques or forms of treatment-is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice....." *Estelle,* 429 U.S. at 107.

Furthermore, I agree with Defendants that, at the very least, officers of reasonable competence could have believed that Defendant Nesmith's actions in conducting the x-ray examination and casting when he did were legal.[FN39] In his memorandum of law, Plaintiff argues that Defendant Nesmith *intentionally* delayed giving Plaintiff an x-ray for 12 hours, and that the four-day delay of placing a hard cast on Plaintiff's wrist caused Plaintiff *permanent injury to his wrist.* (Dkt. No. 88, at 12-13 [Plf.'s Supp. Memo. of Law].) He cites no portion of the

record for either assertion. (*Id.*) Nor would the fact of permanent injury even be enough to propel Plaintiff's Eighth Amendment claim to a jury.[FN40] I emphasize that it is an undisputed fact, for purposes of Defendants' motion, that the reason that Defendant Nesmith placed a splint and not a cast on Plaintiff's wrist and arm on the morning of August 18, 2000, was that Plaintiff's wrist and forearm were swollen, and Defendant Nesmith's medical judgment (based on his experience) was that it was not good medical practice to put a cast on a fresh fracture, because the cast will not fit tightly once the swelling subsides.[FN41] Officers of reasonable competence could have believed that decision was legal.

> FN39. (*Id.*)

> FN40. This particular point of law was recognized in one of the cases Plaintiff himself cites. *Loe,* 582 F.2d at 1296, n. 3 ("[Plaintiff's] assertion that he suffered pain two and one-half weeks after the injury and that the fracture had not healed do not establish deliberate indifference or lack of due process. Similarly, his allegation that he has not achieved a satisfactory recovery suggests nothing more than possible medical malpractice. It does not assert a constitutional tort.").

> FN41. (Dkt. No. 78, Part 12, ¶¶ 31-33 [Defs.' Rule 7.1 Statement]; *see also* Dkt. No. 78, Part 2, ¶¶ 11-13 [Affid. of Nesmith]; Dkt. No. 78, Part 3, Ex. C [Exs. to Affid. of Nesmith] )

**\*15** As a result, I recommend that, in the alternative, the Court dismiss Plaintiff's claims against Defendant Nesmith based on the doctrine of qualified immunity.

**D. Whether Plaintiff Has Adduced Evidence Establishing that He Exhausted His Available Administrative Remedies with Respect to His Assault Claim**

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

or other correctional facility until such administrative remedies as are available are exhausted." [FN42] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [FN43] The Department of Correctional Services ("DOCS") has available a well-established three-step inmate grievance program.[FN44]

FN42. 42 U.S.C. § 1997e.

FN43. *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

FN44. 7 N.Y.C.R.R. § 701.7.

Generally, the DOCS Inmate Grievance Program ("IGP") involves the following procedure.[FN45] *First,* an inmate must file a complaint with the facility's IGP clerk within fourteen (14) calendar days of the alleged occurrence. A representative of the facility's inmate grievance resolution committee ("IGRC") has seven working days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within seven (7) working days of receipt of the grievance, and issues a written decision within two (2) working days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within four (4) working days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within ten (10) working days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within four (4) working days of receipt of the superintendent's written decision. CORC is to render a written decision within twenty (20) working days of receipt of the appeal. It is important to emphasize that *any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process.* [FN46]

FN45. 7 N.Y.C.R.R. § 701.7; *see also White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002).

FN46. 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g ., Croswell v. McCoy,* 01-CV-0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him."); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.).

Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. [FN47] However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA.[FN48] *First,* "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." [FN49] *Second,* if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." [FN50] *Third,* if the remedies were available and some of the defendants did not forfeit, and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." [FN51]

> FN47. *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

> FN48. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).

> FN49. *Hemphill,* 380 F.3d at 686 (citation omitted).

> FN50. *Id.* [citations omitted].

> FN51. *Id.* [citations and internal quotations omitted].

*16 Defendants argue that Plaintiff never exhausted his available administrative remedies with regard to his claim arising out of the assault that allegedly occurred on August 17, 2000. (Dkt. No. 78, Part 13, at 9-11 [Defs.' Memo. of Law].)

Plaintiff responds with four different legal arguments. First, he appears to argue that he handed a written grievance to an unidentified corrections officer but never got a response from the IGRC, and that filing an appeal under such a circumstance is merely optional, under the PLRA (Dkt. No. 86, at 23-25, 44 [Plf.'s Memo. of Law].) Second, he argues that Defendants "can't realistically show" that Plaintiff never sent any grievances or appeals to the Great Meadow C.F. Inmate Grievance Clerk since that facility did not (during the time in question) have a grievance "receipt system." (*Id.* at 25-29.) In support of this argument, he cites unspecified record evidence that, although he sent a letter to one "Sally Reams" at some point and received a letter back from her on May 5, 2003, she later claimed that she had never received a letter from Plaintiff. (*Id.* at 29.) Third, he argues that the determination he received from CORC (at some point) satisfied the PLRA's exhaustion requirement. (*Id.* at 30-38.) Fourth, he argues that Defendants rendered any

administrative remedies "unavailable" to Plaintiff, for purposes of the Second Circuit's above-described three-part exhaustion inquiry, by (1) failing to cause DOCS to provide proper "instructional provisions" in its directives, (2) failing to cause Great Meadow C.F. to have a grievance "receipt system," and (3) "trash [ing]" Plaintiff's grievances and appeals. (*Id.* at 39-45.) [FN52]

> FN52. I note that the breadth of Plaintiff's creative, thoughtful and well-developed legal arguments further demonstrates his extraordinary experience as a litigant.

For the reasons set forth below, I reject each of these arguments. However, I am unable to conclude, for another reason, that Plaintiff has failed to exhaust his administrative remedies as a matter of law, based on the current record.

**1. Plaintiff's Apparent Argument that an Appeal from His Lost or Ignored Grievance Was "Optional" Under the PLRA**

Plaintiff apparently argues that filing an appeal to CORC when one has not received a response to one's grievance is merely optional under the PLRA. (Dkt. No. 86, at 23-25, 44 [Plf.'s Memo. of Law].) If this is Plaintiff's argument, it misses the point.

It may be true that the decision of whether or not to file an appeal in an action is always "optional"-from a metaphysical standpoint. However, it is also true that, in order to satisfy the PLRA's exhaustion requirement, one *must* file an appeal when one has not received a response to one's grievance (unless one of the exceptions contained in the Second Circuit's three-party inquiry exists). *See, supra,* note 46 of this Report-Recommendation.

**2. Plaintiff's Argument that Defendants "Can't Realistically Show" that Plaintiff Never Sent any Grievances or Appeals to the Great Meadow C.F. Inmate Grievance Clerk**

Plaintiff also argues that Defendants "can't realistically show" that Plaintiff never sent any grievances or appeals to the Great Meadow C.F. Inmate Grievance Clerk since that facility did not (during the time in question) have a grievance "receipt system." (Dkt. No. 86,

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

at 25-29 [Plf.'s Memo. of Law].) This argument also fails.

**\*17** Plaintiff appears to misunderstand the parties' respective burdens on Defendants' motion for summary judgment. Even though a failure to exhaust is an affirmative defense that a defendant must plead and prove, once a defendant has met his initial burden of establishing the absence of any genuine issue of material fact regarding exhaustion (which initial burden has been appropriately characterized as "modest"),[FN53] the burden then shifts to the nonmoving party to come forward with specific facts showing that there is a genuine issue for trial regarding exhaustion. *See, supra,* Part III of this Report-Recommendation.

> FN53. *See Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at \*8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ]; *accord, Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at \*9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.), *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at \*17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.).

Here, it is an uncontroverted fact, for purposes of Defendants' motion, that (1) grievance records at Great Meadow C.F. indicate that Plaintiff never filed a timely grievance alleging that he had been assaulted by corrections officers at Great Meadow C.F. in 2000, and (2) records maintained by CORC indicate that Plaintiff never filed an appeal (to CORC) regarding any grievance alleging that he had been so assaulted. (*See* Dkt. No. 78, Part 12, ¶¶ 39-40 [Defs.' Rule 7.1 Statement, providing accurate record citations].) Plaintiff has failed to properly controvert these factual assertions with specific citations to record evidence that actually creates a genuine issue of fact. (*See* Dkt. No. 85, Part 2, at 50-51 [Ex. N to Plf.'s Affid.].) As a result, under the Local Rules of Practice for this Court, Plaintiff has effectively "admitted" Defendants' referenced factual assertions. N.D.N.Y. L.R. 7.1(a)(3).

With respect to Plaintiff's argument that the referenced factual assertions are basically meaningless because Great Meadow C.F. did not (during the time in question) have a grievance "receipt system," that argument also fails. In support of this argument, Plaintiff cites unspecified record evidence that, although he sent a letter to Sally Reams (the IGP Supervisor at Great Meadow C.F. in May 2003) at some point and received a letter back from her on May 5, 2003, she later claimed that she had never received a letter from Plaintiff. (*Id.* at 29.) (*See* Dkt. No. 86, at 29 [Plf.'s Memo. of Law].) After examining Plaintiff's original Affidavit and exhibits, I located and carefully read the documents in question. (Dkt. No. 85, Part 1, ¶ 23 [Plf.'s Affid.]; Dkt. No. 85, Part 2 [Exs. F and G to Plf.'s Affid.].)

These documents do not constitute sufficient evidence to create a triable question of fact on the issue of whether, in August and/or September of 2000, Great Meadow C.F. did not have a grievance "receipt system." At most, they indicate that (1) at some point, nearly three years after the events at issue, Plaintiff (while incarcerated at Attica C.F.) wrote to Ms. Reams complaining about the alleged assault on August 17, 2000, (2) she responded to Plaintiff, on May 5, 2003, that he must grieve the issue at Attica C .F., where he must request permission to file an untimely grievance, and (3) at some point between April 7, 2003, and June 23, 2003, Ms. Reams informed Mr. Eagen that she did not "remember" receiving "correspondence" from Plaintiff. (*Id.*) The fact that Ms. Reams, after the passing of several weeks and perhaps months, did not retain an independent memory (not record) of receiving a piece of "correspondence" (not grievance) from Plaintiff (who was not an inmate currently incarcerated at her facility) bears little if any relevance on the issue of whether Great Meadow C.F. had, in April and/or May of 2003, a mechanism by which it recorded its receipt of *grievances.* Moreover, whether or not Great Meadow C.F. had a grievance "receipt system" in April and/or of 2003 bears little if any relevance to whether it had a grievance "receipt system" in August and/or September of 2000.

**\*18** It should be emphasized that Defendants have adduced record evidence specifically establishing that, in August and September 2000, Great Meadow C.F. had a *functioning* grievance-recording process through which,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

when a prisoner (and specifically Plaintiff) filed a grievance, it was "assign[ed] a number, title and code" and "log[ged] ... into facility records." (Dkt. No. 78, Part 6, ¶¶ 7-9 [Bellamy Decl.]; Dkt. No. 78, Part 7, at 2 [Ex. A to Bellamy Decl.] Dkt. No. 78, Part 8, ¶ 4 [Brooks Decl.]; Dkt. No. 78, Part 9, at 6 [Ex. B to Brooks Decl.].)

Finally, even if Great Meadow C.F. did not (during the time in question) have a functioning grievance-recording process (thus, resulting in Plaintiff's alleged grievance never being responded to), Plaintiff still had the duty to appeal that non-response to the next level. *See, supra,* note 46 of this Report-Recommendation.

### 3. Plaintiff's Argument that the Determination He Received from CORC Satisfied the PLRA's Exhaustion Requirement

Plaintiff argues that the determination he received from CORC (at some point) satisfied the PLRA's exhaustion requirement. (Dkt. No. 86, at 30-38 [Plf.'s Memo. of Law].) This argument also fails.

Plaintiff does not clearly articulate the specific portion of the record where this determination is located. (*See id.* at 30 [Plf.'s Affid., referencing merely "plaintiff's affidavit and exhibits"].) Again, the Court has no duty to *sua sponte* scour the 209 pages that comprise Plaintiff's "affidavit and exhibits" for proof of a dispute of material fact, and I decline to do so (and recommend the Court decline to do so) for the reasons stated above in Part IV.A.1. of this Report-Recommendation. I have, however, in analyzing the various issues presented by Defendants' motion, reviewed what I believe to be the material portions of the documents to which Plaintiff refers. I report that Plaintiff appears to be referring to a determination by the Upstate C.F. Inmate Grievance Program, dated June 20, 2003, stating, "After reviewing [your June 11, 2003, Upstate C.F.] grievance with CORC, it has been determined that the grievance is unacceptable. It does not present appropriate mitigating circumstances for an untimely filing." (Dkt. No. 85, Part 2, at 37 [Ex. J to Plf.'s Affid.]; *see also* Dkt. No. 85, Part 1, ¶¶ 22-34 [Plf.'s Affid.].)

There are two problems for Plaintiff with this document. First, this document does *not* constitute a written determination by *CORC* on a written appeal by

Plaintiff to *CORC* from an Upstate C.F. written determination. (*See* Dkt. No. 85, Part 2, at 37 [Ex. J to Plf.'s Affid.].) This fact is confirmed by one of Plaintiff's own exhibits, wherein DOCS IGP Director Thomas Eagen advises Plaintiff, "Contrary to the IGP Supervisor's assertion in his memorandum dated June 20, 2003, the IGP Supervisor's denial of an extension of the time frames to file your grievance from Great Meadow in August 2000 has not been reviewed by the Central Office Review Committee (CORC). The IGP Supervisor did review the matter with Central Office staff who is [sic] not a member of CORC." (*See* Dkt. No. 85, Part 2, at 39 [Ex. K to Plf.'s Affid.].) At best, the document in question is an indication by Upstate C.F. that the success of an appeal by Plaintiff to CORC would be unlikely.

**\*19** Second, even if the document does somehow constitute a written determination by CORC on appeal by Plaintiff, the grievance to which the determination refers is a grievance filed by Plaintiff on June 11, 2003, at Upstate C.F., not a grievance filed by Plaintiff on August 30, 2000, at Great Meadow C.F. (Dkt. No. 85, Part 2, at 32-35 [Ex. I to Plf.'s Affid.].) Specifically, Plaintiff's June 11, 2003, grievance, filed at Upstate C.F., requested permission to file an admittedly *untimely* grievance regarding the injuries he sustained during the assault on August 17, 2000. (*Id.*)

A prisoner has not exhausted his administrative remedies with CORC when, years after failing to file a timely appeal with CORC, the prisoner requests *and is denied* permission to file an untimely (especially, a two-year-old) appeal with CORC due to an unpersuasive showing of "mitigating circumstances." *See Burns v. Zwillinger,* 02-CV-5802, 2005 U.S. Dist. LEXIS 1912, at *11 (S.D.N .Y. Feb. 8, 2005) ("Since [plaintiff] failed to present mitigating circumstances for his untimely appeal to the IGP Superintendent, the CORC, or this Court, [defendant's] motion to dismiss on the grounds that [plaintiff] failed to timely exhaust his administrative remedies is granted."); *Soto v. Belcher,* 339 F.Supp.2d 592, 595 (S.D.N.Y.2004) ("Without mitigating circumstances, courts consistently have found that CORC's dismissal of a grievance appeal as untimely constitutes failure to exhaust available administrative remedies.") [collecting cases]. If the rule were to the contrary, then, as

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

a practical matter, no prisoner could ever be said to have failed to exhaust his administrative remedies because, immediately before filing suit in federal court, he could perfunctorily write to CORC asking for permission to file an untimely appeal, and whatever the answer, he could claim to have completed the exhaustion requirement. The very reason for requiring that a prisoner obtain permission before filing an untimely appeal presumes that the permitted appeal would be required to complete the exhaustion requirement. Viewed from another standpoint, a decision by CORC to refuse the filing of an untimely appeal does not involve a review of the merits of the appeal.

**4. Plaintiff's Argument that Defendants Rendered any Administrative Remedies "Unavailable" to Plaintiff**

Plaintiff also argues that Defendants rendered any administrative remedies "unavailable" to Plaintiff, for purposes of the Second Circuit's above-described three-part exhaustion inquiry, by (1) failing to cause DOCS to provide proper "instructional provisions" in its directives, (2) failing to cause Great Meadow C.F. to have a grievance "receipt system," and (3) "trash [ing]" Plaintiff's grievances and appeals. (Dkt. No. 86, at 39-45 [Plf.'s Memo. of Law].) This argument also fails.

In support of this argument, Plaintiff "incorporates by reference all the previously asserted points, Plaintiff's Affidavit in Opposition with supporting exhibits, as well as[ ] the entire transcripts of Defendants['] deposition on [sic] Plaintiff ...." (*Id.* at 40, 45.) Again, the Court has no duty to *sua sponte* scour the 265 pages that comprise Plaintiff's Affidavit, Supplemental Affidavit, exhibits, and deposition transcript for proof of a dispute of material fact, and I decline to do so (and recommend the Court decline to do so) for the reasons stated above in Part IV.A.1. of this Report-Recommendation. I have, however, in analyzing the various issues presented by Defendants' motion, reviewed the documents to which Plaintiff refers, and I report that I have found no evidence sufficient to create a genuine issue of triable fact on the issue of whether Defendants, *through their own actions,* have inhibited Plaintiff exhaustion of remedies so as to estop one or more Defendants from raising Plaintiff's failure to exhaust as a defense.

**\*20** For example, Plaintiff has adduced no evidence

that he possesses any *personal knowledge* (only speculation) of any Defendant in this action having "trashed" his alleged grievance(s) and appeal(s),[FN54] nor has he even adduced evidence that it was *one of the named Defendants in this action* to whom he handed his alleged grievance(s) and appeal(s) for delivery to the Great Meadow C.F. Inmate Grievance Program Clerk on August 30, 2000, September 13, 2000, and September 27, 2000.[FN55] Similarly, the legal case cited by Plaintiff appears to have nothing to do with any Defendant to this action, nor does it even have to do with Great Meadow C.F.[FN56]

FN54. (*See* Dkt. No. 85, Part 1, ¶¶ 13-14, 16-17 [Plf.'s Affid., asserting, "Prison officials trashed my grievances and appeals since they claim not to have them despite [the] fact I sent them in a timely manner. It's [the] only reason they wouldn't have them.... Prison officials have a history of trashing grievances and appeals.... I've been subjected to having my grievances and appeals trashed prior to and since this matter and have spoken to alot [sic] of other prisoners whom [sic] said that they were also subjected to having their grievances and appeals trashed before and after this incident, in alot [sic] of facilities.... Suspecting foul play with respect to my grievances and appeals, I wrote, and spoke to[,] prison officials and staff that did nothing to rectify the matter, which isn't surprising considering [the] fact that it's an old problem ...."].)

FN55. (*See* Dkt. No. 85, Part 1, ¶ 6 [Plf.'s Affid., asserting only that "[o]n August 30th, 2000 plaintiff handed the correction officer collecting the mail in F Block SHU in the Great Meadow Correctional Facility an envelope addressed to the inmate grievance clerk ... which contained the grievances relative to this action at hand ...."]; Dkt. No. 85, Part 1, ¶ 9 [Plf.'s Affid., asserting only that "[o]n September 13, 2000, I appealed said grievances to [the] Superintendent by putting them in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail, in F-Block

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

SHU [at] Great Meadow CF ...."]; Dkt. No. 85, Part 1, ¶ 11 [Plf.'s Affid., asserting only that "[o]n September 27th, 2000, I appealed said grievance ... to C.O.R.C. by putting them [sic] in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail in F-Block SHU [at] Great Meadow CF ...."].)

FN56. (*See* Dkt. No. 85, Part 1, ¶ 15 [Plf.'s Affid., referencing case]; Dkt. No. 85, Part 2, at 16-17 [Ex. B to Plf.'s Affid., attaching a hand-written copy of case, which mentioned a prisoner's grievances that had been discarded in *1996* by an *unidentified* corrections officer at *Sing Sing Correctional Facility* ].)

**5. Record Evidence Creating Genuine Issue of Fact**

Although I decline to *sua sponte* scour the lengthy record for proof of a triable issue of fact regarding exhaustion, I have, while deciding the many issues presented by Defendants' motion, had occasion to review in detail many portions of the record. In so doing, I have discovered evidence that I believe is sufficient to create a triable issue of fact on exhaustion.

Specifically, the record contains Plaintiff's testimony that (1) on August 30, 2000, he gave a corrections officer a grievance regarding the alleged assault on August 17, 2000, but he never received a response to that grievance, (2) on September 13, 2000, he gave a corrections officer an appeal (to the Superintendent) from that non-response, but again did not receive a response, and (3) on September 27, 2000, he gave a corrections officer an appeal (to CORC) from that non-response, but again did not receive a response.FN57

FN57. (*See* Dkt. No. 85, Part 1, ¶ 6 [Plf.'s Affid., asserting only that "[o]n August 30th, 2000 plaintiff handed the correction officer collecting the mail in F Block SHU in the Great Meadow Correctional Facility an envelope addressed to the inmate grievance clerk in which contained [sic] the grievances relative to this action at hand ...."]; Dkt. No. 85, Part 1, ¶ 9 [Plf.'s Affid., asserting only that "[o]n September 13, 2000, I appealed said grievances to [the] Superintendent

by putting them in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail; in F-Block SHU [at] Great Meadow CF...."]; Dkt. No. 85, Part 1, ¶ 11 [Plf.'s Affid ., asserting only that "[o]n September 27h, 2000, I appealed said grievance ... to C.O.R.C. by putting them [sic] in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail in F-Block SHU [at] Great Meadow CF ...."].)

The remaining issue then, as it appears to me, is whether or not this affidavit testimony is so self-serving and unsubstantiated by other direct evidence that "no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." FN58 Granted, this testimony appears self-serving. However, based on the present record, I am unable to find that the testimony is so wholly unsubstantiated by other direct evidence as to be incredible. Rather, this testimony appears corroborated by two pieces of evidence. First, the record contains what Plaintiff asserts is the grievance that he handed to a corrections officer on August 30, 2000, regarding the alleged assault on August 17, 2000. (Dkt. No. 85, Part 2, at 65-75 [Ex. Q to Plf.'s Affid.].) Second, the record contains two pieces of correspondence between Plaintiff and legal professionals *during or immediately following the time period in question* containing language suggesting that Plaintiff had received no response to his grievance. (Dkt. No. 85, Part 2, at 19-21 [Exs. C-D to Plf.'s Affid .].)

FN58. *See, supra,* note 12 of this Report-Recommendation (collecting cases).

Stated simply, I find that sufficient record evidence exists to create a genuine issue of fact as to (1) whether Plaintiff's administrative remedies were, with respect to his assault grievance during the time in question, "available" to him, for purposes of the first part of the Second Circuit's three-part exhaustion inquiry, and/or (2) whether Plaintiff has shown "special circumstances" justifying his failure to comply with the administrative procedural requirements, for purposes of the third part of the Second Circuit's three-part exhaustion inquiry.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

**\*21** As a result, I recommend that the Court deny this portion of Defendants' motion for summary judgment.

**E. Whether Plaintiff Has Sufficiently Alleged, or Established, that Defendants Were Liable for the Policy to Review the Non-Life-Sustaining Medical Prescriptions of Prisoners Upon Arrival at Great Meadow C.F.**

As explained above in Part II.A. of this Report-Recommendation, Defendants argue that, during his deposition in this action, Plaintiff asserted, for the first time, a claim that the medical staff at Great Meadow C.F. violated his rights under the Eighth Amendment by failing to honor non-life-sustaining medical prescriptions written at a former facility. (Dkt. No. 78, Part 13, at 3 [Defs.' Mem. of Law].) As a threshold matter, Defendants argue, this claim should be dismissed since Plaintiff never included the claim in his Second Amended Complaint, nor did Plaintiff ever file a motion for leave to file a Third Amended Complaint. (*Id.*) In any event, Defendants argue, even if the Court were to reach the merits of this claim, the Court should dismiss the claim because Plaintiff has failed to allege facts plausibly suggesting, or adduce evidence establishing, that Defendants were personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided such allegations or evidence indicating the policy is even unconstitutional. (*Id.*)

Plaintiff responds that "[he] didn't have to get in particular [sic] about the policy [of] discontinuing all incoming prisoners['] non[-]life[-]sustaining medications without examination and indiscriminently [sic] upon arrival at [Great Meadow] C.F. in [his Second] Amended Complaint. Pleading[s] are just supposed to inform [a] party about [a] claim[,] and plaintiff informed defendant [of] the nature of [his] claims including [the claim of] inadequate medical care. And discovery revealed [the] detail[s] [of that claim] as [Plaintiff had] intended." (Dkt. No. 88, at 10 [Plf.'s Supp. Memo. of Law].) In addition, Plaintiff responds that Defendant Paolano must have been personally involved in the creation and/or implementation of the policy in question since he was the Great Meadow Health Services Director. (*Id.* at 10.)

I agree with Defendants that this claim is not properly

before this Court. Plaintiff's characterization of the notice-pleading standard, and of the contents of his Amended Complaint, are patently without support (both legally and factually). It has long been recognized that a "claim," under Fed.R.Civ.P. 8, denotes "the aggregate of operative facts which give rise to a right enforceable in the courts." [FN59] Clearly, Plaintiff's Second Amended Complaint alleges no facts whatsoever giving rise to an asserted right to be free from the application of the prescription-review policy at Great Meadow C.F. Indeed, his Second Amended Complaint-which asserts Eighth Amendment claims arising *solely* out of events that (allegedly) transpired on August 17, 2000-says nothing at all of the events that transpired immediately upon his arrival at Great Meadow C.F. in early August of 2000, nor does the Second Amended Complaint even casually mention the words "prescription," "medication" or "policy." (*See generally* Dkt. No. 10 [Second Am. Compl.].)

FN59. *Original Ballet Russe, Ltd. v. Ballet Theatre, Inc.,* 133 F.2d 187, 189 (2d Cir.1943); *United States v. Iroquois Apartments, Inc.,* 21 F.R.D. 151, 153 (E.D.N.Y.1957); *Birnbaum v. Birrell,* 9 F.R.D. 72, 74 (S.D.N.Y.1948).

**\*22** Furthermore, under the notice-pleading standard set forth by Fed.R.Civ.P. 8(a)(2), to which Plaintiff refers in his Supplemental Memorandum of Law, Defendants are entitled to *fair notice* of Plaintiff's claims.[FN60] The obvious purpose of this rule is to protect defendants from undefined charges and to facilitate a proper decision on the merits. [FN61] A complaint that fails to provide such fair notice "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN62] This fair notice does not occur where, as here, news of the claim first springs up in a deposition more than two years after the action was commenced, approximately seven months after the amended-pleading deadline expired, and approximately two weeks before discovery in the action was scheduled to close. (*Compare* Dkt. No. 1 [Plf.'s Compl., filed 8/14/03] *with* Dkt. No. 42, at 1-2 [Pretrial Scheduling Order setting amended-pleading deadline as 2/28/05] *and* Dkt. No. 78, Part 11, at 52-53 [Plf.'s Depo.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

Transcript, dated 9/30/05] *and* Dkt. No. 49 [Order setting discovery deadline as to 10/14/05].)

FN60. *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (the statement required by Fed.R.Civ.P. 8 [a][2] must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests").

FN61. *Ruffolo v. Oppenheimer & Co., Inc.,* 90-CV-4593, 1991 WL 17857, at *2 (S.D.N.Y. Feb.5, 1991); *Howard v. Koch,* 575 F.Supp. 1299, 1304 (E.D.N.Y.1982); *Walter Reade's Theatres, Inc. v. Loew's Inc.,* 20 F.R.D. 579, 582 (S.D.N.Y.1957).

FN62. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Tech., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

Under the circumstances, the mechanism by which to assert such a late-blossoming claim was a motion to reopen the amended-pleading filing deadline (the success of which depended on a showing of cause), coupled with a motion for leave file a Third Amended Complaint (the success of which depended, in part, on a showing of lack of prejudice to Defendants, as well as a lack of futility). Plaintiff never made such motions, nor showed such cause.

I acknowledge that, generally, the liberal notice-pleading standard set forth by Fed.R.Civ.P. 8 is applied with even greater force where the plaintiff is proceeding *pro se.* In other words, while all pleadings are to be construed liberally, *pro se* civil rights pleadings are

generally construed with an *extra* degree of liberality. As an initial matter, I have already concluded, based on my review of Plaintiff's extensive litigation experience, that he need not be afforded such an extra degree of leniency since the rationale for such an extension is a *pro se* litigant's inexperience with the court system and legal terminology, and here Plaintiff has an abundance of such experience. *See, supra,* notes 21-25 of this Report-Recommendation. Moreover, even if he were afforded such an extra degree of leniency, his phantom prescription-review claim could not be read into his Second Amended Pleading, for the reasons discussed above. (I note that, even when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended.") FN63

FN63. *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord, Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *6, n. 27 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb.9, 2007); *Lopez v. Wright,* 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan.31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

Nor could Plaintiff's late-blossoming prescription-review claim properly be read into his papers in opposition to Defendants' motion for summary

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

judgment. Granted, a *pro se* plaintiff's papers in opposition to a *motion to dismiss* may sometimes be read as effectively amending a pleading (e.g., if the allegations in those papers are consistent with those in the pleading). However, a *pro se* plaintiff's papers in opposition to a *motion for summary judgment* may not be so read, in large part due to prejudice that would inure to the defendants through having the pleading changed after discovery has occurred and they have gone through the expense of filing a motion for summary judgment.[FN64]

> FN64. *See Auguste v. Dept. of Corr.,* 424 F.Supp.2d 363, 368 (D.Conn.2006) ("Auguste [a *pro se* civil rights plaintiff] cannot amend his complaint in his memorandum in response to defendants' motion for summary judgment.") [citations omitted].

**\*23** Finally, in the event the Court decides to construe Plaintiff's Second Amended Complaint as somehow asserting this claim, I agree with Defendants that the Court should dismiss that claim, also for the reasons discussed above in Part IV.A.2. of this Report-Recommendation. Specifically, Plaintiff has failed to adduce evidence establishing that Defendant Paolano (or any named Defendant in this action) was personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided evidence establishing that the policy is even unconstitutional. *See, supra,* Part IV.A.2. of this Report-Recommendation.

**ACCORDINGLY,** it is

**ORDERED** that the Clerk's Office shall, in accordance with note 1 of this Order and Report-Recommendation, correct the docket sheet to remove the names of Defendants Englese, Edwards, Bump, Smith, Paolano, and Nesmith as "counter claimants" in this action; and it is further

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 78) be *GRANTED* **in part** (i.e., to the extent that it requests the dismissal with prejudice of Plaintiff's claims against Defendants Paolano and Nesmith) and *DENIED* **in part** (i.e., to the extent that it requests dismissal of Plaintiff's claims against the remaining Defendants on the grounds of Plaintiff's failure to exhaust available administrative remedies) for the reasons stated above.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2008.

Murray v. Palmer
Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 173169 (N.D.N.Y.)

(Cite as: 1998 WL 173169 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ralph E. BELCHER, Jr., Plaintiff,
v.
C.O. James SERRIANO, C.O. Jonathan Reickert, CPL.
D. Higget, County of Rensselaer, Defendants.
No. 95–CV–1340 (RSP/GJD).

April 9, 1998.
Ralph E. Belcher, Jr., Collins, New York, plaintiff pro se.

Dreyer Boyajian, LLP, Albany, New York, for defendants,
Brian W. Devane, of counsel.

**ORDER**

POOLER, J.

*1 Plaintiff, Ralph E. Belcher, Jr., a prisoner formerly incarcerated at Rensselaer Correctional Facility, alleges that defendants caused him to suffer mental anguish, headaches, and humiliation when they shook him down in his cell, placed him in restraints, and left him in his cell wearing nothing but underwear for three days. Compl., Dkt. No. 1, ¶ II. Defendants moved for summary judgment on May 2, 1997. Dkt. No. 25. Belcher did not oppose the motion and instead sought leave to withdraw his complaint without prejudice. Dkt. No. 31. Defendants opposed this request. Dkt. Nos. 33–34. By order filed March 19, 1998, I denied Belcher's motion and ordered that he file any affidavits, other evidence, or legal argument that he wished to submit in response to defendants' summary judgment motion within fourteen days of the date of the order. Dkt. No. 37. I cautioned Belcher that if he failed to file responsive submissions, I would grant defendants' motion. *Id.* at 3–4. Belcher filed no response to defendants' motion within the time allowed.

Today, Belcher filed a notice of motion and an affidavit in support of a cross-motion for summary judgment. Dkt. No. 38. In his motion, Belcher relies primarily on the allegations in his complaint, and his affidavit contains no factual support for his conclusory allegations. *Id.* None of Belcher's submissions can be construed as a response to defendants' motion sufficient to overcome summary judgment, and Belcher has failed to file a statement of disputed facts as required by my previous order. It is therefore

ORDERED that defendants' motion for summary judgment is GRANTED and the complaint dismissed in its entirety, and it is further

ORDERED that plaintiff's cross-motion for summary judgment is DISMISSED as moot, and it is further

ORDERED that the Clerk of the Court serve a copy of this order on the parties by regular mail.

IT IS SO ORDERED.

N.D.N.Y.,1998.

Belcher v. Serriano
Not Reported in F.Supp., 1998 WL 173169 (N.D.N.Y.)
END OF DOCUMENT



Not Reported in F.Supp.2d, 2005 WL 3371480 (E.D.N.Y.)

(Cite as: 2005 WL 3371480 (E.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

E.D. New York.
Charles ROBERT VIII, Plaintiff
v.
DEPARTMENT OF JUSTICE, Department of Health
and Human Services, and Social Security
Administration, Defendants.
No. 05-CV-2543NGGETB.

Dec. 12, 2005.
Charles Robert, VIII, Long Beach, NY, pro se.

Keisha-Ann Gray, United States Attorneys Office,
Brooklyn, NY, for Defendants.

*MEMORANDUM AND ORDER*

GARAUFIS, J.

**\*1** The Plaintiff Charles Robert brings this action pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. Robert alleges that the Department of Justice ("DOJ"), the Department of Health and Human Services ("HHS"), and the Social Security Administration ("SSA") failed to release documents responsive to a number of separate FOIA requests to these agencies. The Defendants move to strike his complaint for failure to comply with Fed.R.Civ.P. 8(a) and 12(f), and to sever the instant action and dismiss as against HHS and SSA pursuant to Fed.R.Civ.P. 21. Further, Robert seeks to consolidate this matter with three other FOIA actions by Robert before me, *Charles Robert IV v. Department of Justice,* No. CV-02-1101 (*"Robert IV"* ), *Charles Robert v. v. Department of Justice,* CV-03-4324 (*"Robert V"* ), and *Charles Robert VI a/k/a Snowflake 5391 v. Department of Justice,* CV-04-0269 (*"Robert VI"* ).

For the reasons set forth below, I grant Plaintiff's motion to consolidate this matter (*"Robert VIII"* ) with *Robert IV, Robert V,* and *Robert VI,* grant Defendants' motion for summary judgment as to *Robert IV,* partially

grant and partially deny Defendants' motion to sever *Robert VIII,* and grant Defendants' motions to strike the *Roberts VIII* complaint and to enjoin Plaintiff from further FOIA requests without prior leave of court.

I. BACKGROUND:

Robert is an attorney (now suspended) who in the past represented disabled individuals in appeals of denials to their applications for Supplemental Security Income ("SSI"). (*See, e.g., Robert IV* Compl. ¶ 10.) Robert has filed *pro se* the most recent generation of an array of FOIA actions in an effort to have the government produce documents showing (a) a continuing policy of administrative agencies and attorneys within those agencies, including DOJ, HHS, and SSA, to ignore established precedent in denying Supplemental Security Income ("SSI") applications and in withholding FOIA responsive documents; and (b) the efforts made by the government to silence Robert's criticisms of these alleged policies. (*See, e.g., Robert IV* Compl. ¶¶ 1, 5.) Defendants have identified a total of twenty-four (24) FOIA actions filed by Robert over the past twenty years, employing in these cases such pseudonyms as "Ruppert Counsel," "Stone Counsel," and "Snowflake 5391," and suffixes from "Charles Robert I" through "Charles Robert VIII," which he uses in the instant action. (*See* Decl. of Kathleen A. Mahoney, Oct. 27, 2005, at 1-24.)

Many of these twenty-four cases are closed, on appeal, or before other judges in the Eastern District of New York ("EDNY"). In the interest of brevity, I shall limit the factual background for the instant motions to the four Robert matters now before me, in the order that they were received by this court.

A. *Charles Robert IV v. Department of Justice,* No. CV-02-1101

**\*2** This FOIA action began on February 15, 2002 in the Long Island Division of the EDNY Courthouse, and was reassigned to the Brooklyn Courthouse on May 28, 2002. In this action, Robert sought the release of case file notes of Assistant U.S. Attorneys in the EDNY in three

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3371480 (E.D.N.Y.)

(Cite as: 2005 WL 3371480 (E.D.N.Y.))

cases involving SSI applicant denials, *"Ruppert,"* *"Stone,"* and *"Gordon,"* (*Robert IV* Defendant's ("Def's") 56.1 Statement ¶ 1; *Robert IV* Plaintiff's ("P's") 56.1 Statement ¶ 1), a "Shaheen law enforcement" document, and "the Charles Robert criminal investigative file." (*Robert IV* Def's 56.1 Statement ¶¶ 14, 16; *Robert IV* P's 56.1 Statement ¶¶ 14, 16.)

The *"Ruppert," "Stone,"* and *"Gordon"* requests were docketed, and responsive documents were partially released and partially denied pursuant to FOIA exemptions (b)(2), (b)(5), (b)(6), and (b)(7)(C). (*Robert IV* Def's 56.1 Statement ¶¶ 3-10; *Robert IV* P's 56.1 Statement ¶¶ 3-10.) Robert claims that additional *Ruppert* documents existed that were not searched. (*Robert IV* P's 56.1 Statement ¶ 6.) DOJ alleges that Robert only administratively appealed the *Ruppert* FOIA request, and did not challenge the *Stone* or *Gordon* denials. (*Robert IV* Def's 56.1 Statement ¶¶ 11-13.) Plaintiff contends that he administratively appealed all three partially denied FOIA requests. (*Robert IV* P's 56.1 Statement ¶ 13.)

Robert alleges that he requested the "Shaheen law enforcement" by filing a FOIA request with former Assistant U.S. Attorney ("AUSA") Miller on December 26, 2001. (*Robert IV* Def's 56.1 Statement ¶ 15; *Robert IV* P's 56.1 Statement ¶ 15.) Robert also alleges that he attempted three times to file a "Charles Robert criminal investigative file" FOIA request, but that the FOIA Officer in the EDNY U.S. Attorney's office refused to docket this request. (*Robert IV* Def's 56.1 Statement ¶ 16; *Robert IV* P's 56.1 Statement ¶ 16.) A search for the "Charles Robert criminal investigative file" was made in the EDNY records and databases, and no responsive records were found. (*Robert IV* Def's 56.1 Statement ¶¶ 17-18; *Robert IV* P's 56.1 Statement ¶¶ 17-18.) Robert asserts that documents responsive to his "Charles Robert criminal investigative file" FOIA request exist "in some DOJ unit that is not the 'Office' of the [EDNY]." (*Robert IV* P's 56.1 Statement ¶ 19.)

Defendant DOJ moved for summary judgment on October 3, 2005, and Robert filed opposing papers on November 1, 2005. By letter dated November 7, 2005 to the court, Robert requested the consolidation of this case with the other three related cases pending in this court. (Robert's Letter to the Court dated November 7, 2005

("Robert's Nov. 7 letter"), at 1.)

**B.** *Charles Robert v. v. Department of Justice,* CV-03-4324

On September 3, 2003, Robert began a new FOIA case against DOJ for three categories of documents: the "IMC Investigation Final Report," the "AAG John R. Bolton's May 6, 1988 letter to the USAC," and the "*Ford* Remedy Plans." (*Robert V* Compl. ¶¶ 79, 90-91 (misnumbered ¶¶ 88-91).)

**\*3** The "IMC Investigation Final Report" FOIA request asked for expedited consideration of his demand for documents related to an investigation of the International Medical Center for fraud upon the government in its use of Medicare funding. (*See Robert V* Compl. ¶¶ 11-79.) Robert made this request on July 22, 2003, DOJ denied it, and the denial was administratively appealed on or around August 21, 2003. (*Id.* at ¶¶ 80-82; *Robert V* Answer ¶¶ 80-83.)

The "AAG John R. Bolton's May 6, 1988 letter to the USAC," request sought all the pages of a letter sent by Assistant Attorney General John R. Bolton to the United States Administrative Counsel ("USAC") explaining the DOJ's policy in the EDNY of the process by which DOJ identifies pertinent decisional law in deciding whether to defend the policy decisions of the HHS in denying SSI applications. (*Robert V* Compl. ¶¶ 79-95.) Due to a misnumbering of Robert's Complaint (*see id.* at 23-28), Defendant has not admitted or denied that this FOIA request was made on August 6, 2003 with no responsive FOIA decision by the Defendant. (*Id.* at ¶¶ 97-98; *Robert V* Answer at 3.)

On May 18, 2003, the plaintiff filed a FOIA request for "*Ford* Remedy Plans." (*Robert V* Complaint at 29 (misnumbered ¶ 88).) The "*Ford* Remedy Plans" FOIA request sought release of quarterly reports prepared by DOJ discussing how the Social Security Administration ("SSA") would comply with the court's directives in *Ford v. Shalala,* 87 F.Supp.2d 163 (E.D.N.Y.1999). (*Robert V* Complaint at 25-28 (misnumbered ¶¶ 99-87).) Plaintiff alleges that this request was given no final decision within thirty days, which DOJ denies. (*Id.* at 27 (misnumbered ¶ 91); *Robert V* Answer ¶ 91, at 4.)

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3371480 (E.D.N.Y.)

(Cite as: 2005 WL 3371480 (E.D.N.Y.))

C. *Charles Robert VI a/k/a Snowflake 5391 v. Department of Justice,* CV-04-0269.

On January 23, 2004, Robert filed a FOIA action for the release of documents related to his FOIA requests for the "Director Tyson November, 1985 Zwany Final Report," and the *"Robert v. Holz"* and *"Robert II v. DOJ* Shaheen law enforcement documents." (*Robert VI* Complaint ¶ 1.).

The "Director Tyson November, 1985 Zwany Final Report" FOIA request sought the report upon which Executive Office for the United States Attorneys ("EOUSA") Director Tyson found unsubstantiated an allegation by Robert that AUSA Zwany engaged in a retaliatory investigation of Robert because of his accusations against DOJ. (*Robert VI* Am. Compl. ¶¶ 30-37.) On October 9, 2003, Robert filed a FOIA request for the report upon which Director Tyson's based her finding. (*Id.* at ¶ 38.) Robert's FOIA request was docketed and denied. (*Id.* at ¶ 40-41.) Robert appealed the denial. (*Id.* at ¶ 44.) On June 30, 2004, DOJ responded that no records had been found. (*Id.* ¶¶ 43-45.)

On October 30, 2003, Robert filed a FOIA request for DOJ case file documents for *Robert v. Holz.* (*Id.* ¶¶ 46-75.) According to Robert, the FOIA officer refused despite two attempts to docket this FOIA request. (*Id.* ¶¶ 75-78.) Defendant alleges that Robert sent the FOIA request to the United States Attorney's Office in the EDNY, which is the incorrect component of DOJ. (*Robert VI* Answer ¶¶ 75-76.) Over thirty days have passed since Robert attempted to make this FOIA request. (*Robert VI* Compl. ¶ 79.)

**\*4** On October 30, 2003, Plaintiff sought to file a FOIA request seeking a release of documents by DOJ Office of Professional Responsibility Attorney Michael Shaheen based on his January 9, 1989 letter to Robert ("Shaheen law enforcement document") which explained DOJ's EDNY acquiescence policy. (Id.¶¶85-87, 97.) DOJ would not docket this FOIA request. (*Id.* ¶¶ 98-99.) According to Defendant, this was because Robert again attempted to file the FOIA request at the United States Attorney's Office in the EDNY, which is the incorrect component of DOJ. (*Robert VI* Answer ¶ 99.) Over thirty

days have passed since Plaintiff attempted to file this FOIA request. (*Robert VI* Compl. ¶ 100.) DOJ alleges that its final denial of this FOIA request was on August 13, 2004. (*Robert VI* Answer ¶ 100.)

D. *Charles Robert VIII v. Department of Justice, Department of Health and Human Services, and Social Security Administration,* CV-05-2543

Robert commenced this FOIA action on May 25, 2005 with a 200 paragraph, fifty-two page complaint regarding a new series of rejected or disregarded FOIA requests made to DOJ, HHS, and SSA. In this action, Robert alleges that DOJ continues not to render a final decision with respect to his FOIA request for "Christensen nonacquiescence policy" documents that were the basis of Robert's *Robert VII v. Department of Justice,* 04-CV-1961, a FOIA action that I dismissed because I found that Robert had not exhausted his administrative remedies, and which is now on appeal. (*Robert VIII* Compl. ¶ 46, 48 (citing *Robert VII v. Department of Justice,* 04-CV-1961, slip op. at 8-9 (Mar. 1, 2005)).) Robert alleges that when he attempted to renew his FOIA request for the "Christensen nonacquiescence policy," the DOJ FOIA officer informed him that "as this matter is now before the Court, any action by this Office would be inappropriate. See 28 C.F.R. § 16.9(a)(3) (2003). I am, therefore, closing your appeal file in this Office." (*Id.* ¶ 44.)

Robert in this action also claimed that over thirty days have passed since he filed a number of DOJ FOIA requests that were never docketed: (1) the *"Barrett* nonacquiescence policy," for documents that relate to alleged DOJ policies of withholding documents responsive to FOIA requests (*Robert VIII* Compl. ¶¶ 51-72); (2) a "AUSA Noyer communications with SSA or HHS" FOIA request that DOJ never docketed for documents related to DOJ A.U.S.A. Noyer's communications with HHS and SSA regarding the reasons why HHS ended its criminal investigation of Robert in 1987 (*Id.* ¶¶ 73-78); (3) "DOJ *Squillicioti"* documents related to Robert's allegation that DOJ does not acquiesce to *Jackson v. Schweiker,* 683 F.2d 1076 (7th Cir.1982) (*Id.* ¶¶ 79-85); and (4) "DOJ Special Assistant AUSA documents" for DOJ's standards by which the Attorney General "uses 'Special Assistants' who are SSA attorneys under the supervision of [EOUSA]."

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3371480 (E.D.N.Y.)

(Cite as: 2005 WL 3371480 (E.D.N.Y.))

(*Id.* ¶ 92; *see generally id.* ¶¶ 86-97.)

**\*5** In addition, Robert alleged that he filed a number of related and unrelated rejected and/or disregarded FOIA requests to HHS and SSA. (*Id.* ¶¶ 98-200.) Specifically, Robert filed FOIA demands that HHS produce documents in the possession of HHS "FOIA Director Lee Jackson" that relate to "*Robert II v. HHS,*" (*id.* ¶¶ 98-140), and that concern its acquiescence with *Navarro v. Sullivan,* 751 F.Supp. 349 (E.D.N.Y.1990), (*id.* ¶¶ 141-165), and that SSA produce all documents related to information given to *Ford* class members regarding future SSI eligibility, (*id.* ¶¶ 166-180), SSA's communications with A.U.S.A. Noyer, (*id.* ¶¶ 181-194), and all documents related to the *"Squillicioti"* appeal. (*Id.* ¶¶ 195-199.)

Defendants have not answered the Complaint, but rather moved for the Complaint to be stricken for failure to comport with Fed.R.Civ.P. 8(a) and 12(f), to have the action severed and dismissed as to HHS and SSA for improper joinder pursuant to Fed.R.Civ.P. 21, and for the court to find Robert to be a vexatious litigator and thus to enjoin Robert from further FOIA filings without first obtaining leave from the court in accordance with 28 U.S.C. § 1651(a).

## II. APPLICABLE LAW

A. Standard for Striking Complaint Under Rule 8(a) and 12(f)

"A pleading ... shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends ... (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks." Fed.R.Civ.P. 8(a). In addition, "[e]ach averment of a pleading shall be simple, concise, and direct." Fed.R.Civ.P. 8(e).

"The key to Rule 8(a)'s requirements is whether adequate notice is given." *Wynder v. McMahon,* 360 F.3d 73, 79 (2d Cir.2004). " '[U]nnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage.' "

*Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1281, at 365 (1969).

Generally, "the courts should not tamper with the pleadings unless there is a strong reason for so doing." *Lipsky v. Commonwealth United Corp.,* 551 F.2d 887, 893 (2d Cir.1976) (citations omitted). However, if a complaint does not comport with Rule 8, the court may, upon motion or *sua sponte,* "order stricken from any pleading ... any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). If a complaint is "so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised," the court may dismiss the complaint. *Salahuddin,* 861 F.2d at 42 (citation omitted).

B. Joinder and Misjoinder Standard Under Rules 20 and 21

"All persons ... may be joined in one action as defendants if there is asserted against them ... any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action." Fed.R.Civ.P. 20(a). "The terms transaction and occurrence in Rule 20 permit all 'logically related claims' by or against different parties in a single proceeding." *Fong v. Rego Park Nursing Home,* No. 95 Civ. 4445, 1996 U.S. Dist. LEXIS 22289, at *6 (E.D.N.Y. Aug. 16, 1996) (J. Johnson) (citing *Mosley v. General Motors Corp.,* 497 F.2d 1330, 1332 (8th Cir.1974)). Misjoinder "is not ground for dismissal of an action.... Any claim against a party may be severed and proceeded with separately." Fed.R.Civ.P. 21.

C. Summary Judgment Standard Under Rule 56(e)

**\*6** A motion for summary judgment should be granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the burden of establishing the absence of a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3371480 (E.D.N.Y.)

(Cite as: 2005 WL 3371480 (E.D.N.Y.))

moving party has met this burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). When deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party and must draw all permissible inferences from the submitted affidavits, exhibits, interrogatory answers, and depositions in favor of that party. See Anderson, 477 U.S. at 255.

Once the summary judgment proponent has established the absence of a genuine issue of material fact, "[t]he nonmovant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir.1990) (internal quotations and citations omitted). Rather, the opponent can only create a genuine issue of material fact by citing competent, admissible evidence. Galasso v. Eisman, Zucker, Klein & Ruttenberg, 310 F.Supp.2d 569, 574 (S.D.N.Y.2004) (citing Sarno v. Douglas Elliman-Gibbons & Ives, 183 F.3d 155, 160 (2d Cir.1999)).

D. Judicial Review of Responses to FOIA Requests

FOIA entitles private citizens to access government records subject to nine exemptions that allow an agency to withhold requested information. See NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 136, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975); 5 U.S.C. § 552(b)(1)-(9). A district court may provide injunctive relief to order the production of agency documents improperly withheld after undertaking a de novo review of the agency decision to withhold or redact information. 5 U.S.C. § 552(a)(4)(B). The statutory exemptions contained in the FOIA are to be "narrowly construed with doubts resolved in favor of disclosure." Federal Labor Relations Auth. v. United States Dep't of Veterans Affairs, 958 F.2d 503, 508 (2d Cir.1992). Further, the agency bears the burden of supporting its decision to withhold or redact information requested under the FOIA. See 5 U.S.C. § 552(a)(4)(B); see also Massey v. FBI, 3 F.3d 620, 622 (2d Cir.1993).

Pursuant to 5 U.S.C. § 552(a)(4)(B), district courts are vested with exclusive jurisdiction over FOIA cases. The Supreme Court has held that subject matter

jurisdiction under § 552 is "dependent upon a showing that an agency has (1) 'improperly'; (2) 'withheld'; (3) 'agency records.' " Kissinger v. Reporters Comm. for Freedom of the Press, 445 U.S. 136, 150, 100 S.Ct. 960, 63 L.Ed.2d 267 (1980). "Unless each of these criteria are met, a district court lacks jurisdiction to devise remedies to force an agency to comply with the FOIA's disclosure requirements." United States Dep't of Justice v. Tax Analysts, 492 U.S. 136, 142, 109 S.Ct. 2841, 106 L.Ed.2d 112 (1989). Whether an agency has "improperly" withheld records usually turns on whether one or more exemptions apply to the documents at issue. Tax Analysts, 492 U.S. at 152.

**\*7** FOIA Exemption 5 asserted by Defendant DOJ in the instant action, exempts matters that are: "inter-agency or intra-agency memorand[a] of letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Exemption 5 "encompass [es] traditional common-law privileges against disclosure, including the work-product doctrine, and executive, deliberative process and attorney-client privileges." Nat'l Council of La Raza v. Department of Justice, 411 F.3d 350, 355 (2d Cir.2005).

FOIA specifically provides for an administrative appeal process following an agency's denial of a FOIA request. Under FOIA, an agency must:

(i) determine within 20 days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of any such request whether to comply with such request and shall immediately notify the person making such request of such determination and the reasons therefor, and of the right of such person to appeal to the head of the agency any adverse determination; and

(ii) make a determination with respect to any appeal within twenty days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of such appeal.

5 U.S.C. § 552(a)(6)(A)(i), (ii). The proponent of a FOIA request is "deemed to have exhausted his administrative remedies with respect to such request if the agency fails to comply with the applicable time provisions of this paragraph." 5 U.S.C. § 552(6)(C).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3371480 (E.D.N.Y.)

(Cite as: 2005 WL 3371480 (E.D.N.Y.))

The purpose of this appeal is to "provide agencies an opportunity to correct internal mistakes, and thus avoid unnecessary judicial review." *Hogan v. Huff,* No. 00-CV-6753, 2002 U.S. Dist. LEXIS 11092, at *12 (S.D.N.Y. June 21, 2002). If the denial of the request is upheld on appeal, the agency must "notify the person making such request of the provisions for judicial review of that determination." 5 U.S.C. § 552(a)(6)(A)(ii). Under FOIA, a court lacks subject matter jurisdiction over a requester's claim where the requester has failed to exhaust the administrative remedies provided under the FOIA statute. *See McMillan v. Togus Regional Office, Dep't of Veteran Affairs,* No. 03-CV-1074, 2003 U.S. Dist. LEXIS 24575, at *3 (E.D.N.Y. Nov. 18, 2003) (Weinstein, J.); *Hogan,* U.S. Dist. LEXIS 11092, at *14 ("If a plaintiff fails to exhaust all available administrative remedies under FOIA and the Privacy Act before commencing an action in a federal court, the court lacks jurisdiction.").

## III. DISCUSSION

### A. Motion to Consolidate

Before discussing the motions before this court in *Robert IV* and *Robert VIII,* I must first decide whether to consolidate the above matters. The Federal Rules of Civil Procedure Rule 42(a) provides that "[w]hen actions involving a common question of law or fact are pending before the court, ... [the court] may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay." Fed.R.Civ.P. 42(a). Upon finding that the actions involve common questions of law or fact, this court "has broad discretion in determining whether consolidation is appropriate," and must balance the efficiency gained through consolidation against possible prejudice to the parties. *Johnson v. Kerney,* No. 91-CV-1993, U.S. Dist. LEXIS 18503, at *16 (E.D.N.Y.1993) (J. Sifton) (citing *Hendrix v. Raybestos-Manhattan, Inc.* 776 F.2d 1492 (11th Cir.1985)).

**\*8** Robert moves to consolidate the instant matter with *Robert IV, Robert V,* and *Robert VI.* (Robert's Nov. 7 letter at 1-2.) These cases are all actions challenging

agency denials of similar FOIA requests by Robert principally against DOJ (and secondarily against HHS and SSA), and therefore implicate common questions of law and fact. As there are many claims asserted in these cases, and the defenses in these cases are similar, judicial economy would be substantially preserved by the consolidation of these matters. I conclude that Rule 42(a) permits me to consolidate these cases. I also do not find that Plaintiff or Defendants will suffer any prejudice through the consolidation of these cases. On the contrary, the parties will benefit from litigating these matters in one case. Furthermore, when I asked the parties if they objected to the consolidation of the Robert matters before this court, Defendants stated that they did not. (*Robert VIII* Tr. at 8.) Therefore, I grant Robert's motion to consolidate *Robert IV, Robert V, Robert VI,* and *Robert VIII,* and shall proceed to discuss the pending motions of these cases.

### B. *Robert IV* Summary Judgment Motion

#### 1. Stone *and* Gordon *FOIA Requests*

A FOIA requester can seek judicial review only after he has unsuccessfully appealed to the head of the agency as to any denial and thereby exhausted his administrative remedies. *Sloman v. United States Dep't of Justice,* 832 F.Supp. 63, 65-66 (S.D.N.Y.1993). Defendants' motion for summary judgment on the *Stone* and *Gordon* records must be granted because Defendants have shown an absence of a genuine issue of material fact, and Robert failed to show a genuine issue of fact through citation to competent, admissible evidence. The evidence submitted demonstrates that Robert did not appeal the *Stone* and *Gordon* FOIA denials.

The Local Rules of this court state that a motion for summary judgment must include a separate statement of facts that cites to "evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e)." EDNY Local Rule 56.1(d). Defendants refer to the Declaration of John F. Boseker, Attorney Advisor in EOUSA of DOJ, in which Boseker swears and refers to attached exhibits showing that on August 17, 2001, EOUSA advised Robert that his *Stone* and *Gordon* FOIA requests were denied, and that he had sixty days to appeal

Not Reported in F.Supp.2d, 2005 WL 3371480 (E.D.N.Y.)

(Cite as: 2005 WL 3371480 (E.D.N.Y.))

the denials. (*Robert IV* Boseker Decl. ¶¶ 14-15; Exs. F-G.) Boseker also swears that DOJ never received an appeal of its denial of Robert's *Stone* and *Gordon* FOIA requests. (Id.¶ 18.) Boseker's Declaration and the exhibits attached therein are competent evidence under [Fed.R.Civ.P. 56(e)]. I therefore find that Defendants have met their burden to show an absence of genuine issue of fact that Plaintiff did not exhaust his administrative remedies for the *Stone* and *Gordon* FOIA requests.

To rebut this finding, Robert alleges that "[t]he plaintiff timely appealed all three decisions, Ruppert, Stone, and Gordon and the defendant did not include the Stone and Gordon timely appeals in Exhibits filed with the Court." (*Robert IV* P's 56.1 Statement ¶ 12.) However, Robert in his 56.1 Statement cites to no rebuttal evidence. (*See id.*) In opposing a motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." [Fed.R.Civ.P. 56(e)]. Plaintiff's conclusory statement fails to rebut Defendants' competent evidence showing an absence of genuine issue of fact that Plaintiff has not administratively exhausted the *Stone* and *Gordon* FOIA requests. *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d at 121. Therefore, Robert's *Stone* and *Gordon* FOIA appeals are hereby dismissed. *McMillan,* 2003 U.S. Dist. LEXIS 24575, at \*3.

### 2. Ruppert *FOIA Request*

**\*9** I also find an absence of issue of fact concerning the *Ruppert* FOIA request. The Defendant DOJ has sufficiently shown that the six pages not disclosed by DOJ responsive to the *Ruppert* FOIA request were properly withheld under FOIA. The parties agree that in response to Plaintiff's FOIA request for the case file notes of the A.U.S.A. who handled the *Ruppert* litigation, DOJ withheld six responsive pages, claiming various FOIA exemptions. (*Robert IV* Def's 56.1 Statement ¶ 6-7; *Robert IV* P's 56.1 Statement ¶ 6-7; *Robert IV* Boseker Decl. ¶ 11, Ex. E.) DOJ prepared a *Vaughn* index [FN1] of the withheld six-page document, which describes the documents as an "intra-agency communication made in anticipation of litigation, particularly focused on recommending action

regarding appeal, consisting of legal analysis of issues presented and responses," and designates them as "attorney work product" subject to exemption from FOIA pursuant to [5 U.S.C. § 552(b)(5)] ("Exemption 5"). (*Id.* ¶ 19, Ex. L at 1.)

> [FN1]. *See Vaughn v. Rosen,* 484 F.2d 820, 823 (D.C.Cir.1973).

Exemption 5 "clearly applies to memoranda prepared by an attorney in contemplation of litigation which set forth the attorney's theory of the case and his litigation strategy." *National Labor Relations Board v. Sears, Roebuck & Co.,* 421 U.S. 132, 155, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975). DOJ's description of the withheld documents from its *Vaughn* index as attorney work-product evaluating DOJ's legal strategies in the *Ruppert* litigation sufficiently describes the documents' purpose and actual use to satisfy its burden that they are subject to Exemption 5. *See Grand Central Partnership, Inc. v. Cuomo,* 166 F.3d 473, 480-81 (2d Cir.1999). Accordingly, there is an absence of genuine issue of fact that the withheld memorandum prepared in contemplation of litigation is exempt from FOIA disclosure under Exemption 5.

Robert's argument that the recent Second Circuit decision in *Nat'l Council* compels the production of the *Ruppert* documents is unpersuasive. The Second Circuit in *Nat'l Council* rejected DOJ's argument that a memorandum publicly used to justify a change in DOJ policy could be withheld pursuant to Exemption 5 because it was protected by the "deliberative process privilege." *Nat'l Council of La Raza v. Department of Justice,* 411 F.3d 350, 357 (2d Cir.2005). In the instant *Ruppert* FOIA request, I find that the documents are subject to Exemption 5 because they are attorney work-product, not because they are part of DOJ's "deliberative process." As a result, *Nat'l Council* is inapposite.

### 3. *"Shaheen law enforcement" and "Charles Robert criminal investigative file" FOIA Requests*

I also grant summary judgment for DOJ on the "Shaheen law enforcement" and "Charles Robert criminal investigative file" FOIA requests. FOIA requires that the demand "compl[y] with the agency's published rules

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

stating the time, place, fees and procedures to be followed when making a request." *United States v. Agunbiade,* No. 90-CR-610, 1995 U.S. Dist. LEXIS 8043, at *18-19 (E.D.N.Y. May 10, 1995) (Bartels, J.) DOJ regulations provide that FOIA requests must be made to "the Department component that maintains those records." 28 C.F.R. Part 16.3(a). DOJ provides that FOIA requests of an Office of the U.S. Attorney should be submitted to the Executive Office for U.S. Attorneys. *See* DOJ Department Components, *available at* http://www.usdoj.gov/04foia/04_4.html. However, Robert provided the "Shaheen law enforcement" FOIA request to former AUSA Miller. (*Robert IV* Def's 56.1 Statement ¶ 15; *Robert IV* P's 56.1 Statement ¶ 15.) Robert does not allege that AUSA Miller is a FOIA Officer, or that he worked in the Executive Office for U.S. Attorneys. Because "requests directed to an improper party or agency ... do not satisfy the jurisdictional predicate," *Agunbiade,* at *12 (citations omitted), the court grants DOJ's summary judgment motion for the "Shaheen law enforcement" request.

**\*10** Similarly, Robert's "Charles Robert criminal investigative file" FOIA request lacks a jurisdictional predicate. Although Robert alleges that he attempted to file this request with the FOIA Officer in the EDNY, he does not allege that he submitted this request pursuant to 28 C.F.R. Part 16.3(a). (*Robert IV* Def's 56.1 Statement ¶ 16; *Robert IV* P's 56.1 Statement ¶ 16.) Moreover, assuming *arguendo* that Robert's FOIA request was improperly handled by the EDNY FOIA Officer, DOJ provided competent evidence that it conducted a search of the A.U.S.A. records and databases in the EDNY and found no documents responsive to his request. (Aug. 29, 2003 Decl. of Susan Riley ¶¶ 2-4.) Robert cannot challenge DOJ's response to this FOIA request because DOJ has satisfied its burden that no responsive documents were withheld, and Robert has not provided this court with evidence that presents a genuine issue of material fact that any documents responsive to his request exist.

Accordingly, I grant DOJ's motion for summary judgment in its entirety.

C. *Robert VIII* Defendants' Motion to Sever

I grant Defendants' motion to sever the Complaint as

to HHS, but deny it as to SSA. Specifically, Defendants move to sever and dismiss all claims against HHS and SSA, and to dismiss the complaint as to these defendants as improperly joined. The Defendants, in support of their motion, suggest that the action should be severed because they involve different FOIA requests. (Def's Mem. Supp. Mot. Strike P's Comp. Injunctive Relief ("Def's Mem. in Supp."), at 8-9.) Such a ruling would discourage joining claims that involve the same substantive FOIA request provided to different governmental agencies. However, "Rule 20(a) provides for joinder of parties if there is *any* question of law or fact common to all." *Fong,* No. 95-CV-4445, 1996 U.S. Dist. LEXIS 22289, at *9 (quoting *Blesedell v. Mobil Oil Co.,* 708 F.Supp. 1408, 1422 (S.D.N.Y.1989) (emphasis in original)). Thus, Rule 20(a) requires me to answer whether the individual FOIA requests to the different defendants are logically related.

There is no logical relationship between Robert's claims against HHS and the other claims in this action. There is no common transaction or occurrence linking the HHS denied and/or withheld FOIA requests and those denied and/or withheld by DOJ and SSA.[FN2] As a result, HHS is improperly joined to this action. *See* Fed.R.Civ.P. 20(a).

> [FN2]. Although Plaintiff argues against severance of the Defendants in *Robert VIII* on the ground that some FOIA demands to DOJ request documents sent to HHS, he does not allege that any of his FOIA demands to HHS are logically related to his FOIA demands to DOJ or SSA, which is the relevant Rule 20(a) inquiry. (Plaintiff's *Robert VIII* Mem. Opp. at 22-25.)

However, I find that there is a logical relationship between the "AUSA Noyer communications with SSA or HHS" requests and FOIA claims against DOJ and SSA. These requests involve the same claim by Robert, that DOJ and SSA possess FOIA responsive documents involving communications with AUSA Noyer. The requests also all involve the same question of law, specifically whether the FOIA requests were denied in violation of FOIA. As a result, I find that DOJ and SSA are properly joined to this action. In addition, Robert may join the other *Robert VIII* claims that he has against DOJ and SSA pursuant to Rule 18(a). Fed.R.Civ.P. 18(a); *see*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3371480 (E.D.N.Y.)

(Cite as: 2005 WL 3371480 (E.D.N.Y.))

*Wolde-Meskel v. Vocational Instruction Project Community Servs., Inc.,* 166 F.3d 59, 62 (2d Cir.1999). Hence, I grant Defendants' motion to sever this action as to HHS; I dismiss Robert's action against HHS with leave to refile as a separate action within thirty (30) days; and I deny Defendants' motion to sever this action as regards SSA.

D. *Robert VIII* Defendants' Motion to Strike

*11 I shall now proceed to consider the Defendants' motion to strike the complaint as "redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). The *Robert VIII* Complaint is 200 paragraphs and 52 pages long. The vast majority of the paragraphs in the *Robert VIII* Complaint consist of what Robert dubs "background facts," which upon examination are largely irrelevant. For example, paragraph 103 is a two page quotation from a letter by "HCFA Medicaid Director Richardson" regarding Medicaid liens. (*Robert VIII* Compl. ¶ 103.) In other paragraphs, Robert advises the court that he is forwarding the denial of four different FOIA requests to "Senator Cornyn and Senator Leahy as specific evidence to support their proposed legislation Openness Promotes Effectiveness in our Nation Act of 2005, S. 394, and the Faster FOIA Act of 2005, S.589." (*Robert VIII* Compl. ¶¶ 165, 180, 194, 200.)

Pages and entire sections of the complaint involve allegations of, *inter alia,* a "clandestine nonacquiescence policy" by Executive Branch attorneys to circumvent established precedent in defending denied SSI appeals and withholding FOIA responsive documents showing this policy, (*Robert VIII* Compl. ¶ 20), a retaliatory national security investigation of him as a possible terrorist for his FOIA claims against DOJ, (*id.* at ¶¶ 57, 62), and that former HHS General Counsel del Real "had been a CIA asset whom CIA Director Casey had ... embedded at HHS to implement a clandestine HHS nonacquiescence policy by rigging the HHS computers in order to divert unaudited HHS funds through [International Medical Centers] and onto the contras...." (*Id.* at ¶ 63.). Robert may justly feel that these allegations, which he attempts to prove through FOIA requests, support his conclusion that his FOIA requests are of great importance. However, these allegations are irrelevant to the validity of Robert's FOIA claims. *See Lipsky,* 551 F.2d at 893 (reasoning that a

motion to strike should be granted if shown that "no evidence in support of the allegation would be admissible"). Moreover, the prolix and argumentative nature of these allegations render the document as a whole "unintelligible [so] that its true substance, if any, is well disguised." *Salahuddin,* 861 F.2d at 42. I conclude that this Complaint is not a short and plain statement of Plaintiff's FOIA claims, or of the jurisdictional basis and sought remedies of those claims.

Moreover, those paragraphs in the Complaint that are arguably relevant are unreasonably difficult to understand and combine relevant allegations with surplusage. I do not believe that striking the irrelevant paragraphs would result in a complaint that comports with Rule 8(a) requirements. As a result, the only remedy to this Complaint's violation of Rule 8(a) is to have the entire document stricken. Finally, there is no prejudice to Plaintiff in striking this Complaint, because his complaint must be amended regardless to consolidate his remaining claims.

*12 The Defendants' motion to strike the Plaintiff's Complaint is granted. I find that hidden within Robert's complaints "contain[ ] the seeds of a viable complaint." *Woodard v. Hardenfelder,* 845 F.Supp. 960, 969 (E.D.N.Y.1994). Therefore, I grant Plaintiff leave to refile a short and concise complaint that pleads the surviving claims of these consolidated cases by or before January 9, 2006.

C. Injunction

This court has the power pursuant to 28 U.S.C. § 1651 to enjoin further filings in support of frivolous and vexatious claims. *In re Hartford Textile Corp.,* 681 F.2d 895, 897 (2d Cir.1982) (per curiam), *cert. denied* 459 U.S. 1206, 103 S.Ct. 1195, 75 L.Ed.2d 439 (1983). In *Safir v. United States Lines, Inc.,* the Second Circuit articulated five factors to consider in deciding whether to enjoin a party from future filings:

(1) the litigant's history of litigation and in particular whether it entailed vexatious, harassing, or duplicative lawsuits; (2) the litigant's motive in pursuing the litigation, e.g., does the litigant have an objective good faith expectation of prevailing?; (3) whether the litigant is represented by counsel; (4) whether the litigant has

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3371480 (E.D.N.Y.)

(Cite as: 2005 WL 3371480 (E.D.N.Y.))

caused needless expense to other parties or has posed an unnecessary burden on the courts and their personnel; and (5) whether other sanctions would be adequate to protect the courts and other parties.

*Safir v. United States Lines, Inc.,* 792 F.2d 19, 24 (2d Cir.1986). "Ultimately, the question the court must answer is whether a litigant who has a history of vexatious litigation is likely to continue to abuse the judicial system and harass other parties." *Id.*

*1. The Litigant's History of Litigation*

Charles Robert has filed twenty-four FOIA actions in this courthouse since 1985. (Oct. 27, 2005 Mahoney Decl., at 1.) Twenty of those have been dismissed. (*See id.* (citing *Robert v. Bell* et al., CV-89-3482 (JM); *Ruppert Counsel II v. Messick,* CV-91-2105 (LDW)(DFJ); *Snowflake 5391 v. The National Archives* et al., CV-98-3598 (LDW)(VVP) (affirmed in *Robert v. The National Archives,* 1 Fed. Appx. 85 (2d Cir.2001)); *Robert v. HHS,* CV-99-3648 (JM)(ETB); Robert v. SSA, CV-99-3650(JM), then (LDW)(ETB); *Robert v. Central Intelligence Agency,* CV-01-4198 (JS)(ARL); *Robert III v. DOJ,* CV-01-4198 (JM); *Robert III v. HHS,* CV-01-6114 (JM) then (JG)(EBT) (affirmed in *Robert v. HHS,* 78 Fed. Appx. 146 (2d Cir.2003) (dismissed on motion to dismiss); *Robert v. Holz,* CV-85-4205 (LDW); *Rupert Counsel v. Bell,* CV-90-0881; *Stone Counsel v. Bell et al.,* CV-91-1261; *Robert v. DOJ,* CV-99-3649 (JM)(EBT) (affirmed in *Robert v. DOJ,* 26 Fed. Appx. 87 (2d Cir.2002)); *Robert II v. HHS,* CV-01-4778 (ADS) then (DLI)(ETB) (dismissed on motion for summary judgment; *Robert v. Diefenderfer III,* CV-90-3403 (LDW); *Ratisher-Cricchio Counsel v. HHS,* CV-96-6275 (JG)(MDG) (dismissed pursuant to stipulation); *Ruppert Counsel III v. DOJ,* CV-95-1795 (LDW)(ETB) (dismissed as moot)).)

**13** Robert's recent submissions to the court are unduly burdensome to the court and the Defendants, and fail to place Defendants on notice of Robert's claims. Robert's complaints are unreasonably lengthy. (*See Robert IV* Compl. (428 paragraphs and 90 pages); *Robert V* Compl. (94 paragraphs and 29 pages); *Robert VI* Compl. (142 paragraphs and 31 pages); *Robert VIII* Compl. (200 paragraphs and 52 pages).) Robert's complaints contain

hundreds of paragraphs that in their best light read as an attempt to collaterally attack entire classes of SSI application denials, or a demand for a congressional hearing for alleged wrongdoing by government officials. These wide-ranging accusations and elaborate conspiracy theories are irrelevant, render his pleadings unintelligible, fail to place Defendants on notice of his claims, and place an unacceptable burden on this court. As a result, in three instances (apart from the instant motion to strike in *Robert VIII* ) Robert's complaints have been stricken for failure to comply with Rule 8. (*Id.* (citing *Snowflake 5391 v. The National Archives et al.,* CV-98-3598 (LDW)(VVP); *Robert IV; Robert VII a/k/a Snowflake 5391 v. DOJ,* CV-04-1961 (NGG)(ETB)).)

Further, Robert's FOIA litigation history is replete with examples of failure to prosecute. In five instances, Robert did not even oppose the defendants' motion to dismiss/for summary judgment. (*Id.* (citing *Robert v. Bell et al.,* CV-89-3482 (JM); *Robert v. Doe et al.,* CV-89-4039 (LDW); *Robert v. Diefenderfer III,* CV-90-3403 (LDW); *Ratisher-Cricchio Counsel v. HHS,* CV-96-6275 (JG)(MDG); *Robert III v. DOJ,* CV-01-4198 (JM)).) In two other cases, the action was frivolous. In *Robert v. Doe et al.,* CV-89-4039, Robert withdrew the action with prejudice after Defendants filed a motion to dismiss because the responsive record had been released to Robert before he filed the action. (*Id.* at 3.) In *Robert v. Central Intelligence Agency,* CV-00-4325(JS)(ARL), the court dismissed the action because Robert commenced the case based on an alleged FOIA request that Robert had never made. (*Id.* at 16.)

Robert's failure to prosecute is also evident in the *Robert IV* motion for summary judgment. The sole document Robert offered as evidence in opposition to the Defendant's motion for summary judgment is a 121 page, 379 paragraph affidavit that chronologically delivers a litany of theories and accusations that form the basis of Robert's belief that the defendants are claiming that "smoking gun" documents do not actually exist, and that Robert has been wrongly targeted as a national security threat. The verbiage in the affidavit does not appear to be newly drafted, but rather consists of paragraphs pasted together from the various FOIA complaints he has filed over the last four years. (*Robert IV* Aff. Opp. Mot.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3371480 (E.D.N.Y.)

(Cite as: 2005 WL 3371480 (E.D.N.Y.))

Dismiss.) As stated *supra,* in the process of making these assertions, repeated from one FOIA action to the next, this affidavit fails to aver to or attach any exhibits in support of the basic elements of a cognizable FOIA claim that a court might consider in DOJ's motion for summary judgment.

**\*14** In light of Robert's history of meritless cases, failure to prosecute, and burdensome and unintelligible submissions, I find that Robert's litigation history in the EDNY is vexatious. *Safir,* 792 F.2d at 24.

*2. The Litigant's Motive*

I conclude from examining the case history of Robert's FOIA actions in this courthouse, and Robert's submissions in *Robert IV, Robert V, Robert VI,* and *Robert VIII* that Robert's failure to prosecute is intentional. Over the past twenty years Robert's FOIA actions have been repeatedly dismissed and withdrawn. And yet, Robert persists in litigating meritless claims, in submitting complaints that do not comport with Rule 8, and in failing to oppose motions.

I also find intentional Robert's refusal to use his real name in his lawsuits despite this court's instructions. Rule 17 of the Federal Rules of Civil Procedure requires that "[e]very action shall be prosecuted in the name of the real party in interest." Fed.R.Civ.P. 17(a). However, over the past fifteen years Robert has utilized aliases such as "Ruppert Counsel" and "Snowflake 5391," and other times added suffixes to his own name despite a specific admonition for him to cease this practice. Judge Wexler in his June 8, 1999 Memorandum and Order specifically warned that "any future litigation involving the documents at issue shall be commenced in the name of Charles Robert only." *Snowflake 5391 a/k/a Charles Robert v. The National Archives et al.,* slip op., at 3.

Since that time, Robert has filed lawsuits utilizing the pseudonyms Charles Robert I-VIII. At the last hearing in this matter, I asked Robert if he understood that his use of suffixes could be construed to mean that he intended to mislead the court as to how many prior FOIA cases he had filed, and he answered in the negative. (*Robert VIII* Sept. 8, 2005 Tr. at 4-5.) I reject Robert's denial. It defies credibility that an experienced attorney previously

admonished to use his real name as the party in future *pro se* lawsuits would innocently attach fake suffixes to his name as the real party.

In conclusion, I find that Robert's commencement of FOIA actions that lack merit, his failure to prosecute, and his use of pseudonyms as the real party constitute willful violations of the federal rules and this court's orders.

*3. Whether the Litigant is Represented by Counsel*

Robert is not represented by counsel, and, as a suspended attorney unauthorized to practice law, is correctly viewed as *"pro se."* However, Robert is no stranger to this court; nor is he a layperson. Robert is an attorney who has practiced and appeared in this Circuit and this District on numerous occasions over the past twenty years. According to Robert's self-description, he has appeared in this court on behalf of clients seeking SSI twenty times over the past twenty-two years. (*Robert VI* Compl. ¶ 15.) He has filed more than that number of FOIA actions in this court during the same period. (*Id.* ¶ 16.) Robert cannot claim that he is ignorant or incapable of following the Federal Rules. Robert also has not alleged that he is otherwise unable to understand or follow this court's orders. Therefore, I hold Robert to a higher standard than I would a *pro se* layperson inexperienced with the Federal Rules or the rules of the court.

*4. Expense to Other Parties and Use of Judicial Resources*

**\*15** Defendants and this court have expended considerable resources in the litigation of the Robert FOIA matters. It is axiomatic that each commenced action requires considerable resources to litigate and adjudicate. I find that the twenty-four FOIA cases filed by Robert in this court have required a substantial use of judicial resources at considerable expense to Defendants.

*5. Whether Other Sanctions Would be Adequate*

I am troubled by Robert's disregard of the liberal pleading guidelines set forth by the Federal Rules, his failure to prosecute his FOIA actions after commencing them, and his willful disobedience of this court's clear and unambiguous instructions. His prolix, argumentative, and immaterial submissions have resulted in needless

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3371480 (E.D.N.Y.)

(Cite as: 2005 WL 3371480 (E.D.N.Y.))

expenditure of time and resources for defendants and the court. I find that Robert is perfectly able to understand the rules that he has repeatedly violated, and I am compelled to conclude that these violations were intentional. I also believe that Robert's vexatious litigation and violations of court instructions will continue unless this court intervenes to prevent its continuance.[FN3] *In re Hartford Textile Corp.,* 681 F.2d at 897.

> FN3. Over time, Robert's submissions have become more prolix, argumentative, and difficult to understand. (*Compare Robert v. Holz* et al., CV-85-4205 (LDW) Compl. (23 paragraphs) *with Robert IV* Compl. (428 paragraphs).) In addition, although Defendants have not raised the issue, Robert may be relitigating FOIA denials previously upheld by this court. *See Robert v. DOJ,* 26 Fed. Appx. 87 (2d Cir.2002) (affirming denial of "Charles Robert Criminal Investigation" and "AUSA Noyer" FOIA document requests). Examining Robert's submissions in advance of filing will therefore provide this court with the opportunity to ensure that Robert follows the Federal Rules in his submissions and that his claims are not barred by *res judicata.*

At the same time, while the vast majority of Robert's FOIA litigation is meritless, Robert's FOIA requests are not patently frivolous. A review of the FOIA requests that have been the subject of Robert's litigation shows that Defendants typically produce some of the requested documents sought by the requests before Robert commences an action in court. Therefore, an injunction of the type that would preclude Robert from ever presenting future FOIA cases in this court would be inappropriate. *See, e.g., Malley v. New York City Board of Education,* 112 F.3d 69, 69-70 (2d Cir.1997) (granting injunctive relief because plaintiff persisted in repeatedly filing *the same* claim that had been dismissed on statute of limitations and *res judicata* grounds).

Under the circumstances, I find that enjoining Robert from filing further actions without previous leave from me is an appropriate remedy. Examining Robert's future FOIA claims in advance of the commencement of the action shall provide this court with the opportunity to disallow

future complaints that do not comport with the Federal Rules or that lack merit or are duplicative, while permitting potentially meritorious actions.

## IV. CONCLUSION

Defendant's motion for summary judgment in *Robert IV* is GRANTED. Defendants' motion in *Robert VIII* for severance is GRANTED as to HHS, and DENIED as to SSA. Robert's action against HHS in *Robert VIII* is dismissed, with leave to refile within thirty (30) days. Defendants' motion in *Robert VIII* to strike the Complaint and to enjoin Robert from further FOIA actions in this court without prior leave of court is GRANTED.

All surviving claims not severed in the above matters are hereby consolidated into this action, the caption of which shall state *"Charles Robert v. Department of Justice and Social Security Administration."* I direct the parties and the Clerk of the Court to utilize this caption in all future submissions to the court regarding this matter. Robert is granted leave to file an amended complaint that joins his remaining nonsevered FOIA claims against DOJ and SSA by or before January 9, 2006. Failure to file an amended complaint shall result in dismissal of these consolidated matters with prejudice. Defendants are directed to serve an answer or pre-answer motion by or before February 9, 2006.

**\*16** Furthermore, Robert is cautioned that if this amended complaint is found not to comply with Fed.R.Civ.P. 8(a), or if it includes new claims or claims that have in the past been dismissed, that I shall dismiss the complaint with prejudice and consider the imposition of sanctions. Robert is directed not to include in the amended complaint any verbiage not directly related to the elements of a FOIA claim for the FOIA requests that I have permitted Robert to join in this matter.

Any future FOIA complaint(s) by Robert, including claims severed from this action, must be submitted to my attention as a Motion for Leave to File. [FN4] Any future Robert FOIA complaints to this court must abide by the same rules that I have imposed for the instant amended complaint, and must be filed using his true name, "Charles Robert." The Clerk of the Court is directed to reject without filing or docketing any new FOIA complaint filed

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3371480 (E.D.N.Y.)

(Cite as: 2005 WL 3371480 (E.D.N.Y.))

by Robert without my prior authorization.

> FN4. Robert in his opposition brief in *Robert VIII* sought leave to file a complaint for FOIA requests made on November 16, 2005. (Plaintiff's *Robert VIII* Mem. Opp. at 3.) I deny this request without prejudice, and instruct Robert to refile this proposed action as a Motion for Leave to File in compliance with my instructions in this M & O.

Should Robert violate any of these instructions regarding future FOIA actions, I shall dismiss the action, and consider the imposition of sanctions. *Simmons v. Abruzzo,* 49 F.3d 83, 87 (2d Cir.1995); *Link v. Wabash Railroad Co.,* 370 U.S. 626, 629-30, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962).

SO ORDERED.

E.D.N.Y.,2005.

Robert v. Department of Justice
Not Reported in F.Supp.2d, 2005 WL 3371480 (E.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1985 WL 298 (S.D.N.Y.)

(Cite as: 1985 WL 298 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Terrence E. MASON, Plaintiff,
v.
THOMAS A. COUGHLIN, et al., Defendants.
No. 84 CIV. 7861 SWK.

Feb. 20, 1985.
MEMORANDUM OPINION AND ORDER

SHIRLEY WOHL KRAM, United States District Judge.

**\*1** The plaintiff has moved, pursuant to Rule 65 of the Federal Rules of Civil Procedure, for a preliminary injunction. The Court reads plaintiff's moving papers as requesting an order directing the defendants to transfer him to a different facililty than the one he is currently incarcerated in. Plaintiff seeks this relief to avoid what he alleges to be a pattern of assault and harrassment against him by certain of the defendants who work at the facility where plaintiff is currently incarcerated.

In their reply papers, the defendants assert that they have acceded to the plaintiff's reqeuest, and have transferred him to another facility. In view of this it appears to the Court that plaintiff's motion for a preliminary injunction is now moot.

Even if the motion is not moot, the effect of defendants' assent to plaintiff's transfer reqeuest is to destroy any claim of irreparable harm which plaintiff may have had. Thus, because plaintiff can no longer demonstrate that he will suffer irreparable harm, him motion for a preliminary injunction is DENIED. *Jack Kahn Music Co. v. Baldwin Pinano & Organ Co., 604 F.2d 755, 758 (2d Cir.1979).*

Should the plaintiff be transferred back to the Clinton Correctional Facility at some future date, or should he encounter at the facility where he is currently incarcerated (Attica Correctional Facility) difficulties similar to those which he alleged to have occurred at clinton, he may once again move for appropriate relief from this Court. It is further,

ORDERED, that the clerk of this Court shall serve, by certified mail, a copy of this Memorandum Opinion and Order upon the plaintiff, Terrence E. Mason.

SO ORDERED.

S.D.N.Y.,1985.

Mason v. Coughlin
Not Reported in F.Supp., 1985 WL 298 (S.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.